**In the Matter of David DELLINGER et al., Appellants.**

**No. 18294.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 9, 1972.

Decided May 11, 1972.

Leave to File Petition for Rehearing
Denied July 6, 1972.

Leonard I. Weinglass, Morton Stavis, Newark, N. J., James Reif, Center for Constitutional Rights, New York City, William W. Brackett, Thomas M. Haney, Stuart S. Ball, Chicago, Ill., Anthony G. Amsterdam, Stanford, Cal., William M. Kunstler, Center for Constitutional Rights, New York City, James B. Moran, Chicago, Ill., Arthur Kinoy, Rutgers University School of Law, Newark, N. J., Doris Peterson, Center for Constitutional Rights, Helene E. Schwartz, New York City, Thomas P. Sullivan, Chicago, Ill., for appellant.

Charles R. Nesson, Cambridge, Mass., for Wm. M. Kunstler and Leonard I. Weinglass.

James R. Thompson, U. S. Atty., Gary Starkman, Asst. U. S. Atty., Chicago, Ill., for appellee.

Alan S. Ganz, Henry F. Field, Robert J. Vollen, Owen Fiss, Neil Komesar, Chicago, Ill., for amicus curiae.

Before FAIRCHILD, CUMMINGS, and PELL, Circuit Judges.

CUMMINGS, Circuit Judge.

After this Anti-riot Act case against seven of these defendants was submitted to the jury, acting under Rule 42(a) of the Federal Rules of Criminal Procedure, the trial judge summarily convicted them and their two trial attorneys of contempt of court in violation of 18 U.S. C. § 401(1). All nine now appeal from the findings of contempt and the sentences imposed upon them.

In the certificates of contempt, the court found that the 5-month trial was "marred by continual disruptive outbursts in direct defiance of judicial authority by defendants and defense counsel." It found that "throughout this case * * * the behavior of the de-

fendants was aimed at baiting the judge and inciting and harassing the U. S. Attorneys in an attempt to stop the trial." The entire record of the trial was made part of the contempt proceedings.

The contempt sentences ranged from 2 months and 18 days for defendant Weiner to 4 years and 13 days for Attorney Kunstler. Many of the arguments raised by the parties were also raised in the contempt case against Bobby Seale, who was a co-defendant in the Anti-riot case until a mistrial was declared as to him, resulting in his severance. In the interest of brevity, we will incorporate the rulings in our opinion in United States v. Seale, 461 F.2d 345, when dispositive of arguments herein.

*Electronic Surveillance as to Seale*

■ Appellants argue that their contempt judgments should be reversed because of the Government's allegedly illegal electronic surveillance as to Seale. As co-defendants and counsel, they have no standing to complain that their Fourth Amendment rights were violated where, as here, their conversations or conversations on their premises were not involved. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176.

We have seen in United States v. Seale, *supra*, that the only conversation possibly bearing on his contempt is contained in the first paragraph of the earliest of the three logs. There was nothing in any of the logs which could conceivably be deemed an intrusion into councils of the defendants other than Seale. There not only was no "direct intrusion * * * into attorney-client discussions" (Hoffa v. United States, 387 U.S. 231, 233, 87 S.Ct. 1583, 1584, 18 L.Ed.2d 738), but also there was no indirect intrusion, however remote, that could possibly give appellants standing to complain of these logs under the

Fifth or Sixth Amendments. Cf. Granello v. United States, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458; United States v. Fannon, 435 F.2d 364, 368 (7th Cir. 1970).

If United States v. United States District Court for Eastern District of Michigan, 444 F.2d 651 (6th Cir.), certiorari granted, 403 U.S. 930, 91 S.Ct. 2255, 29 L.Ed.2d 708 (1971), is reversed by the Supreme Court, then under the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. § 2511(3)), the surveillances were lawful and need not be disclosed for this additional reason.

We hold that the Seale logs require neither reversal nor dismissal of the contempt charges against appellants.

*Trial Before Another Judge*

■ As a result of the Supreme Court's opinion in Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532, the Government has conceded that the contempt convictions of all of these appellants, except the two trial counsel, should be reversed and remanded for consideration by another trial judge. The convictions of counselors Kunstler and Weinglass are asserted to stand on a different footing. We disagree.

The Government argues that the post-trial summary contempt punishment of the lawyers in this case was proper under Sacher v. United States, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717. That case involved a trial judge's summary contempt conviction, after trial, of several attorneys who had represented eleven Communist Party leaders convicted of Smith Act violations in the celebrated *Dennis* trial.[1] It is clear that the lawyers' contemptuous conduct in that case included an attack upon the trial judge personally. 343 U.S. at 4–5, 72 S.Ct. 451 and 343 U.S. at 33–35, 72 S.Ct. 451. (Frankfurter, J., dissenting).[2] Never-

---

1. See Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137.

2. Dissenting Justices Black and Frankfurter additionally characterized the trial judge's behavior in terms suggesting the embroilment found present in Offutt v.

United States, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11. 343 U.S. at 17, 34, 72 S. Ct. 451; see United States v. Meyer, 149 U.S.App.D.C. ——, 462 F.2d 827, 836, n. 16 (1972).

theless, the Supreme Court majority upheld the post-trial summary procedure, deciding that "summary" as used in Fed.R.Crim.Pro. 42(a) was not synonymous with "instantly" but rather referred to the informality of the procedure. 343 U.S. at 9, 72 S.Ct. 451. If the trial judge could have cited the lawyers instantly, he was entitled to do so at the end of the trial since "no possible prejudice to them can result from delaying it until the end of the trial if the circumstances permit such delay." 343 U.S. at 10, 72 S.Ct. at 455. Responding to the argument that post-trial summary procedure was inappropriate where the conduct in question included a personal attack on the judge, Mr. Justice Jackson, speaking for the Court, said Rule 42(a) contained "no such limitation" and found any distinction between personally offensive contempts and impersonal contumacies illusory. Predicating the applicability of Rule 42(a) upon such a distinction, he stated, "would nullify, in practice, the power it purports to grant." 343 U.S. at 12, 72 S.Ct. at 456.

Were *Sacher* the Supreme Court's latest pronouncement on the subject, we would affirm the trial judge's use of summary procedure in the instant case since, as the Government argues, the factual postures of the two cases are closely akin. However, as Judge McGowan has convincingly elaborated in United States v. Meyer, 149 U.S.App.D.C. ——, 462 F.2d 827 (1972), cases subsequent to *Sacher* have considerably undermined its vitality.[3]

In Offutt v. United States, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11, the Supreme Court forbade the use of summary contempt power post-trial by a trial judge who had become "personally embroiled" with the lawyer whom he cited. 348 U.S. at 17, 75 S.Ct. 11. The Court, speaking through Mr. Justice Frankfurter, held under its "supervisory authority over the administration of criminal justice in the federal courts" (348 U.S. at 13, 75 S.Ct. at 13) that a trial judge so embroiled could not proceed summarily after the completion of the trial but must recuse himself to allow another judge to adjudicate the contempt.[4] The Court said: "[T]he pith of this rather extraordinary [summary contempt] power to punish without the formalities required by the Bill of Rights for the prosecution of federal crimes generally, is that the necessities of the administration of justice require such summary dealing with obstructions to it." 348 U.S. at 14, 75 S.Ct. at 13. The thrust of the *Offutt* opinion is that where the trial judge waits until the conclusion of trial to cite for contempt, the necessity to preserve order in the courtroom cannot sanction

---

3. See Comment, Invoking Summary Criminal Contempt Procedures—Use or Abuse? United States v. Dellinger—The "Chicago Seven" Contempts, 69 Mich.L. Rev. 1549, 1568–1569 (1971). *Sacher* has also met with strong criticism in commentary. See, *e. g.*, *Id.* at 1565–1568; Goldfarb, The Contempt Power, 228–230 (1971) ; Note, Summary Punishment for Contempt: A Suggestion That Due Process Requires Notice and Hearing Before an Independent Tribunal, 39 S.Cal. L.Rev. 463 (1966) ; Comment, Federal Procedure: Effect of Delay in Summary Punishment for Criminal Contempt Under Rule 42(a), Federal Rules of Criminal Procedure: Sacher et al. v. United States, 343 U.S. 1, 72 S.Ct. 451, 96 L. Ed. 717 (1952), 37 Cornell L.Rev. 795 (1952).

4. In *Offutt* the Court relied heavily on the pre-*Sacher* case of Cooke v. United States, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767. *Cooke* was concerned with an indirect contempt by an attorney consisting of a prima facie contumacious letter requesting the judge to recuse himself in further cases involving the attorney's client. The Supreme Court unanimously held summary contempt procedure unwarranted in the case of this indirect contempt. (The decision antedated the advent of the Federal Rules of Criminal Procedure.) However, the Court went further and directed that another judge be assigned to hear the contempt adjudication on remand since the attorney's conduct consisted of a personal attack on the trial judge. Significantly the *Sacher* majority did not discuss *Cooke*, ostensibly because it was pre-Federal Rules of Criminal Procedure. See 343 U.S. at 8, n. 14, 72 S.Ct. 451.

summary procedure. On the other hand, the "fair administration of justice" (348 U.S. at 17, 75 S.Ct. 11) will not tolerate a judge who has become personally embroiled with trial attorneys to sit in judgment on their conduct, at least after the trial is over, merely because that course is more convenient, more economical and less time consuming than having another judge conduct a hearing. See United States v. Meyer, 149 U.S.App. D.C. ——, 462 F.2d 827 (1972).

In Ungar v. Sarafite, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921, a witness, who was also a lawyer, in a state criminal trial was held in contempt for his conduct on the witness stand. The trial judge presided over the post-trial contempt proceeding. The witness-contemnor argued this was improper because his remarks were a personal attack on the judge which "necessarily, and without more" disqualified the trial judge from conducting the contempt hearing. 376 U.S. at 583, 84 S.Ct. 841. The Supreme Court rejected the argument and upheld the summary procedure in that case, concluding from its own examination of the record that the witness' conduct "was disruptive, recalcitrant and disagreeable commentary, but hardly an insulting attack upon the integrity of the judge carrying such potential for bias as to require disqualification." 376 U.S. at 584, 84 S.Ct. at 847. Moreover, contrary to the situation in *Offutt*, the Court found that the trial judge had not become personally involved with the petitioner. 376 U.S. at 585, 84 S.Ct. 841.

In Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532, the Supreme Court required recusal as a matter of due process where the trial judge was the victim of an insulting personal attack by a *pro se* defendant and waited until the conclusion of the trial to cite for contempt. In that case the Court did not find the judge was an "activist seeking combat" as in *Offutt*, but on the other hand, could not say from its examination of the record that Mayberry's remarks were merely "disruptive, recalcitrant and disagreeable commentary" as were the remarks in *Ungar*. Rather the tenor of the bitter, vilifying remarks was such that an inevitable potential for bias was generated. 400 U.S. at 465–466, 91 S.Ct. 499. In the Court's words:

> "[A] judge, vilified as was this Pennsylvania judge, necessarily becomes embroiled in a running, bitter controversy. No one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication." 400 U.S. at 465, 91 S.Ct. at 505.

■ From a distillation of the foregoing authorities, two significant propositions emerge. First, a distinction can and must be made between contumacious conduct generally and contumacious conduct which is "apt to strike 'at the most vulnerable and human qualities of a judge's temperament.'" Mayberry v. Pennsylvania, *supra* at 466, 91 S.Ct. at 505. If, as Mr. Justice Jackson had intimated in *Sacher*, this distinction was illusory and unworkable, the Court would not have carefully appraised the record in *Ungar* to conclude "we cannot say there was bias, or such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." 376 U.S. at 588, 84 S.Ct. at 849. The Court in *Mayberry* would not have reached an opposite conclusion on examination of the record. And the Court would not in *Offutt* have stated that it is "important that district judges guard against [the] easy confusion" of "identify[ing] offense to self with obstruction to law." 348 U.S. at 14, 75 S.Ct. at 13.[5]

---

5. Some commentators have suggested that Mr. Justice Jackson was correct in concluding that it is realistically impossible to distinguish between personally insulting contempts and those which are not personal affronts, but in consequence argue for disqualification in every case of delayed citation. See The Supreme Court, 1970 Term, 85 Harv.L.Rev. 1, 298–301 (1971); Note, Summary Punishment for

Second, if the conduct of the defendant includes a personal attack on the trial judge carrying such potential for bias that he is not "likely to maintain that calm detachment necessary for fair adjudication" *Mayberry, supra,* 400 U.S. at 465, 91 S.Ct. at 505, the trial judge must disqualify himself if he waits to act until the conclusion of the trial. When the trial proceedings have terminated, the need to proceed summarily is not present. In this situation, the possible prejudice to the accused as well as the diminution of the quality of justice in the public eye [6] overrides any economy of effort that would be achieved by summary procedure. Insofar as the Court in *Sacher* saw no need to differentiate between a trial judge's ability to act instantly and his ability to cite for contempt after the trial is ended, even where personal attack is involved, it has since altered its focus. See Mayberry v. Pennsylvania, *supra*; Harris v. United States, 382 U.S. 162, 164–167, 86 S.Ct. 352, 15 L.Ed.2d 240; Offutt v. United States, *supra.*

The argument is made that *Sacher* has special vitality where the contemnor is a lawyer. Mayberry was not a lawyer. Certainly the fact that the defendant is an attorney can have no bearing on the need to distinguish between an obstruction to justice and a personal affront which makes bias probable. But the Court in *Sacher* adverted to the desirability of avoiding instant action against a contumacious attorney because that course "is not unlikely to prejudice his client." 343 U.S. at 10, 72 S.Ct. at 455. In *Mayberry* the Court recognized that "instant treatment of contempt where lawyers are involved may greatly prejudice their clients," but cautioned that "it may be the only wise course where others are involved," 400 U.S. at 463, 91 S.Ct. at 504, as others were in the case at bar.

In any event, the wisdom of deferring action against a lawyer has nothing to do with the requisites of due process when the trial judge "does not act the instant the contempt is committed, but waits until the end of the trial * * *." *Mayberry, supra* at 463–464, 91 S.Ct. at 504. That is, while the possible prejudice to the lawyer's clients may counterbalance the need to preserve order in the court through immediate action, this consideration simply has no bearing on whether the trial judge may himself proceed summarily or must call in another judge to take his place when he has already decided to wait. See United States v. Meyer, 149 U.S.App.D.C. ——, 462 F.2d 827, 840, n. 21 (1972).

Consequently, all that remains is for us to assess in the light of *Mayberry* the character of the lawyer's conduct as it appears from the record.

Our study of this record convinces us that under *Mayberry* the trial judge was disqualified from passing upon the contempt specifications against these lawyers because their attack upon him did carry "such potential for bias as to require disqualification." As in *Mayberry,* the insults leveled by Messrs. Kunstler and Weinglass against the trial judge were apt to strike "at the most vulnerable and human qualities of a

---

Contempt: A Suggestion That Due Process Requires Notice and Hearing Before an Independent Tribunal, 39 S.Cal.L.Rev. 463, 466 (1966). One state intermediate court has so held. People v. Kurz, 35 Mich.App. 643, 192 N.W.2d 594, 602–603 (1971). However, the Supreme Court has not overruled *Sacher* but rather has consistently refused to "imprison the discretion of judges within rigid mechanical rules." Offutt v. United States, 348 U.S. 11, 15, 75 S.Ct. 11, 14, 99 L.Ed. 11, or to make broad generalizations. Mayberry v. Pennsylvania, 400 U.S. 455, 463, 91

S.Ct. 499, 27 L.Ed.2d 532. It is clearly committed to reviewing the character of the defendant's conduct to determine the necessity for disqualification. Ungar v. Sarafite, 376 U.S. 575, 583–588, 84 S.Ct. 841, 11 L.Ed.2d 921. "It is, of course, not every attack on a judge that disqualifies him from sitting." *Mayberry supra,* 400 U.S. at 465, 91 S.Ct. at 505.

6. "Justice must satisfy the appearance of justice." *Offutt, supra,* 348 U.S. at 14, 75 S.Ct. at 13; *Mayberry, supra,* 400 U.S. at 465, 91 S.Ct. 499.

judge's temperament," thus requiring "a public trial before a judge other than the one reviled by the contemnor[s]." 400 U.S. at 466, 91 S.Ct. at 505; see also Cooke v. United States, 297 U.S. 517, 539, 45 S.Ct. 390, 69 L.Ed. 767; Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11.[7]

Here the trial judge was the recipient of numerous and unprecedented attacks and insults by both trial counsel. These attacks would have affected any judge personally. For example, no judge could remain impartial toward Mr. Kunstler after the judge's honesty and integrity were assailed as follows.

"Mr. Kunstler: I want to comment on this, your Honor, because I think what you have just said is about the most outrageous statement I have ever heard from a bench, and I am going to say my piece right now, and you can hold me in contempt right now if you wish to.

"You have violated every principle of fair play when you excluded Ramsey Clark from that witness stand. The New York Times, among others, has called it the ultimate outrage in American justice.

\* \* \* \* \* \*

"I have sat here for four and a half months and watched the objections denied and sustained by your Honor, and I know that this is not a fair trial. I know it in my heart. If I have to lose my license to practice law and if I have to go to jail, I can't think of a better cause to go to jail for and to lose my license for—

\* \* \* \* \* \*

"I am going to turn back to my seat with the realization that every thing I have learned throughout my life has come to naught, that there is no meaning in this court, and there is no law in this court—

\* \* \* \* \* \*

"—and these men are going to jail by virtue of a legal lynching—

\* \* \* \* \* \*

"—and that your Honor is wholly responsible for that, and if this is what your career is going to end on, if this is what your pride is going to be built on, I can only say to your Honor, 'Good luck to you.'"

The record abounds with other instances.

Although Mr. Weinglass engaged in lesser attacks upon the trial judge, the need for recusal is also present as to him. For example, Weinglass remarked that "The door in this courtroom seems to swing in one direction [against the defendants]." He also referred to the trial judge as "inhumane," called the judge's action "disgraceful," and possibly accused the judge of "dishonesty." (It is unclear whether he was referring to the judge or to the prosecutors.) Moreover, the trial judge characterized Weinglass' remarks as "insulting," "sarcastic," and on one occasion accused him of making an "invidious comparison between the treatment the court afforded the witnesses called by the defendant as opposed to the treatment afforded witnesses called by the Government." Additionally, it would be artificial to view the conduct of either defense counsel in isolation from that of the other since defense counsel mutually supported each other's activities or, for that matter, in isolation from the concededly disqualifying disrespect of the other defendants since the conduct of all the defendants here was inextricably interwoven. The trial judge himself felt that all the defendants worked in concert at "baiting the judge" and implicated the two lawyers in this nefarious purpose as is evidenced in the common preface of the contempt certificates.

Finally, there is really no necessity to attempt to calculate precisely the potential for bias generated by the conduct of

---

7. Therefore, it is unnecessary for us to decide whether the lawyers' conduct had its reflex in the judge so as to require disqualification under the "embroilment" standard.

these attorneys. The record reveals that their conduct tended to be productive of actual prejudice toward them on the part of the trial judge. In such a situation it matters not whether the judge's reaction was understandable or not; *Mayberry* must govern.

■ Accordingly, while regretting the necessity therefor, we conclude that all 9 contemnors must be tried before another judge.[8]

### Jury Trial

■ For the reasons given in our opinion in United States v. Seale, *supra,* each appellant whose sentences aggregated more than 6 months was entitled to a jury trial. Since defendant Lee Weiner received only a 2 months and 18 days sentence, he is not so entitled. Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522, and Cheff v. Schnackenberg, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629. No indictment was required of any individual, even those whose sentences aggregated more than one year. United States v. Bukowski, 435 F.2d 1094 (7th Cir. 1970), certiorari denied, 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809. On remand, the guidelines established in United States v. Seale, *supra,* will govern. As noted in that companion case, the inferential findings and descriptions contained in the preface and conclusion of the contempt certificate must be deleted in order to avoid the jury's according them undue weight. In addition, in this case the trial judge's observations prefatory to many of the individual specifications present the same potential for prejudice, and therefore they also should not be placed before the jury. However, the judge handling this case on remand shall have authority to precede each specification with an introduction necessary to set out the precise offense alleged in the following excerpt from the transcript and to place the conduct depicted therein in its proper context. If the judge to whom this case is referred for trial decides that the outside limit of a cumulative sentence for any appellant (except Mr. Weiner, who is not entitled to a jury trial by virtue of his short sentence) should be 6 months maximum, a jury trial will not be necessary for him.

### Legally Insufficient Specifications

■ A. *Attorneys.* As noted in the companion opinion, United States v. Seale, *supra,* in order for conduct to be punishable under 18 U.S.C. § 401(1), it must "clearly be shown" that the conduct "actually obstructed the district judge in 'the performance of judicial duty.'" In re McConnell, 370 U.S. 230, 234, 82 S.Ct. 1288, 1291, 8 L.Ed.2d 434; Ex parte Hudgings, 249 U.S. 378, 383, 39 S.Ct. 337, 63 L.Ed. 656. Our opinion in *Seale* requires, in addition to proof of the requisite wrongful intent, proof that the misbehavior was an "actual and material obstruction." See *Seale, supra,* 461 F.2d at 369. Where, as here, the conduct complained of is that of an attorney engaged in the representation of a litigant, the search for these essential elements of the crime of contempt must be made with full appreciation of the contentious role of trial counsel and his duty of zealous representation of his client's interests.

■ In dealing with an attorney's contempt, the Supreme Court noted in McConnell, *supra,* 370 U.S. at 236, 82 S.Ct. at 1292, "[W]hile we appreciate the necessity for a judge to have the power to protect himself from actual obstruction in the courtroom * * * it is also essential to a fair administration of justice that lawyers be able to make honest good-faith efforts to present their clients' cases. An independent judiciary and a vigorous, independent bar are both indispensable parts of our system of justice. To preserve the kind of trials that our system envisages, Congress has lim-

---

8. As in United States v. Seale, *supra,* the new judge would be chosen by the Executive Committee of the court below, pursuant to its local rules, but it would have to exclude judges who have officially expressed an opinion on this case.

ited the summary contempt power vested in courts to the least possible power adequate to prevent actual obstruction of justice * * *." The appellants interpret this to mean that where an attorney's conduct is involved, good faith is an absolute defense to citation for contempt. As noted in the *Seale* opinion, we do not believe *McConnell* supports such a position.

The *McConnell* opinion cannot be read as a grant of impunity for all conduct undertaken in good faith. On the contrary, the pith of *McConnell,* when reduced to its essential, is that without an actual obstruction, there can be no contempt. That view is made explicit at page 236, 82 S.Ct. at page 1292 where the Court states, "[T]he arguments of a lawyer in presenting his client's case strenuously and persistently cannot amount to a contempt of court so long as the lawyer does not in some way create an obstruction which blocks the judge in the performance of his judicial duty. The petitioner created no such obstacle here."

While *McConnell* cannot be read as an immunization for all conduct undertaken by an attorney in good faith representation of his client, it does require that attorneys be given great latitude in the area of vigorous advocacy. Appellate courts must ensure that trial judges (or the jury on remand) are not left free to manipulate the balance between vigorous advocacy and obstructions so as to chill effective advocacy when deciding lawyer contempts. Admittedly, the line defies strict delineation (Goldfarb, The Contempt Power, 172 (1971)), but by our resolving doubts in favor of advocacy, an independent and unintimidated bar can be maintained while actual obstruction is dealt with appropriately.

In delineating the limits of zealous advocacy, we must repeat the instruction of Mr. Justice Jackson in Sacher v. United States, 343 U.S. 1, 9, 72 S.Ct. 451, 455, 96 L.Ed. 717, where he noted:

"Of course, it is the right of counsel for every litigant to press his claim, even if it appears farfetched and untenable, to obtain the court's considered ruling. Full enjoyment of that right, with due allowance for the heat of controversy, will be protected by appellate courts when infringed by trial courts. But if the ruling is adverse, it is not counsel's right to resist it or to insult the judge—his right is only respectfully to preserve his point for appeal."

See also United States v. Schiffer, 351 F.2d 91, 94 (6th Cir. 1965) certiorari denied, 384 U.S. 1003, 86 S.Ct. 1914, 16 L.Ed.2d 1017; MacInnis v. United States, 191 F.2d 157, 160 (9th Cir. 1951), certiorari denied, 342 U.S. 953, 72 S.Ct. 628, 96 L.Ed. 708; Halliman v. United States, 182 F.2d 880, 887 (9th Cir. 1950), certiorari denied, 341 U.S. 952, 71 S.Ct. 1010, 95 L.Ed. 1375.

Many of the contempt specifications against the attorneys arise out of their persistence in continuing argument on motions and rulings after express orders by the trial judge to cease. With respect to these specifications, appellants contend that such persistence was warranted by the trial judge's refusal to hear reasonable argument from the defense prior to ruling. In support of this contention, reliance is placed upon Cooper v. Superior Court, 55 Cal.2d 291, 10 Cal.Rptr. 842, 359 P.2d 274 (1961). In that case the Supreme Court of California accepted the appellant's argument that "[t]he power to silence an attorney does not begin until reasonable opportunity for appropriate objection or other indicated advocacy has been afforded." 10 Cal.Rptr. at 846, 359 P.2d at 278. Although this principle is not without appeal in extreme situations such as *Cooper,* where the judge *sua sponte* recalled a deadlocked jury and gave them his comments on the weight of the evidence without informing counsel of his actions or allowing them an opportunity to register objections, it cannot be accepted as a general principle. If a trial judge prejudicially denies counsel an adequate opportunity to argue a point, appellate courts will reverse, and that alone will

deter most judges from arbitrarily cutting off argument. United States v. Offutt, 145 F.Supp. 111, 114 (D.D.C. 1956), modified, 101 U.S.App.D.C. 97, 247 F.2d 88, certiorari denied, 355 U.S. 856, 78 S.Ct. 85, 2 L.Ed.2d 64 (1957); see United States v. Sacher, 182 F.2d 416, 430 and 454 (concurring opinion of Frank, J.), affirmed, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717; Hallinan v. United States, 182 F.2d 880, 885 (9th Cir. 1950), certiorari denied, 341 U.S. 952, 71 S.Ct. 1010, 95 L.Ed. 1375; United States v. Bollenbach, 125 F.2d 458, 460 (2d Cir. 1942); Sprinkle v. Davis, 111 F.2d 925, 930 (4th Cir. 1940). And where the judge is arbitrary or affords counsel inadequate opportunity to argue his position, counsel must be given substantial leeway in pressing his contention, for it is through such colloquy that the judge may recognize his mistake and prevent error from infecting the record. It is, after all, the full intellectual exchange of ideas and positions that best facilitates the resolution of disputes. However, this is not to say that attorneys may press their positions beyond the court's insistent direction to desist. On the contrary, the necessity for orderly administration of justice compels the view that the judge must have the power to set limits on argument. We simply encourage judges to exercise tolerance in determining those limits and to distinguish carefully between hesitating, begrudging obedience and open defiance.

■ A reading of the specifications against the attorneys in this case reveals a pattern in the specifications for refusal to obey a court directive to cease argument. That pattern necessitates a brief comment. The record discloses that the trial judge, when ordering counsel to terminate their argument or sit down, frequently added a rejoinder or coupled the order with a statement which called for a response by the attorneys. In such situations, it is our view that an invited, additional response cannot subsequently be viewed as a contemptuous violation of the order.

■ ■ Appellants, relying on In re Abse, 251 A.2d 655 (D.C.Mun.Ct.App. 1969), also argue that an attorney may with impunity defy a court order to refrain from reply where the judge has charged him with professional misconduct. The court in *Abse* held that an attorney charged by the trial judge with unprofessional conduct may insist upon being heard in his own defense so long as his response is respectful. We agree that there is in this limited situation cogent reason for permitting such response since appellate review is not available to vindicate an attorney who is erroneously charged with unprofessional conduct. To require him to remain silent in the face of such a charge is, as the court said in *Abse*, to render him "helpless." Of course, it bears repeating that *Abse* affords only an opportunity to answer the charge respectfully. Even if the judge's accusation be unfounded or ill-tempered, it does not protect counter-misbehavior, for as the court noted in United States v. Offutt, 145 F.Supp. 111, 114 (D.D.C.1956), "[T]wo wrongs do not make a right, and misconduct cannot obliterate other misconduct."

■ Yet another frequent charge against the attorneys is that they failed to aid the court in maintaining order. While this charge was often coupled with the additional assertion that they actively encouraged their clients in their disruptions, for purposes of remand it is necessary to distinguish between the two situations. An attorney has no affirmative obligation to restrain his client under pain of the contempt sanction, although we do not express an opinion as to the breach of professional ethics that may be involved in this situation. Indeed, compelling an attorney to control the conduct of his client under threat of the contempt sanction might well destroy the confidence in the attorney-client relationship which is necessary to a proper and adequate defense. However, where an attorney encourages disruptive behavior by a client or fans the flames

of existing frictions, he cannot find immunity from punishment for such conduct. As the Court said in United States v. Landes, 97 F.2d 378, 381 (2d Cir. 1938),

> "Counsel should not obtrude upon the court the passion, the prejudice, or the unreason of his client. These must be left outside the courtroom door. The controversy that crosses the threshold should be a controversy sifted by the intelligence and shaped by the conscience of the lawyer, not the turmoil of personal dispute."

■ Finally, as was noted in Seale, mere disrepect or insult cannot be punished where it does not involve an actual and material obstruction. This is particularly true with respect to attorneys where the "heat of courtroom debate" may prompt statements which are ill-considered and might later be regretted. In re Hallinan, 71 Cal.2d 1179, 81 Cal.Rptr. 1, 459 P.2d 255 (1969). Substantial freedom of expression should be tolerated in this area since "[J]udges are supposed to be men of fortitude, able to thrive in a hardy climate." Craig v. Harney, 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546. However, as also noted in Seale, although it is elusive, there is a line beyond which disrespect becomes obstruction. When the remarks create an imminent prejudice to a fair and dispassionate proceeding, that line has been crossed.

The presence or absence of contempt may turn upon no more than how the remark was made.[9] For example, where the insult or disrespectful remark is shouted, the insult itself may not amount to an obstruction of the judicial process, but by the manner in which it was made it may. This was made clear in In re Little, 404 U.S. 553, 92 S.Ct. 659, 31 L.Ed.2d 708 (1972), where the Supreme Court reversed a contempt conviction for disrespectful conduct but in doing so noted, "[T]here is no indication, and the State does not argue, that petitioner's statements were uttered in a boisterous tone or in any wise actually disrupted the court proceeding." Moreover, if an entirely unnecessary and not insignificant delay is occasioned by insulting remarks which serve, for instance, only to vent the speaker's spleen, a material obstruction would exist.

■ With respect to the question of intent, we said in Seale that the minimum standard is one of a voluntary action known by the actor to be wrongful or one that he reasonably should have been aware was wrongful. Attorneys have a right to be persistent, vociferous, contentious, and imposing, even to the point of appearing obnoxious, when acting in their client's behalf. An attorney may with impunity take full advantage of the range of conduct that our adversary system allows. Given this extreme liberality necessary to a vital bar and thus the effective discovery of truth through the adversary process, an attorney possesses the requisite intent only if he knows or reasonably should be aware in view of all the circumstances, especially the heat of controversy, that he is exceeding the outermost limits of his proper role and hindering rather than facilitating the search for truth.

■ Thus, as we did with the contempt specifications in Seale, we have carefully examined those against the attorney appellants and have determined that some do not, as a matter of law, charge conduct which rises to the level of an "obstruct[ion] [of] the administration of justice." 18 U.S.C.A. § 401 (1). Again, it bears repeating that those specifications which are remanded for trial are not thereby found to be obstructions, nor do they necessarily show misbehavior or the requisite intent. The jury will determine the issues of misbehavior, obstruction, and intent for all specifications not found insufficient as a matter of law. Those specifications deemed legally insufficient are (by appellant and number): Weinglass, Nos. 1, 2, 3, 5, 6, 7, and 8; Kunstler, Nos. 1, 2, 5, 11, 12, 13, 14, 15, 16, the first part of

---

9. See Dobbs, Contempt of Court: A Survey, 56 Cornell L.Rev. 183, 264 (1971).

17, 18 and 19. However, the jury may consider the conduct described therein in connection with the factual questions to be resolved with respect to the valid specifications. See United States v. Seale, *supra.*

■ As we made clear in United States v. Seale, impropriety on the part of the trial judge cannot justify or excuse contemptuous conduct. However, judicial (or prosecutorial) provocation is to be considered by the new hearing judge in extenuation of the offense and in mitigation of any penalty to be imposed.

■ B. *Non-lawyers.* With respect to the non-lawyer defendants who were cited for contumacious conduct, it is manifest that the standards regarding the essential elements of the offense set forth in United States v. Seale, shall apply to the trial upon remand. It is equally clear that litigants not even making a pretense of self-representation are not to be afforded the same latitude of speech and action as an attorney. Judge Breitel stated in Katz v. Murtagh, 28 N.Y.2d 234, 240, 321 N.Y.S.2d 104, 109, 269 N.E. 2d 816, 820 (1971), "[T]he court is not a public hall for the expression of views, nor is it a political arena or a street. It is a place for trial of defined issues in accordance with law and rules of evidence, with standards of demeanor for court, jurors, parties, witnesses and counsel." This Court pointed out in United States ex rel. Robson v. Malone, 412 F.2d 848, 850 (7th Cir. 1969), that in courtrooms "there must be silence, except as the orderly conduct of business calls for speech." Thus where there is legally adequate representation and no pressing need for the litigant to interject himself into the proceedings, this Court is hesitant to find as a matter of law that any such interjection did not rise to the level of an obstruction. We believe that ques-

tion is better left for the jury in this situation.

■ Brief mention, however, must be made concerning those specifications which deal with the appellants' refusals to stand when court was convened and recessed. It is our opinion that such symbolic acts, when not coupled with further disturbance or disruption, sometimes might not rise to the level of an actual and material obstruction of the judicial process. In United States ex rel. Robson v. Malone, *supra,* we expressed "some doubt about the power of the court to require spectators to perform purely ceremonial or symbolic acts." While the *per curiam* opinion in *Malone* concluded that a court "may require such rising" and while we reaffirm that conclusion as to rising at the beginning of a session and end of a recess, we believe on remand some of the failures to rise here could be found nonobstructive. Such symbolic acts as cited here, when tested by the actual and material standard, do not necessarily alone amount to obstructions punishable as criminal contempt.[10] Of course, where such an act is accompanied by some disturbance, disorder or interruption, an obstruction may exist.

It is decided, therefore, that all specifications against non-lawyer appellants be remanded for trial by jury.

---

After careful consideration of the arguments of appellants and *amici curiae,* in our judgment, except as to those legally insufficient, none of the charges merits dismissal "in the interests of justice."[11] In the words of Mr. Justice Cardozo, "Justice, though due to the accused, is due to the accuser also."[12] Therefore, the contempt convictions of appellants are reversed and remanded for further proceedings not inconsistent herewith.

10. See Dobbs, Contempt of Court: A Survey, 56 Cornell L.Rev. 181, 204 (1971).

11. Of the *amici curiae,* the Americans for Effective Law Enforcement, Inc. opposed

whereas the remaining *amici* favored dismissal.

12. Snyder v. Massachusetts, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674.

APPENDIX

———

Number of Contempt Specifications and
Sentences Thereunder

DAVID T. DELLINGER

32 Specifications; 2 year, 2 month, 9 day sentence.

Specification  1.  (Sentence: 6 months)
2.  (1 month)
3.  (7 days)
4.  (3 days)
5.  (7 days)
6.  (1 day)
7.  (7 days)
8.  (1 month)
9.  (1 day)
10.  (1 day)
11.  (7 days)
12.  (1 day)
13.  (2 days)
14.  (4 days)
15.  (4 days)
16.  (3 days)
17.  (6 days)
18.  (2 days)
19.  (6 days)
20.  (4 days)
21.  (3 days)
22.  (3 days)
23.  (5 days)
24.  (6 months)
25.  (7 days)
26.  (4 months)
27.  (2 days)
28.  (2 days)
29.  (7 days)
30.  (5 months)
31.  (7 days)
32.  (7 days)

RENNARD C. DAVIS

23 Specifications; 2 year, 1 month, 19 day sentence.

Specification  1.  (Sentence: 2 days)
2.  (1 day)
3.  (1 day)
4.  (1 day)
5.  (1 day)
6.  (2 months)
7.  (1 day)
8.  (1 day)
9.  (14 days)
10.  (7 days)
11.  (7 days)
12.  (1 day)
13.  (7 days)
14.  (2 months)
15.  (2 months)
16.  (6 months)
17.  (3 months)
18.  (14 days)
19.  (7 days)
20.  (2 months)
21.  (5 months)
22.  (14 days)
23.  (1 month)

THOMAS E. HAYDEN

11 Specifications; 1 year, 2 month, 14 day sentence.

Specification  1.  (Sentence: 2 days)
2.  (1 day)
3.  (1 month)
4.  (1 day)
5.  (1 day)
6.  (1 day)
7.  (3 months)
8.  (4 months)
9.  (1 day)
10.  (7 days)
11.  (6 months)

ABBOTT H. HOFFMAN

23 Specifications; 8 month sentence.

Specification  1.  (Sentence: 1 day)
2.  (7 days)
3.  (1 day)
4.  (7 days)
5.  (1 day)
6.  (1 day)
7.  (1 day)
8.  (2 months)
9.  (1 day)
10.  (7 days)
11.  (1 month)
12.  (14 days)
13.  (14 days)
14.  (7 days)
15.  (1 day)
16.  (withdrawn)
17.  (42 days)

18. (14 days)
19. (7 days)
20. (2 days)
21. (4 days)
22. (5 days)
23. (6 days)
24. (7 days)

## JERRY C. RUBIN

15 Specifications; 2 year, 1 month, 23 day sentence.

Specification 1. (Sentence: 1 day)
2. (1 day)
3. (1 day)
4. (1 day)
5. (4 months)
6. (1 day)
7. (1 day)
8. (1 month)
9. (6 months)
10. (2 months)
11. (6 months)
12. (6 months)
13. (7 days)
14. (7 days)
15. (3 days)

## LEE WEINER

7 Specifications; 2 month, 18 day sentence.

Specification 1. (Sentence: 1 day)
2. (1 day)
3. (1 day)
4. (1 day)
5. (1 month)
6. (14 days)
7. (1 month)

## JOHN R. FROINES

10 Specifications; 6 month, 15 day sentence.

Specification 1. (Sentence: 1 month)
2. (1 day)
3. (1 day)
4. (1 day)
5. (1 month)
6. (1 month)
7. (14 days)
8. (14 days)
9. (2 months)
10. (14 days)

## WILLIAM M. KUNSTLER

24 Specifications; 4 year, 13 day sentence.

Specification 1. (Sentence: 1 month)
2. (14 days)
3. (3 months)
4. (14 days)
5. (14 days)
6. (3 months)
7. (3 months)
8. (6 months)
9. (21 days)
10. (14 days)
11. (7 days)
12. (14 days)
13. (14 days)
14. (1 month)
15. (21 days)
16. (2 months)
17. (4 months)
18. (1 month)
19. (1 month)
20. (6 months)
21. (6 months)
22. (4 months)
23. (1 month)
24. (2 months)

## LEONARD I. WEINGLASS

14 Specifications; 1 year, 8 month, 5 day sentence.

Specification 1. (Sentence: 2 days)
2. (4 months)
3. (14 days)
4. (14 days)
5. (1 month)
6. (1 month)
7. (14 days)
8. (1 month)
9. (1 month)
10. (3 months)
11. (1 month)
12. (5 months)
13. (1 month)
14. (21 days)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

United States of America ex rel. Judge Julius J. Hoffman

vs.

David T. Dellinger [et al.]

No. 69 CR 180

## CERTIFICATE OF CONTEMPT *

In conformity with Rule 42(a), Federal Rules of Criminal Procedure, 18 U. S.C., I hereby certify that the series of criminal contempts set forth below were committed in the actual presence of the court and were seen or heard by the court during the trial of the case of United States of America v. David T. Dellinger, et al., 69 CR 180, which commenced on September 24, 1969.

This was a case marred by continual disruptive outbursts in direct defiance of judicial authority by the defendants and defense counsel. I will specify here the instances of conduct of record which I consider to have been contemptuous, but I also make the entire record of the case of United States of America v. David T. Dellinger, et al., 69 CR 180, a part of this proceeding.

Much of the contemptuous conduct in this case does not show, of record. The constant murmurs and snickering emanating from the defense table were not captured on the printed page. No record, no matter how skillfully transcribed, can adequately portray the venom, sarcasm, and tone of voice employed by a speaker. No record, no matter how skillfully transcribed, can adequately reflect the applause, the guffaws, and other subtle tactics employed by these contemnors in an attempt to break up this trial. I have not focused on these cheap theatrics, histrionics, and affectations. I note them for the record lest my silence be construed as approval. But for the sake of the citations of contempt in this case, I limit myself to that conduct which is clearly and adequately portrayed in the record.

This was a long trial. The behavior of the defendants and defense counsel was prepared with direct and defiant contempt for the court and the federal judicial system as a whole. Here is a record of exceptional circumstances which were disruptive of the proceedings. It has been my considered judgment throughout this case that the behavior of the defendants was aimed at baiting the judge and inciting and harassing the U. S. Attorneys in an attempt to stop the trial. I would have been derelict in my duty as a Federal District Judge if I were to permit such base and unethical tactics to succeed. Consequently, I have waited until this trial was concluded before making a final determination of contempt. The exigencies of such a complex and difficult case compelled me to follow that course.

## DAVID T. DELLINGER

### I.

On October 15th when the Judge entered the courtroom, Mr. Dellinger was standing and the following colloquy occurred:

"Mr. Dellinger: Mr. Hoffman, we are observing the moratorium.

The Court: I am Judge Hoffman, sir.

Mr. Dellinger: I believe in equality, sir, so I prefer to call people mister or by their first name."

The Court: Sit down. The clerk is about to call my cases.

Mr. Dellinger: I wanted to explain to you we are reading the names of the war dead.

The Marshal: Sit down.

---

* This Certificate preceded the individual specifications of contempt with regard to each defendant and the two trial attorneys. It is hereinafter omitted to avoid repetition.

Mr. Dellinger: We were just reading the names of the dead from both sides.

The Marshal: Sit down."

Official Transcript Page 2425A.

Subsequently the jury was brought into the room. When the jury was seated, the defendant Dellinger once more rose and the following colloquy occurred:

"Defendant Dellinger: Before the witness resumes the stand, we would like to propose—

Mr. Schultz: If the Court please—

Mr. Foran: Your Honor. If the Court please, may the marshal take that man into custody?

Defendant Dellinger: A moment of silence—

Mr. Schultz: Your Honor, this man—

The Court: Mr. Marshal, take out the jury."

(The following proceedings were had in open court, out of the presence and hearing of the jury:)

"Defendant Dellinger: We only wanted a moment of silence.

Mr. Foran: Your Honor, this man has announced this on the elevator coming up here that he was intending to do this.

Defendant Dellinger: I did not. It doesn't matter, I would have been glad to, but I did not.

Mr. Foran: Your Honor, I object to this man speaking out in court.

The Court: You needn't object. I forbid him to disrupt the proceedings. I note for the record that his name is—

Defendant Dellinger: David Dellinger is my name.

The Court: You needn't interrupt my sentence for me.

Defendant Dellinger: You have been interrupting ours. I thought I might finish that sentence.

The Court: The name of this man who has attempted to disrupt the pro-

ceedings in this court is David Dellinger and the record will clearly indicate that, Miss Reporter, and I direct him and all of the others not to repeat such occurrences." Official Transcript Pages 2429–30.

### II.

When the witness Salzberg left the witness box in order to identify the defendant Hayden, the defendant Dellinger said to him, in a voice loud enough for the jury to hear:

"Mr. Dellinger: Quite a let down. I am really disappointed in you." Page 3770.

### III.

On October 22nd, after the defendant Seale had defied a judicial order by speaking out again and again, after being told to stop, the defendant Dellinger rose and addressed the court:

"Mr. Dellinger: I think you should understand we support Bobby Seale in this—at least I do." Page 3642.

### IV.

On October 27th, during the testimony of the witness Frapolly, the defendant Dellinger made the following comment:

"Mr. Dellinger: Mr. Foran, do you believe one word of that?

Mr. Foran: Your Honor, may the record show the comment from the defendant Dellinger, your Honor?

The Court: Yes. Mr. Dellinger has made several comments from time to time. The record may indeed show—

Did you get the comment of Mr. Dellinger?

Mr. Dellinger: Yes. I asked Mr. Foran if he could possibly believe one word of that. I don't believe the witness believes it. I don't believe Mr. Foran believes it.

The Court: And continue to take his words, and I admonish you, sir, not to interrupt this trial by your conversation or your remarks. You have a

very competent lawyer representing you. You are not permitted to speak while he represents you." Page 4372.

### V.

On October 28th, the following occurred:

"Mr. Kunstler: Your Honor, the defendants, with whom I have consulted, every one except Mr. Seale, have requested me to just make one question —ask one question of your Honor before they give me their decision, and the question would be: Is the price of my doing the compromising or waiving by Mr. Seale of his constitutional assertion that I am not his lawyer and he wants to defend himself?

The Court: You don't expect me to answer a question put to me that way, do you?

Mr. Dellinger: Why not? You expect us to answer a question." Page 4395.

### VI.

At the close of the court session on October 28th, 1969, the defendant Dellinger refused to rise in the customary manner when the court left the room. Pages 4618–19.

### VII.

On October 28th in the afternoon session, after the court had engaged in a colloquy with Mr. Seale concerning his right to cross examine witnesses, Mr. Dellinger rose and stated the following:

"Mr. Dellinger: And all the defendants support Bobby Seale's right to have a counsel of his choice here and affirm that he has been denied that right." Page 4638.

### VIII.

On October 29th, Mr. Dellinger engaged in a physical struggle with one of the marshals who was attempting to restrain the defendant Bobby Seale, and when the court called a recess, Mr. Dellinger refused to rise in the customary manner. Pages 4724–4729.

### IX.

On October 29th, in the afternoon session, when the court was compelled to call a recess, the defendant Dellinger again refused to rise in the customary manner. Page 4763.

### X.

On October 30th, at the beginning of the court session, the defendant Dellinger again refused to rise in the customary manner. Page 4801.

### XI.

On October 30th, after the defendant Hayden had engaged in a colloquy with the court, the defendant Dellinger commented aloud from the defense table:

"Mr. Dellinger: What about the motion? There was a motion. The motion was for voir dire of the jury. He hasn't ruled." Page 4844.

### XII.

On October 30th, when the court again called a recess, Mr. Dellinger once more refused to rise in the customary manner. Page 4849.

### XIII.

On November 12th, during the direct examination of the witness Bock, the defendant Dellinger laughed at the court as the court made an observation and Mr. Dellinger said aloud so that the jury could hear:

"Mr. Dellinger: We are not ashamed to laugh." Page 6258.

The conduct was repeated a few moments later during the testimony of Mr. Bock and the following occurred:

"Mr. Schultz: Mr. Kunstler is laughing so he can influence the jury with the impression that this is absurd. That is why he is laughing aloud because he—if Mr. Dellinger would stop talking when we are addressing the court—

Mr. Dellinger: I am trying to tell something to my lawyer. It is absurd. It is—he is a vaudeville actor." Pages 6288–89.

## XIV.

On November 19th, during the cross examination of the witness Bock, the following occurred:

"Mr. Schultz: Objection. That has no bearing, no probative—if Mr. Dellinger will stop talking to me when I am trying to address the court—

Mr. Dellinger: I don't talk to you.

Mr. Schultz: And mumble to me every time I am trying to make an objection—

Mr. Dellinger: Don't go making up things, Richard Schultz. I didn't talk to you. I don't mind your making all of these phony objections, but when you start lying about me, too, I think that is disgusting.

The Court: Mr. Dellinger—

Mr. Dellinger: I didn't say a word to him, Judge.

The Court: You just said enough to make me admonish you not to make any more remarks like that.

Mr. Kunstler: Your Honor, you ought to admonish the U. S. Attorney not to make remarks—

The Court: He may not speak out here. He has a lawyer.

Mr. Dellinger: He just lied about me.

Mr. Schultz: I am sitting next to Mr. Dellinger and he is mumbling under his breath to me. He has been doing this for the last—

Mr. Dellinger: I said 'Ah' when he asked a bad question. I didn't say a word—

The Court: You have competent lawyers to speak for you, sir, and I shall not permit you to speak for yourself.

Mr. Kunstler: Then your Honor, I would ask your Honor to direct the U. S. Attorney not to take comments that are made here at the table to me or any other member of this table as remarks always addressed to him.

Mr. Foran: Your Honor, I was sitting here, too. I overheard the remark.

Mr. Dellinger: You're adding a lie to his lie, and I say that on my word.

The Court: I see that you are not accepting my admonition, sir, and I ask the reporter to make note of that." Pages 7341–43.

## XV.

On November 20, after the Court had made a ruling refusing to grant a writ of habeas corpus ad testificandum, the following colloquy took place:

"Mr. Dellinger: Aw Jesus—fascist—

The Court: Who is that man talking Mr. Marshal?

Mr. Dellinger: That is Mr. David Dellinger and he is saying that that is an arbitrary denial when you say who is key to our defense. We know who is key to our defense and we want to put on our key defense witness.

The Court: Mr. Marshal, ask that man to sit down.

The Marshal: Sit down, Mr. Dellinger.

Mr. Dellinger: I think that is acting like a fascist court like Mr. Seale said when you make decisions of that kind and deprive us of our witnesses. Because he has already been persecuted in one court, now you are persecuting him and us in another court." Page 8078.

## XVI.

On November 26th, the day before Thanksgiving, after the Court determined that it would be unable to permit the sequestered jury to return home for the Thanksgiving Holiday, the following occurred:

"Mr. Dellinger: We move—

Mr. Kunstler: Your Honor, we move—

Mr. Weinglass: It's true. It's a true comment.

The Court: Who was that man who said he moved that is not a lawyer?

Mr. Dellinger: I am telling our lawyers we move the jury not have to be sequestered so they can be home.

The Court: Mr. Marshal, will you have that man—

Mr. Dellinger: You asked about it, and I am telling you.

The Court: Let him sit down.

Mr. Dellinger: I was telling the lawyer before.

The Court: He has a lawyer." Page 8610.

### XVII.

During the testimony of the witness Meyerding, the following occurred:

"The Court: I note for the record that certain of the defendants, Dellinger particularly—

Mr. Dellinger: I did not.

The Court: —made noises.

Mr. Dellinger: I beg your pardon, I did not utter a single noise. When I have noises, [sic] I stand up and say so.

The Court: I heard you, sir.

Mr. Dellinger: I did not sigh; I did not utter a single noise, absolutely not.

The Court: And the man sitting next to you did also.

Mr. Dellinger: You mean to say you are calling me a liar? If so, you are a liar. I did not utter a single noise.

The Court: And make a note of that last statement.

Mr. Dellinger: I have called this a fascist court before and I think he is trying to prove it. It is absolutely irresponsible on your part.

The Court: Make a note of that last statement.

Mr. Dellinger: Absolutely irresponsible.

The Marshal: Sit down, please.

Mr. Dellinger: And dishonest.

The Court: Make a note of that last statement.

Miss Reporter, have you all of Mr. Dellinger's comments? Have you?

The Reporter: Yes." Official Transcript, Pages 10,086–87.

### XVIII.

On December 11 during the cross examination of the witness Ochs, the following occurred:

"Mr. Dellinger: He answered. You don't have to keep asking that.

Mr. Schultz: I don't know how many lawyers there are at that table.

Mr. Dellinger: I am consulting with my lawyer.

Mr. Schultz: I don't know whether an objection is being made or what?

The Court: The Court notes that—

Mr. Kunstler: Your Honor, Mr. Dellinger has made a remark to me that he doesn't have to keep asking the same question.

The Court: Will you let me finish my observation?

Mr. Kunstler: Oh, go ahead. I thought you had.

The Court: Mr. Dellinger made a loud remark which provoked Mr. Schultz to say: 'I don't know how many lawyers there are,' and I think that was a good inquiry. Mr. Dellinger has done that sort of thing before and I merely wanted to identify the person, that is all, for the record." Pages 10,628–29.

### XIX.

On December 15, when the Court was compelled to request the marshal to remove Mr. Stuart Ball, Jr., the following occurred:

"The Court: Mr. Marshal, take Mr. Ball out.

Mr. Dellinger: That is an injustice.

Mr. Kunstler: That is a lawyer who is part of our defense team.

The Court: He is not a lawyer admitted to practice in this court.

Mr. Kunstler: You are removing a lawyer from the defense table.

The Court: No, he is not a lawyer admitted to practice here.

Mr. Kunstler: That doesn't matter, your Honor. He is—

Mr. Dellinger: He wasn't laughing."
Pages 11,179–80.

A few moments later, the following colloquy occurred:

"Mr. Kunstler: But he didn't laugh, your Honor. If he laughed, that is one thing, perhaps, but two defendants have admitted laughing.

The Court: My eyesight is good and my hearing is good.

Mr. Kunstler: You were wrong about Mr. Dellinger. You thought he made a noise. We have submitted an affidavit as to that.

The Court: I suppose I didn't hear him call me a liar in open court.

Mr. Kunstler: That is a different matter, your Honor.

The Court: Oh—

Mr. Dellinger: I said if you said I was talking that that was a lie, that you were calling me a liar.

The Court: You didn't—you said 'You are a liar.'

Mr. Kunstler: No. Read the transcript.

Mr. Dellinger: You accused me of being a liar and I said that was a lie.

The Court: Will you sit down?

Mr. Dellinger: And you are very prejudiced and unfair and I state that in open court. It is not a fair trial and you have no intention of giving us a fair trial and when I speak throughout the country, I say that you are the assistant prosecutor or maybe the chief prosecutor and it is true and the people of this country will come to learn that about you and about some other judges in this court.

A Spectator: Right on.

Mr. Davis: That's why we were laughing."

(There was disorder in the courtroom.)

"A Spectator: Right on, boys.

Mr. Hoffman: You said you were doing it for us.

The Court: Have you got all those remarks, Miss Reporter?

Mr. Dellinger: Now one of our legal staff you have falsely accused and that is why I speak up.

The Court: Now, if you will permit me—

Mr. Kunstler: Your Honor, what is happening? The marshals are taking people out.

A Spectator: Why don't you clear the whole courtroom?

The Court: Will you—

Mr. Dellinger: You see, we are interested in the truth and you are not and the government is not and that is what the conflict is here." Official Transcript, Pages 11,182–85.

XX.

On December 30, during the direct examination of the witness Hoffman, the following occurred:

"Mr. Marshal: Mr. Dellinger—

Mr. Dellinger: I am a little upset by the dishonesty of the court's process—yes, my name is David Dellinger.

The Court: That man's name is Dellinger, Miss Reporter.

Mr. Dellinger: They are not interested in the truth. They just want one side of things to go in, even made up things, but they won't allow the real things, the real truth.

The Court: Mr. Dellinger is continuing to speak, Miss Reporter.

Mr. Dellinger: Darned right. I hope the jury understands that, too.

Mr. Schultz: Your Honor, this is a deliberate attempt to make it appear—

Mr. Dellinger: What do you—

Mr. Schultz: —that because the defendants don't follow—

The Court: Mr. Schultz—

Mr. Kunstler: Oh, your Honor—unfair to the government.

Mr. Dellinger: The government will go to jail for ten years, I suppose.

Mr. Schultz: Your Honor—

The Court: Just a minute, sir. Now, Mr. Schultz, don't underestimate anybody's intelligence. Anyone knows that has been in a courtroom before that a defendant represented by counsel doesn't speak out.

Mr. Dellinger: Even when he's being railroaded he doesn't speak out.

The Court: I hope, Miss Reporter, you get those remarks.

Mr. Kunstler: Your Honor, there comes a time when every human being feels the necessity to speak out and Mr. Dellinger—

The Court: I didn't ask you to philosophize.

Mr. Kunstler: I am not philosophizing, I am defending a client.

The Court: There comes a time when courtroom decorum must be observed.

Mr. Dellinger: Decorum is more important than justice, I suppose.

The Court: I have never sat in a trial over the many years where a defendant has spoken up on his own when—

Mr. Froines: Perhaps you can give him four years like you gave Bobby Seale.

Mr. Dellinger: We just walk politely into jail." Official Transcript, Pages 12,913–16.

And very slightly later:

"The Court: And I direct you to sit down or I will have the marshal—

Mr. Kunstler: Mr. Schultz says—

The Court: Please ask this lawyer to sit down.

Mr. Kunstler: I have a right to stand and talk in defense of my client.

Mr. Dellinger: That's why we have to speak up, because you won't let our lawyers have a fair chance." Page 12,-916.

XXI.

On January 9th, after the court directed Mr. Rubin to remain in the courtroom and use the washroom facilities in the adjoining lock-up if he needed to go to the bathroom, the following colloquy occurred:

"Mr. Rubin: I want to go to the bathroom.

Mr. Dellinger: Convicted us already.

Mr. Davis: Guilty until proven innocent." Page 14,716.

XXII.

On January 9th, when the court reiterated its order concerning the use of the washroom facilities, the following occurred:

"The Marshal: Mr. Dellinger—

The Court: Let the record show that after I requested the Marshal to keep Mr. Dellinger quiet he laughed right out loud again. Out loud. The record may so indicate.

Mr. Dellinger: And he is laughing right now, too." Page 14,824.

XXIII.

On January 12th the court made an evidentiary ruling and the following occurred:

"The Court: The objection of the government to Defendants' Exhibit 279 for identification will be sustained.

Mr. Dellinger: Oh, ridiculous.

The Court: Who said 'ridiculous'?

Mr. Dellinger: I did. It was ridiculous. I stand on that fact. You don't want us to have a defense.

The Court: I just wanted to know who said that.

Mr. Dellinger: You don't want us to have a defense. You are a hypocrite.

The Court: Did you get all those remarks?

Mr. Dellinger: I stand by them, too. You earned them. It really brings the whole system of justice under discredit when you act that way. What

Mayor Daley and the police did for the electoral process in its present form you are now doing for the judicial process.

The Court: Mr. Marshal—

Mr. Davis: We want a fair trial.

Mr. Dellinger: You don't think it is a fair trial, do you?

Mr. Marshal: Just be quiet, Mr. Dellinger.

Mr. Dellinger: You are being paid by the same company but you ought to be able to think for yourself a little bit.

The Court: Bring in the jury.

Mr. Weinglass: If your Honor please, before the jury comes in, I have a motion to make on behalf of the defendants. Prior to the jury leaving the court and while they were still here in the room and pursuant to my request for a five minute adjournment, your Honor made a statement in open court in the presence of the jury that it was your attitude that this case should be 'gotten rid of.'

The Court: I didn't say that.

Mr. Dellinger: You did.

A Defendant: You did so.

The Court: I said we shouldn't be wasting time. You got more than a five minute recess. I waited here.

Mr. Dellinger: You said 'get rid of the case.'

Mr. Weinglass: As far as I'm concerned—

The Court: Mr. Marshal, will you tell that man to remain quiet?

The Marshal: Mr. Dellinger—

Mr. Weinglass: I most respectfully dispute the Court's recollection. Your Honor did use the words 'get rid of.'

The Court: Whether you are respectful or not, the evidence of the respect with which the court is treated has been demonstrated by one of the defendants.

Mr. Dellinger: I didn't say anything you didn't deserve.

The Court: I will say to you, Mr. Weinglass—

Mr. Dellinger: I only speak the truth." Official Transcript, Pages 15,139–41.

### XXIV.

On January 14th the following occurred:

"The Court: Mr. Marshal, I am not here to be laughed at by these defendants, patricularly Mr. Rubin.

Mr. Marshal: Mr. Dellinger, also, will you refrain from laughing?

Mr. Dellinger: That is a lie. And it wasn't Mr. Rubin. We laugh enough and you can catch us when we do but you just happened to get the wrong one.

Mr. Kunstler: Your Honor, I don't think the record should constantly have these references to chuckles.

The Court: I think the record should show that and I see that the record does. I don't share your view.

Mr. Kunstler: The Court has made a sally before and the room laughed and you didn't put that on the record.

The Court: I will not sit here—and you must know it by now, certainly— and have defendants laugh at my rulings, sir. And I will not hear you on that.

Mr. Kunstler: You don't mind if they laugh at me or if they laugh at someone else.

The Court: I will ask you to sit down.

The Court: Will you sit down? I saw Mr. Dellinger talking. If anybody else did—

Mr. Dellinger: You did not see me talking. My lips were not moving. That is not the first time you have lied in this courtroom. My lips were not moving.

The Court: Did you get those last remarks?

Mr. Schultz: It was the defendant Hoffman.

Mr. Dellinger: If you can make an honest mistake, that's all right, but to lie about it afterwards and say you saw me talking when you didn't, that is different.

The Court: Will you ask that man to sit down.

Mr. Dellinger: You will go down in infamy in history for your obvious lies in this courtroom, of which that is only the most recent one.

Mr. Marshal: Sit down, sir.

Mr. Dellinger: It is absolutely true what I am saying.

Mr. Marshal: Will you—

Mr. Dellinger: Absolutely true.

The Court: Mr. Marshal, will you ask that man to be quiet?

Mr. Dellinger: You will be ashamed of that for the rest of your life, if anything can shame you.

Mr. Schultz: Your Honor, it was the defendant Hoffman sitting immediately behind Dellinger who made those remarks.

The Court: Let the record show—

Mr. Dellinger: Thanks for telling the truth, Mr. Schultz.

Mr. Kunstler: Mr. Hoffman attempted to clarify the record. He was the one responsible. He took the blame for it. It was not Mr. Dellinger or anyone else, or Mr. Rubin.

The Court: Oh, I heard Mr. Rubin and saw him.

Mr. Kunstler: Your Honor—

The Court: Will you please sit down? I will make the rulings here. The record will be what it is.

Mr. Kunstler: I want the record—

The Court: It can't be any more clear.

Mr. Dellinger: I want to make the record clear. Mr. Rubin did not laugh. You are standing there saying you heard it. That is why I called you a liar. He did not laugh. I was sitting next to him.

The Court: Mr. Marshal—

Mr. Dellinger: And you made it up. It is about time this got out into the open so everyone could know what you are doing here. It is one thing to be prejudiced, it is another thing to be a liar.

The Court: Mr. Marshal, I ask you to restrain that man.

The Marshal: Be quiet.

Mr. Kunstler: He is trying to clarify the record.

The Court: He has got a lawyer.

Mr. Kunstler: I am his lawyer and I represent—.

The Court: That is right, and we have had enough of this.

Mr. Kunstler: But the record must be crystal clear that it was not Mr. Dellinger, it was not Mr. Rubin. Mr. Hoffman—

The Court: Mr. Dellinger said enough.

Mr. Kunstler: Mr. Hoffman has taken the blame.

The Court: I have never sat in fifty years through a trial where a party to a law suit called the judge a liar.

Mr. Dellinger: Maybe they were afraid to go to jail rather than tell the truth, but I would rather go to jail for however long you send me than to let you get away with that kind of thing and people not realize what you are doing.

The Court: Mr. Marshal, do I have to tell you again, sir." Official Transcript, Pages 15,585–91.

## XXV.

Throughout the trial the defendant Dellinger has commented on the evidence and the witnesses presented by the prosecution. On January 16th during the cross examination of the witness Goodwin the following incident occurred:

"Mr. Kunstler: Then I think—

Mr. Dellinger: Now he is going into his imagination.

Mr. Foran: Your Honor, there is testimony concerning this exact statement from Mr. Dellinger on August 28th between 10:30 and noon at 407 South Dearborn Street.

Mr. Dellinger: Yes, police agents, but you made it appear as if it was from my article. It is just Bill called the attention—

The Court: Whose are those last words? Did you get the words of Mr. Dellinger, Miss Reporter?

The Reporter: Yes.

Mr. Kunstler: He was just pointing our, your Honor, that there had been no shift from—

The Court: I heard. I heard. I don't need your advice on that, Mr. Kunstler.

Mr. Foran: I shifted, your Honor, when Mr. Kunstler complained that I was talking about his article. I will go back and ask him another question." Official Transcript, Page 16,-201.

## XXVI.

On January 23, during the direct examination of the witness Davis, the court indicated that argument on a mistrial motion had been completed, and ordered Mr. Kunstler to sit down. After Mr. Kunstler flaunted the court's orders and continued to argue, the defendant Dellinger rose from his place at the defense table, and the following incident ensued:

"Mr. Kunstler: You haven't even heard the motion.

Mr. Rubin: You haven't heard it yet.

The Court: For a mistrial.

Mr. Kunstler: Yes, but I would like to argue it.

The Court: Oh, there is no ground for a mistrial.

Mr. Kunstler: Your Honor knows you have referred to the question of defendants taking the stand. You have committed the cardinal error of a court with reference—

The Court: I direct the marshal to have this man sit down.

Mr. Kunstler: Every time I make a motion am I going to be thrown in my seat when I argue it?

The Court: You may sit down.

Mr. Dellinger: Force and violence.

Mr. Kunstler: If that is the ruling of the court, that we cannot argue without being thrown in our seats—

Mr. Dellinger: The judge is inciting a riot by asking the marshal to have him sit down.

The Court: That man's name is Dellinger.

Marshal Joneson: Will you be quiet, Mr. Dellinger.

Mr. Dellinger: After such hypocrisy I don't particularly feel like being quiet. I said before the judge was the chief prosecutor, and he's proved the point.

The Court: Will you remain quiet. Will you remain quiet, sir.

Mr. Dellinger: You let Foran give a foreign policy speech, but when he tries to answer it, you interrupt him and won't let him speak.

There's no pretense of fairness in this court.

The Court: Mr. Marshal, will you go to that man and ask him to remain quiet.

Mr. Dellinger: No pretense of fairness. All you're doing is employing a riot—employing force and violence to try to keep me quiet—

Marshal Joneson: Be quiet, sir.

Mr. Dellinger: —just like you gagged Bobby Seale because you couldn't afford to listen to the truth that he was saying to you. You're accusing me. I'm a pacifist.

Marshal Joneson: Sit down, please, and be quiet.

Mr. Dellinger: I employ non-violence, and you're accusing me of violence, and you have a man right here, backed up by guns, jails, and

force and violence. That is the difference between us.

Marshal Joneson: Will you sit down. (Applause.)

The Court: Will you continue, please, with the direct examination of this witness.

Mr. Dellinger: There goes the violence right there.

Mr. Kunstler: That's the government in operation, your Honor, as it has been throughout this trial.

The Witness: Your Honor, that's my sister they are taking out of the courtroom.

The Court: Even your sister—

Mr. Kunstler: Nobody but the government has employed violence in this courtroom—with Bobby Seale, with spectators." Official Transcript, Pages 17,371–17,373.

At this point, the marshals found it necessary to remove several of the spectators from the courtroom for disorderly conduct. Mr. Kunstler made some remarks about the removal of the spectators, and Mr. Foran rose to defend the way the trial was being conducted. This precipitated the following outburst from Mr. Dellinger:

"Mr. Foran: Your Honor, traditionally in American law, cases are tried in a courtroom by the participants in the trial, not the audience, not spectators, not relatives of the defendants, but by witnesses and by the court and by the jury, not by shouting and screaming and voluntary statements from counsel, or from the defendants shouting out in courtrooms, because that is the American judicial system, and it's worked very well for two hundred years, and it's not going to change now for these people.

Mr. Dellinger: Yes, kept the black people in slavery for two hundred years and wiped out the Indians and kept the poor people in problems and started the war in Viet Nam which is killing off at least a hundred Americans and a thousand Vietnamese every week, and we are trying to stop it.

Marshal Joneson: Sit down.

Mr. Dellinger: And you call that ranting and raving and screaming because we speak the truth.

Marshal Joneson: Mr. Dellinger, sit down, please.

Mr. Foran: Your Honor, in the American—

Mr. Dellinger: And that judge won't let that issue come into the trial, that's why we are here.

Mr. Foran: Your Honor, in the American system there is a proper way to raise such issues and to correct them.

Mr. Dellinger: That was the proper way with Fred Hampton, wasn't it?"

Mr. Kunstler made several more remarks, and Mr. Schultz rose to answer him, and Mr. Dellinger interjected a comment again:

"Mr. Schultz: We complied with the rules of this court. We have made no statements to the press, to any press, since this case was indicted. Mr. Kunstler, on a regular basis, has been falsifying to the press, violating the rules of the court prohibiting every attorney in this case from making press conferences, and he has been doing it and he stands before this court and says the Government has.

Mr. Dellinger: And they have rules like that in Nazi Germany." Official Transcript, Pages 17,374 through 375.

## XXVII.

On January 24, once more the testimony of the defendant Davis was interrupted. Mr. Foran was responding to an argument by Mr. Kunstler, when Mr. Dellinger interjected his remarks once more:

"Mr. Foran: In this case, your Honor, we have heard these people adopt or attempt to adopt Dr. King, attempt to adopt Senator McCarthy, Robert Kennedy, both of whom were better friends of mine than they ever were of theirs.

Mr. Dellinger: Oh, my God.

Mr. Foran: Mr. Kennedy appointed Mr. Schultz, your Honor.

Mr. Kunstler: Oh, your Honor—

Mr. Dellinger: Reverend Abernathy was the co-chairman of the Mobilization and I worked intimately with Martin Luther King and Ralph Abernathy.

Mr. Foran: Robert Kennedy appointed this young man as an Assistant United States Attorney.

The Court: Mr.—young man, will you have Mr. Dellinger sit down, and, Miss Reporter, did you get Mr. Dellinger's remarks?"

Mr. Dellinger did not sit down at the direction of the marshal and very slightly later the following ensued:

"The Court: Mr. Marshal, ask that man to sit down.

Mr. Dellinger: There has to be some way of speaking the truth. We have to speak the truth some way. If you won't allow it to come in other ways, we have to stand up and tell it because it is true.

The Court: Mr. Marshal—

Mr. Dellinger: Ralph Abernathy was the co-chairman and close worker—

The Court: Have that man sit down, Mr. Marshal, or do we have to have three marshals?" Official Transcript, Pages 17,808–17,811.

### XXVIII.

At the end of the court session on January 24, while the court was attempting to instruct the jury prior to recess, Mr. Dellinger made several loud remarks at the defense table, which were easily overheard throughout the courtroom. The incident is reported as follows:

"The Court: With that, Mr. Foran, I think we will recess tonight until Monday morning.

Ladies and gentlemen—

The Marshal: Will you please keep quiet? Sit down. Sit down.

The Court: Ladies and gentlemen of the jury, we are about to recess until tomorrow morning.

Mr. Dellinger: —hear a pig talk about civil disobedience—

The Marshal: Mr. Dellinger—

Mr. Dellinger: I was just talking to my friend.

The Court: I will wait." Official Transcript, Page 17,860.

### XXIX.

On January 30, the court was required to instruct the marshals concerning the behavior of disorderly spectators. Mr. Dellinger made the following sarcastic comment after that instruction:

"The Court: I direct the jury to disregard the applause of each and every person who participated in it and the marshals will exclude from the courtroom any spectators who applauded after the witness left the stand.

Mr. Dellinger: Thanks a lot. Thanks, fellows." Official Transcript, Page 19,032.

### XXX.

On February 4, the incident occurred which finally led the court to revoke Mr. Dellinger's bail. During the testimony of the witness Riordan, Mr. Dellinger rose from his place at the defense table and interjected the following remark:

"Mr. Dellinger: Oh, bull shit.

The Court: Did you get that, Miss Reporter?

Mr. Dellinger: That is an absolute lie.

The Court: Did you get that, Miss Reporter?

Mr. Dellinger: Let's argue about what I stand for and what you stand for, but let's not make up things like that.

The Court: All those remarks were made in the presence of the court and jury by Mr. Dellinger."

After a brief argument about the propriety of these remarks, the court determined to excuse the jury momentarily, and the following incident occurred:

"The Court: I will have to excuse you, ladies and gentlemen of the jury, with my usual orders.

Mr. Dellinger: You're a snake. We have to try to put you in jail for ten years for telling lies about us, Dick Schultz.

Marshal Joneson: Be quiet, Mr. Dellinger.

Mr. Dellinger: When it's all over, the judge will go to Florida, but if he has his way, we'll go to jail. That is what we're fighting for, not just for us, but for all the rest of the people in the country who are being oppressed.

A Spectator: Damn right. Assert ourselves.

Voices: Right on.

The Court: Take that man into custody. Mr. Marshal, take that man into custody.

Voices: Right on, right on.

Mr. Schultz: Into custody.

The Court: Into custody.

Voices: Right on.

Mr. Davis: Go ahead, Dick Schultz, put everybody in jail.

Mr. Dellinger: Dick Schultz is a Nazi if I ever knew one.

Mr. Schultz: Your Honor, will you please tell Mr. Davis to walk away from me?

Mr. Dellinger: Put everybody in jail."

\*     \*     \*     \*     \*     \*

"Mr. Schultz: Your Honor, we have 3500 material. We have 3500 252–A–1 and 252–A–2.

The Court: I would like to make a note of those if you will go slowly, please.

Mr. Schultz: 3500 252–A–1 and 252–A–2. –A–1, your Honor, is the complete document.

Mr. Dellinger: It is completely false." Official Transcript, Pages 19,-669 through 19,673.

### XXXI.

On February 6th, during the argument of a motion to restore Mr. Dellinger's bail, Mr. Dellinger arose and inserted the following remarks into the record:

"The Court: Is there anything you want to say in reply to Mr. Schultz?

Mr. Dellinger: I would like to say that I have not—

The Court: Not you, sir.

Mr. Dellinger: I would just like to say I have not screamed, and—

The Court: I have asked your lawyer.

Mr. Dellinger: —I have not used repeated vile or obscene language. That's untrue.

The Court: Please sit down." Official Transcript, Page 19,904.

### XXXII.

On February 7th, the court ruled against a special application on behalf of Mr. Dellinger concerning his confinement. At the close of the court session he made the following sarcastic remarks about the ruling:

"Mr. Dellinger: That wins respect.

The Court: Mr. Marshal, the court will be in recess until Monday morning.

Marshal Dobrowski: Everyone please rise.

Mr. Dellinger: You now have my respect, Judge, I'm sure you know." Official Transcript, Pages 20,282–83.

Accordingly, I adjudge the defendant David T. Dellinger guilty of the several individual specifications of direct criminal contempt enumerated above.

### RENNARD C. DAVIS

#### I.

On October 22, the defendant Davis arrived in the courtroom 18 minutes after the start of the court session. The

Court had denied a motion to permit the defendant to bring a cake into the courtroom. Upon arrival the defendant Davis announced in a loud voice:

"Mr. Davis: They arrested the cake, Bobby. They arrested it." (Tr. p. 3,640)

## II.

At the close of the court session on October 28, the defendant Davis refused to rise when the Court left the bench at the end of the session. (Tr. pp. 4,618–19)

## III.

On October 29, at the conclusion of the morning session, the defendant Davis refused to rise when the Court left the bench. (Tr. pp. 4,728–29)

## IV.

On October 29, when a recess was called during the afternoon session, the defendant Davis refused to rise when the Court left the bench. (Tr. p. 4,763)

## V.

At the beginning of the morning court session on October 30, the defendant Davis refused to rise at the direction of the marshal when the Court entered the chamber. (Tr. p. 4,801)

## VI.

On October 30, when the jury returned to the courtroom, the defendant Davis rose from his seat at the defense table and made the following speech to the jury:

"Ladies and gentlemen of the jury, I am trying to say he was being tortured while you were out of this room by these marshals. They came and tortured him while you are out of the room. It is terrible what is happening. It is terrible what is happening." (Tr. p. 4,845)

## VII.

On October 30, when the Court called a recess, the defendant Davis refused to rise as the Court left the bench. (Tr. pp. 4,849–50)

## VIII.

On October 30, at the beginning of the afternoon session the defendant Davis refused to rise in response to the marshal's directions when the Court entered the room. (Tr. p. 4,853)

## IX.

On November 26, when the Court requested Mr. Dellinger to sit down, the defendant Davis commented in a loud voice from his place at the table:

"Mr. Davis: Why don't you gag all of us, Judge?

The Court: Who said that?

Mr. Davis: Bobby Seale said that.

Mr. Schultz: The defendant Davis said that, your Honor.

The Court: The defendant Davis. Did you get that, Miss Reporter?" (Tr. p. 8,078)

## X.

On December 15, Mr. Davis and other defendants laughed out loud at the Court while the Court was making a ruling on a motion. The defendant Davis acknowledged his laughter:

"Mr. Davis: It was me that was laughing, your Honor." (Tr. p. 11,-179)

## XI.

On January 9, the defendant Davis commented out loud from the defense table:

"Mr. Davis: Guilty until proven innocent." (Tr. p. 14,716)

## XII.

On January 12, the Court refused to permit one of the attorneys to leave the room during the proceedings. Mr. Davis interrupted the orderly proceeding by rising and stating:

"Mr. Davis: Your Honor, my rights are being jeopardized by Mr. Weinglass not being able to leave the courtroom to interview witnesses.

The Court: Will you sit down, sir.

Mr. Davis: If you want to protect my rights, I would kindly ask you to allow him to interview witnesses."

This outburst came in front of the jury. (Tr. p. 15,074)

## XIII.

On January 13, during the direct examination of the witness Bond, the defendant Davis stated from the defense table in a voice loud enough for the jury to hear:

"Mr. Davis: This is a joke." (Tr. p. 15,364)

## XIV.

On January 23, while the defendant Davis was on the stand as a witness on direct testimony, the Judge was required to make an evidentiary ruling. After the Court had considered a document and ruled that it could not come into evidence, Davis accused the Court of having ruled without reading the document.

"The Court: I shall not take it in.

In the presence of the jury I will sustain the objection of the Government.

Mr. Weinglass: Your Honor has read the document?

The Court: I have looked it over.

The Witness: You never read it. I was watching you. You read two pages.

The Court: Mr. Marshal, will you instruct that witness on the stand that he is not to address me.

You, Mr. Marshal, you are closest to him.

The Marshal: Face this way.

The Witness: I will look at the Judge.

The Court: Do you have what the witness said, Miss Reporter?

The Reporter: Yes.

Mr. Weinglass: I didn't hear that.

The Witness: I said he didn't read the document. I watched him. He never looked at it.

The Court: He said 'You never read it,' looking at me.

The Witness: I meant the Judge did not read the document." (Tr. pp. 17,-443–44)

## XV.

On January 23, the witness Davis falsely accused the Judge of sleeping during the proceedings.

"A. You are making me memorize them. If I can read them — is that admissible? The Judge is asleep.

The Court: What did he say?

The Witness: I am sorry. I thought you had gone to sleep. I am sorry.

The Court: Oh, no. I am listening very carefully. I just wanted you to repeat. I wanted to be sure I heard what you said." (Tr. p. 17,542)

## XVI.

During the time the witness Davis was being cross-examined by the Government Attorney, which is reported in the transcript, Davis continually volunteered remarks and observations. He did not restrict his answer to the scope of the question posed. The Court was required to instruct him no less than 43 times to restrict his answers to the scope of the question posed. No sooner were these orders given than they were violated over and over and over again. This violation of 43 Court orders in the period of three days must be considered contemptuous. (Tr. pp. 17,820 through 18,245)

## XVII.

On January 28, the defendant Davis interrupted Mr. Schultz, the Assistant United States Attorney, to make the following remarks:

"Mr. Schultz: I wish Davis, who was such a gentle boy on the stand for the last couple of days, smiling at the jury and pretending he was just a little boy next door, would stop whispering and talking to me while I am talking.

Mr. Davis: You are a disgrace, sir. I say you are a disgrace. I really say you are a disgrace." (Tr. p. 18,397)

## XVIII.

On February 2, after an extended speech by Mr. Kunstler, there was an outburst of applause in the courtroom. Mr. Davis participated in that applause and admitted having done so. It is reported in the record as follows:

"The Court: Every one of those applauders—

Voices: Right on. Right on.

The Court: Out with those applauders.

Mr. Davis: I applauded, too, your Honor. Throw me out." · (Tr. p. 19,-113)

## XIX.

On February 2, during the testimony of the witness Lynskey, Mr. Kunstler brought the Reverend Abernathy into the courtroom. The Court admonished him for this disruptive tactic and the following comment was made by the defendant Davis:

"Mr. Kunstler: If it is disrupting to put a witness on the stand, I never heard of disrupting.

Mr. Davis: I never heard of a case where you couldn't put a witness on the stand." (Tr. p. 19,160)

## XX.

On February 4, during the testimony of the witness Riordan, Mr. Dellinger spoke out. In the ensuing disturbance, Mr. Davis inserted the following remarks:

"The Court: Take that man into custody. Mr. Marshal, take that man into custody.

Voices: Right on, right on.

Mr. Schultz: Into custody.

The Court: Into custody.

Voices: Right on.

Mr. Davis: Go ahead, Dick Schultz, put everybody in jail." (Tr. p. 19,671)

## XXI.

On February 4, when the Court announced that it had determined to revoke the defendant Dellinger's bail, there was an outburst in the courtroom. Mr. Davis inserted the following remark:

"The Court: This isn't the first word, and I won't argue this.

Mr. Davis: This Court is bull shit.

The Court: There he is saying the same words again.

Mr. Davis: No, I say it."

\* \* \* \* \* \*

"Mr. Rubin: Everything in this court is bull shit.

Mr. Davis: I associate myself with Dave Dellinger completely 100 per cent. This is the most obscene court I have ever seen."

\* \* \* \* \* \*

"Mr. Davis. Mr. Rubin's wife they are now taking—

Mr. Rubin: Keep your hands off her. You see them taking away my wife?

Mr. Davis: Why don't you gag the press, too, and the attorneys, gag them." (Tr. pp. 19, 778–79)

## XXII.

On February 5, after the Court had determined that it had heard sufficient argument it ordered Mr. Weinglass to discontinue arguing. The Court ruled. Mr. Davis then rose with the following statements:

"Mr. Weinglass: Your Honor will not permit me to continue a legal argument?

The Court: You heard what I said. I deny the motion.

Mr. Davis: May we defend ourselves if our lawyers can't?" (Tr. pp. 19,800–01)

And slightly later, during the same argument:

"The Court: Have that man sit down. I will hear no further argument on this motion.

Mr. Davis: Could I make a motion to defend myself since you won't let my lawyer represent me?" Official Transcript, Page 19,814.

### XXIII.

On February 7th, at the conclusion of the government's rebuttal case, the defense moved for an early recess of the Saturday session. The purpose of this recess purportedly was to permit them to secure two additional witnesses and a certified copy of an Illinois court record. While the court was discussing this request with Mr. Kunstler, there was a loud laugh from the defense table. The court determined that there was no point in granting courtesies to parties unable to conduct themselves with a modicum of respect for the court. Mr. Davis then made several comments to the court:

"Mr. Davis: Is it not possible to put on our defense?

"Mr. Davis: We can't put on our witnesses." (Tr. p. 20,270)

The jury returned, and the argument resumed in their presence. Mr. Davis, before the jury, interjected the following remark when Mr. Foran spoke in favor of the court's ruling:

"Mr. Davis: Save the Judge." (Tr. p. 20,276)

Shortly thereafter the court ruled adversely to Mr. Dellinger on a special application concerning his confinement. Mr. Davis greeted this ruling with the following sarcastic comments:

"Mr. Davis: That's fair. That's fair." (Tr. p. 20,282)

"Mr. Davis: Have a good week-end, Judge." (Tr. p. 20,283)

Accordingly, I adjudge the defendant Rennard C. Davis guilty of the several individual specifications of direct criminal contempt enumerated above.

### THOMAS E. HAYDEN

### I.

On September 26th, during the opening remarks by Mr. Schultz, the defendant Hayden rose and shook his fist in the direction of the jurors. The following colloquy occurred:

"The Court: This will be but a minute, Mr. Marshal. Who is the last defendant you named?

Mr. Schultz: Mr. Hayden.

The Court: Hayden. Who was the one before?

Mr. Schultz: Davis, and prior to that was Dellinger.

The Court: The one that shook his fist in the direction of the jury?

Mr. Hayden: That is my customary greeting, your Honor.

The Court: It may be your customary greeting, but we do not allow shaking of fists in this courtroom. I made that clear.

Mr. Hayden: It implied no disrespect for the jury; it is my customary greeting.

The Court: Regardless of what it implies, sir, there will be no fist shaking, and I caution you not to repeat it.

Mr. Hayden: May I use that gesture to my fellow defendants, my attorneys?

The Court: That applies to all of the defendants.

Mr. Marshal, bring the jury back." (Tr. 5)

### II.

At the end of the afternoon session on October 28th, the defendant Hayden refused to rise in the customary manner when directed to do so by the Marshal. (Tr. 4,618–19)

### III.

On October 29, while the Court was engaged in a colloquy with Mr. Seale and Mr. Schultz, Mr. Hayden rose and made the following comment:

"Mr. Seale: Will you please tell the Court the reason I am talking is because I didn't want a spontaneous response to any kind of activity that might go on. Will you please tell the Court I said to keep cool.

Mr. Hayden: They did nothing when Bobby Seale was physically attacked. They did nothing.

The Court: Will you remain silent, you defendants, please. You have a lawyer.

Mr. Hayden: Just as he ordered them to.

The Court: Mr. Marshal, bring in the jury." (Tr. 4,635)

## IV.

On October 29, at the close of the morning session, the defendant Hayden refused to rise in the customary manner when instructed to do so by the marshals. (Tr. 4,728-29)

## V.

During the afternoon session of October 29 when the Court was compelled to call a recess, the defendant Hayden refused to rise again, despite the instructions of the marshal. (Tr. 4,763)

## VI.

On October 30, at the beginning of the morning session, the defendant Hayden refused to rise in the customary manner when the Judge entered the courtroom. (Tr. 4,801)

## VII.

On October 30, when the Court was compelled to deal with Mr. Seale because of previous outbursts, Mr. Hayden indulged in the following rhetoric, rising to address the Court:

"Mr. Hayden: Your Honor, could I address you?

The Court: No, you may not, sir. You have a lawyer. That is what lawyers are for. I am not permitted under the decisions of the Supreme Court to let you speak.

Mr. Hayden: All I want to say is that—

The Court: Sit down, please.

Mr. Hayden: Bobby Seale should not be put in a position of slavery.

The Court: Mr. Marshal—

Mr. Hayden: He wants to defend himself.

The Court: Tell that man to sit down. What is his name?

Mr. Hayden: My name is Tom Hayden, your Honor.

The Court: All right.

Mr. Hayden: I would just like to—

The Court: Let the record show that Mr. Tom Hayden rose and addressed the Court, persisted in speaking despite the Court's direction that he sit down.

Bring in the jury, Mr. Marshal." (Tr. 4,843-44)

## VIII.

On October 30, when the Court was compelled to direct the marshals to restrain Mr. Seale, the following incident occurred:

"Mr. Seale: The Judge is not—he is not trying to give you no fair trial. That's what you are. You are lying. You know exactly what you are.

Mr. Hayden: Now they are going to beat him, they are going to beat him.

Mr. Hoffman: You may as well kill him if you are going to gag him. It seems that way, doesn't it?

The Court: You are not permitted to address the court, Mr. Hoffman. You have a lawyer.

Mr. Hoffman: This isn't a court. This is a neon oven.

Mr. Foran: That was the defendant Hoffman who spoke.

The Court: Let the record show that the defendant Hoffman spoke.

Mr. Schultz: Prior to that it was Mr. Hayden who was addressing the jury while they were walking out of here.

Mr. Hayden: I was not addressing the jury. I was trying to protect Ms. (sic.) Seale. The man is supposed to be silent when he sees another man's nose being smashed?

Mr. Hoffman: The disruption started when these guys got into over-kill. It is the same exact thing as last year in Chicago, the same exact thing.

The Court: Mr. Hoffman, you are directed to refrain from speaking you are ordered to refrain from speaking. It is clear that after this morning that I think we cannot go ahead. I would be glad to entertain first suggestions from the government and then from the defense as to whether or not this trial shouldn't be recessed until two o'clock. I am perfectly willing to try to continue and do my best to discharge the obligations of my office.

Mr. Foran: Your Honor, I would like to see if we couldn't continue.

The Court: What do you say?

Mr. Foran: I would like to see if we could continue.

The Court: All right. It will take some time to—then we will take a brief recess.

Mr. Hayden: I thought you were going to ask the defendants.

Mr. Weinglass: Are we part—weren't we being invited to participate in the dialogue between then—

Mr. Schultz: It is they who are disrupting this trial and now they want to make the decision as to whether or not we should proceed. It is incredible. It is they who are fostering this and they want to advise the court—

The Court: I have ordered a recess.

Mr. Weinglass: The court invited it.

The Court: Let the record show that.

Mr. Hayden: Stand up. Stand up. Don't let them have any pretext.

The Court: Let the record show that Mr. Hayden asked people—

Mr. Hayden: I ask the people there to do what they were told and they did it.

The Court: Mr. Hayden, do not try to fill my sentences out for me and you are not permitted to speak except as you may come to be a witness in this case. You are not permitted to speak out loud. You may, of course, consult with your lawyer." (Tr. 4,-846–49)

IX.

On January 9, the defendant Hayden openly and blatantly laughed at the court while the court was attempting to make a ruling. (Tr. 14,824)

X.

On January 28, while the Assistant United States Attorney was making a statement to the court, Mr. Hayden rose and said:

"Mr. Hayden: That is not true." (Tr. 18,439)

XI.

On January 28 the court ruled that the defendants would not be permitted to call former United States Attorney General Ramsey Clark to the stand as a witness. The court entered the following order:

"The Court: I therefore sustain the objection of the government to having the defense call this witness, Attorney General Clark, before the jury, and I also order both counsel for the government and the defense not to refer to this hearing or the subject matter thereof before the jury after the jury is brought in.

Mr. Schultz: Does that include the defendants also, your Honor? They speak more than their attorneys sometimes.

The Court: Yes, yes.

Mr. Schultz: Would you direct them also?

The Court: I would order the defendants not to discuss that matter in the presence of the jury. It would not be fair to either side." (Tr. 18,524–25)

The very next day Mr. Hayden directly and defiantly violated that order in the presence of the jury. The following occurred:

"Mr. Foran: Your Honor, the theatre is beginning again. May we have

the jury excused, your Honor, since the government is unable to respond, since the government is bound to proper conduct in a courtroom?

Mr. Hayden: Proper conduct? You wouldn't let the former Attorney General of the United States testify.

The Court: Ladies and gentlemen, I direct you to disregard the statement of Mr. Kunstler and I will have to excuse you with my usual orders.

Mr. Kunstler: I think the jury should hear the whole thing.

The Court: There are a lot of thoughts you have had here.

Mr. Foran: Your Honor, you will note, of course that Mr. Hayden shouted out in the courtroom about the Attorney General not testifying before the jury after a direct and clear direction from the court after the Attorney General had testified extensively on voir dire that it should not be mentioned before the jury. Mr. Hayden jumped to his feet, shouted that out while the jury was filing out of the room.

Mr. Weinglass: That statement is as accurate as other statements made by Mr. Foran. This time it was done right in the presence of the court. Your Honor must—your Honor does not have to be reminded that if there is a shout in the courtroom and I think the fact that Mr. Foran had to state it is proof of the fact that it didn't occur. The court has never failed to note for the record when there was a disturbance in the courtroom.

Mr. Foran: Mr. Weinglass, honor and honesty are clearly demonstrated to the court, I'm sure. Your Honor saw Mr. Hayden make that statement. It was very loudly said, clearly said for purposes of influencing the jury improperly.

Mr. Weinglass: All right. Let's put it to the test of honesty. Did your Honor see Mr. Hayden jump up to his feet?

Mr. Schultz: It didn't jump up to his feet, but Mr. Hayden made the statement, Mr. Weinglass. Didn't Mr. Hayden make the statement, Mr. Weinglass? Did Mr. Hyaden (sic.) make the statement?

Mr. Dellinger: Save him, Dick.

The Court: The marshals will exclude from the courtroom anyone who is disorderly.

Mr. Schultz: Your Honor, would inquire of Mr. Weinglass whether or not he heard Mr. Hayden make the statement?

The Court: No. I will let the record determine that.

Mr. Hayden: Your Honor, I did make the statement. I did not intend to, as the government said. It came out because I lost my temper after listening to what Mr. Foran said. I am sorry that I did it. I did not intend it.

The Court: You got the answer.

Mr. Hayden: I did not understand—

Mr. Weinglass: He did not jump to his feet. He did not shout.

The Court: That rather convicts you, doesn't it, by your own client?" (Tr. 18,827–30)

Accordingly, I hereby adjudge the defendant Thomas Hayden guilty of the several individual contempts specified above.

## ABBOTT H. HOFFMAN

### I.

On September 26, during the opening statement by the Government, defendant Hoffman rose and blew a kiss to the jurors. (Tr. 9)

### II.

On October 23, well after the date of the Court's order sequestering the jury and ordering the jury that they may see no newspapers, the defendant Hoffman held up a newspaper so the jurors might

see the headline in the courtroom. The following colloquy occurred:

"Mr. Schultz: If the Court please—

Mr. Kunstler: I would rather be directed.

Mr. Schultz: Before you direct him, if you are going to direct Mr. Kunstler, I would like to make one observation for the record. At 12:30 this morning or 12:30 early this afternoon, when the jury was adjourned, after the jury stood up, defendant Hoffman—in fact, he had the same article that he has in front of him there—

Mr. Hoffman: Yes, I was going to show it to—

Mr. Schultz: He held up the newspaper for them to see and—

Mr. Hoffman: It ain't a newspaper. It is the Berkeley Tribe and doesn't tell lies, so it isn't a newspaper.

The Court: I wonder if you would ask your client—you know, when I was out there trying cases, if my clients started to talk when another lawyer was speaking, Mr. Kunstler, I told him to remain quiet. Now, I can direct him to remain quiet. The United States Attorney was speaking to the Court. He is entitled to be heard just as you are entitled to be heard. We are not running a circus. This happens to be a court—even though there are those who don't share views.

Mr. Kunstler: I would suggest, your Honor, then, that Mr. Hoffman be permitted to respond and not be interrupted—

The Court: I will not hear from your clients.

Mr. (sic.) Mr. Hoffman: I was just trying to be helpful, your Honor.

The Court: I will not hear from your client. I will let Mr. Schultz finish his observation." (Tr. 3,866–67)

### III.

On October 28, at the close of the session, the defendant Hoffman refused to rise in the customary manner when directed to do so by the marshal. (Tr. 4,618–19)

### IV.

On October 29, the following colloquy occurred:

"The Court: I will ask you to sit down, sir. You have a lawyer to speak for you. I haven't been told that you represent all of these defendants, either.

Mr. Hoffman: We have been told that they are defendants too.

Mr. Foran: May the record show that that was the defendant Hoffman who made that—

The Court: Yes; yes.

Mr. Foran: The previous statement was made by the defendant Dellinger.

The Court: The last statement was made by the defendant Abbie Hoffman.

Mr. Hoffman: I don't use that last name anymore.

The Court: Will you remain quiet." (Tr. 4,639)

### V.

At the close of the morning session on October 29, the defendant Hoffman refused to rise in the customary manner. (Tr. 4,728–29)

### VI.

On October 29, when the Court was compelled to call a recess during the afternoon session, the defendant Hoffman once more refused to rise in the customary manner. (Tr. 4,763)

### VII.

On October 30, at the beginning of the court session, the defendant Hoffman refused to rise in response to the marshal's direction. (Tr. 4,801)

### VIII.

On October 30, when the Court was compelled to deal appropriately with Mr.

Seale, Mr. Hoffman engaged in the following:

"Mr. Seale: The Judge is not—he is not trying to give you no fair trial. That's what you are. You are lying. You know exactly what you are.

Mr. Hayden: Now they are going to beat him, they are going to beat him.

Mr. Hoffman: You may as well kill him if you are going to gag him. It seems that way, doesn't it?

The Court: You are not permitted to address the Court, Mr. Hoffman. You have a lawyer.

Mr. (sic.) Mr. Hoffman: This isn't a court. This is a neon oven.

Mr. Foran: That was the defendant Hoffman who spoke.

The Court: Let the record show that the defendant Hoffman spoke." (Tr. 4,846)

And very shortly thereafter he continued in the following interchange:

"Mr. Hayden: I was not addressing the jury. I was trying to protect Mr. Seale. The man is supposed to be silent when he sees another man's nose being smashed?

Mr. Hoffman: The disruption started when these guys got into overkill. It is the same thing as last year in Chicago, the same exact thing.

The Court: Mr. Hoffman, you are directed to refrain from speaking. You are ordered to refrain from speaking." (Tr. 4,847)

After this interchange the Court determined that a recess would be appropriate. When the Court left the bench the defendant Hoffman refused to rise in the customary manner. (Tr. 4,849)

### IX.

On October 30, after a brief recess the Judge returned to the bench in the afternoon and the defendant Hoffman again refused to rise in the customary manner. (Tr. 4,853)

### X.

On November 12, the defendant Hoffman and the other defendants openly laughed at the Judge while he was making a ruling. The following colloquy occurred:

"The Court: That observation will remain on the record and this loud laughter has got to cease.

Mr. Hoffman: Mr. Weinglass, how many years do you have to laugh at?

Mr. Weinglass: I would further want to—

Mr. Hoffman: I am talking to my lawyer." (Tr. 6,257–59)

### XI.

On November 26, after the Court made a ruling the following colloquy occurred:

"The Court: I decide each motion on its own papers, sir, and I am not aware of any witnesses that the Government has srought (sic.) to bring here. I don't know whether—

Mr. Hoffman: We are very confused about this. Is the Government going to present our defense as well as our prosecution?

The Court: Have you gotten that— what is the name of that defendant speaking?

Mr. Hoffman: Just Abbie. I don't have a last name, Judge. I lost it. We can't respect the law when it's tyranny.

The Court: Are you able to hear the defendant Hoffman speaking?

Mr. Hoffman: Abbie.

The Reporter: Yes, sir." (Tr. 8,-081)

### XII.

On December 15, the defendant Hoffman openly laughed at the Court during its ruling on a motion and admitted it.

"Mr. Hoffman: I was laughing." (Tr. 11,181)

### XIII.

On December 30, while the defendant Hoffman was testifying on cross examination, the following colloquy occurred:

"The Court: I will admonish the jury—the United States Attorney—

The Witness: Wait until you see the movie.

The Court: —if it is required that he be admonished.

The Witness: Wait until you see the movie.

The Court: And you be quiet.

The Witness: Well—the movie's going to be better.

The Court: Did you get that last, Miss Reporter?

The Reporter: Yes, sir.

The Court: The last words spoken by the witness on the stand." (Tr. 13,013)

### XIV.

On January 9, the defendant Hoffman openly laughed at the Court again. The following colloquy occurred:

"Mr. Kunstler: Oh, your Honor, there is a certain amount of humor when talking about a bathroom—

The Court: Oh, I know that is your favorite reply.

Mr. Hoffman: I laughed, too." (Tr. 14,824)

### XV.

On January 14, there was again an excessive and obnoxious outburst of laughter from the table of the defendants. The following colloquy occurred:

"Mr. Kunstler: I just don't want to get thrown in my chair by the marshals so I will have to sit down, but I just don't think it is fair to do that.

Mr. Hoffman: I laughed anyway.

The Court: Will you be quiet, Mr.—

Mr. Hoffman: I laughed. It wasn't Jerry, it was me.

The Court: Did you get that, Miss Reporter?

Mr. Hoffman: At that ruling. I laughed.

The Court: That was Mr. Dellinger.

Mr. Kunstler: That was not Mr. Dellinger.

Mr. Schultz: Your Honor, that was Mr. Hoffman.

Mr. Kunstler: Your Honor—

Mr. Schultz: That was the defendant Hoffman speaking.

Mr. Hoffman: I was him." (Tr. 15,587)

### XVI.

Withdrawn.

### XVII.

On January 21st, the defendants were conducting a conference with one of their staff "members" at the defense table, while Mr. Foran was attempting to speak. The conference was loud enough to cause the following disturbance:

"The Marshal: Excuse me, Mr. Foran.

Will you take your seat at the table, please.

Mr. Hoffman: We're organizing the defense.

The Marshal: Take your seat. Now, come on.

Mr. Hoffman: She's on the staff.

The Marshal: Mr. Kunstler, talking is not—I'm asking him to take his seat.

Mr. Kunstler: I don't know what he was doing. He said he was talking to his wife.

Mr. Hoffman: We are talking in a low voice. He didn't even hear.

The Court: The defendant's place at the trial is at the defendants' table.

Mr. Hoffman: We were talking—

A Defendant: Let our staff sit at the table, everything would be all right.

Mr. Kunstler: Your Honor, he was sitting, just talking quietly with his wife, who is part of our staff.

The Court: I know. I know what he's doing. I require—the rule of this court is that the defendants sit at the defendants' table.

Mr. Hoffman: How do we organize the trial?

The Court: I order Mr. Hoffman to sit at the defendants' table.

Mr. Hoffman: OK. We can just talk from here. Why don't you go out and talk to Paul Krassner and get the defense together.

I don't see how we can prepare the defense. We have to sit here seven days—" (Tr. 16,791–92)

### XVIII.

On January 23, while Mr. Foran and Mr. Dellinger were engaged in a colloquy, Mr. Hoffman inserted the following remarks:

"Mr. Foran: Your Honor, in the American system there is a proper way to raise such issues and to correct them.

Mr. Dellinger: That was the proper way with Fred Hampton, wasn't it?

Mr. Foran: And correct them, your Honor by the proper governmental system, and there is a proper way to do that.

Mr. Hoffman: Correction the way you handled the war in Viet Nam, the same proper—" (Tr. 17,376)

Shortly thereafter during the same incident a discussion ensued concerning the propriety of Mr. Kunstler's press conferences. Mr. Hoffman again interjected his comments. It's reported as follows:

"The Court: Yes, there is a law against a lawyer participating—

Mr. Kunstler: No, there isn't. The rule is quite clear, and we know what it is.

The Court: There is a law against—

Mr. Hoffman: The Judge had an interview in Time Magazine.

The Court: A lawyer on television discussing the case.

Mr. Kunstler: Let's have what I said that was false. That was the accusation.

The Court: I will ask you both to sit down.

Mr. Hoffman: The Judge gave an interview to Time Magazine.

The Court: And I will instruct Mr. Weinglass to continue with the direct examination of this witness." (Tr. 17,379)

### XIX.

On January 30, at the conclusion of the court's session, the Court asked the parties and attorneys to stay after the jury had been excused. The Court then broached the subject of the propriety of the public speeches given by the defendants. While this discussion was going on Mr. Hoffman again inserted his remarks gratuitously. The incident is reported as follows:

"The Court: I am not going to be put on the griddle about it. Now you are the lawyer. You are one of the lawyers for the defendants. And I think it is wholly inappropriate for defendants in a criminal case to make the kind of speech that was made and the matter of bail goes beyond mere protection for the Government that the defendant appear. Read the book.

Mr. Weinglass: But I do not think the matter of bail should be held over their heads in order to reduce the amount of public speaking they are doing.

The Court: Oh, I don't—

Mr. Hoffman: I will be in Miami on Sunday afternoon with the same speech.

The Court: That expression—did you hear that? I haven't heaed (sic.) lawyr (sic.) for the defendants try to quiet their clients during this trial when they spoke out, not once in four and a half months, not once." (Tr. 19,094–19,095)

## XX.

On February 2, the Court had determined that argument on a particular question had been completed. The Court admonished Mr. Kunstler several times to sit down and desist arguing. The Court had previously ordered the defendants and their attorneys not to mention the fact that the former Attorney General of the United States, Ramsey Clark, had been excluded by order of the Court. Mr. Hoffman made several comments after the Court had indicated argument was completed, and he violated the Court's order concerning the Attorney General. The record states:

"The Court: You sit down, sir, or we will arrange to have you put down.

Mr. Hoffman: Are you going to gag the lawyers, too?

A Voice: Chained to the chair—

Mr. Hoffman: You don't have to gag the jury, because they haven't been able to see our witnesses.

The Court: That was Mr. Hoffman that made that remark, Miss Reporter.

Mr. Hoffman: The past Attorney General of the United States, Ramsey Clark—" (Tr. 19,159)

Later in the day, the defendant Hoffman interrupted the Court to make the following sarcastic remark:

"The Court: All I have to repeat to you, Mr. Kunstler, is that I know you practice in the Southern District of New York. I have practiced there a lot as a lawyer before all of the then District Judges. I never saw—

Mr. Hoffman: When it was under British control." (Tr. 19,199–200)

## XXI.

On February 4, during the cross examination of the witness Phillips, Mr. Kunstler was examining the witness considering the witness' concept of how hippies dress. During that incident, Mr. Hoffman got up and danced around, lifting his shirt and baring his body to the jury, and engaged in antics designed to make light of the testimony of the witness. The incident is reported as follows:

"Q. You are the first one that hasn't identified him. (Hoffman) This is Mr. Hoffman over here.

(There was laughter in the courtroom.)

The Court: Let the record show that Mr. Hoffman stood up, lifted his shirt up, and bared his body in the presence of the jury—

Mr. Kunstler: Your Honor, that is Mr. Hoffman's way.

The Court: —dancing around.

(There was laughter in the courtroom.)

Mr. Kunstler: Your Honor, that is Mr. Hoffman's way.

The Court: It is a bad way in a courtroom."

\* \* \* \* \* \*

"Q. Mr. Phillips, my question before we had the little colloquy had to do with—

The Court: It was not a little colloquy, that was taking Mr. Hoffman to task for improper conduct in the courtroom.

By Mr. Kunstler:

Q. Before Mr. Hoffman was taken to task for improper conduct in the courtroo, (sic.) I asked you whether he was in hippie dress.

Mr. Hoffman: Thatwould (sic.) make it hippie dress, naked." (Tr. 19,622–24)

## XXII.

On February 4, at the end of the session, the Court indicated that it had determined to revoke the bail of the defendant Dellinger. In the uproar which followed this decision Mr. Hoffman made the following remarks:

"Mr. Hoffman: You are a disgrace to the Jews. You would have served Hitler better. Dig it."

\* \* \* \* \* \*

"Mr. Hoffman: I heard you haven't let anybody free in four years. That's right, stop me."

\* \* \* \* \* \*

"Mr. Hoffman: They are all our cases. We are bailing that guy out and every guy that gets arrested."

\* \* \* \* \* \*

"Mr. Hoffman: No spectators while they put them in jail." (Tr. 19,781–82)

## XXIII.

On February 5, after the Court had decided not to reinstate Mr. Dellinger's bail, Mr. Hoffman made the folowing remarks in the outburst which ensued:

"Mr. Hoffman: Your idea of justice is the only obscenity in the room. You schtunk! Vo den! Shanda fur de goyem!

Obviously it was a provocation. That's why it has gone on here today because you threatened him with the cutting of his freedom of speech in the speech he gave in Milwaukee.

The Court: Mr. Marshal, will you ask the defendant Hoffman to—

Mr. Hoffman: This ain't the Standard Club.

The Marshal: Mr. Hoffman—

Mr. Hoffman: Oh, tell him to stick it up his bowling ball.

How is your war stock doing, Julie?

You don't have any power. They didn't have any power in the Third Reich either.

The Court: Will you ask him to sit down, Mr. Marshal?

The Marshal: Mr. Hoffman, I am asking you again to shut up.

Mr. Rubin: Gestapo.

Mr. Hoffman: Show him your .45.

Show him a .45. He ain't never seen a gun." (Tr. 19,801–02)

\* \* \* \* \* \*

"Mr. Hoffman: Mies vander Rohe was a Kraut, too." (Tr. 19,803)

"Mr. Hoffman: You know you cannot win the fucking case. The only way you can is to [put] us away for contempt. We have contempt for this court, and for you, Schultz, and for this whole rotten system. That's the only justice. That is why [they want] this because they can't prove this fucking case." (Tr. 19,803–04)

\* \* \* \* \* \*

"Mr. Hoffman: You put him in jail because you lost faith in the jury system. I hear you haven't lost a case before a jury in 24 tries. Only the Krebiozen people got away. We're going to get away too. That's why you're throwing us in jail now this way.

Contempt is a tyranny of the court, and you are a tyrant. That's why we don't respect it. It's a tyrant." (Tr. 19,814)

"Mr. Hoffman: The judges in Nazi Germany ordered sterilization. Why don't you do that, Judge Hoffman?" (Tr. 19,815)

"Mr. Hoffman: We should have done this long ago when you chained and gagged Bobby Seale. Mafia controlled pigs. Racist." (Tr. 19,816)

\* \* \* \* \* \*

"Mr. Hoffman: No, I won't shut up, I ain't an automaton like you. I don't want to be a tyrant and I don't care for a tyrannical system. Best friend the blacks ever had, huh. How many blacks are in the Drake Towers? How many are in the Standard Club? How many own stock in the Brunswick Corporation?" (Tr. 19,816–17)

And later in the day Mr. Hoffman, at the end of the session, made the additional comment:

"Mr. Hoffman: It was every man. We'll see you at the Standard Club, Julie." (Tr. 19,877)

## XXIV.

On February 6th, in the presence of the jury, the defendant Hoffman attempted to hold the court up to ridicule by entering the courtroom in judicial robes (Tr. 19,888) which he later removed, threw to the floor and used to wipe his feet.

Accordingly, I hereby adjudge the defendant Abbott H. Hoffman guilty of

the several individual specifications of direct criminal contempt enumerated above.

## JERRY C. RUBIN

### I.

At the conclusion of the afternoon session on October 28, the defendant Rubin refused to rise in the traditional manner at the direction of the United States Marshals. (Tr. 4,618–4,619)

### II.

At the conclusion of the morning session on October 29, the defendant Rubin once more refused to stand at the urging of the Marshal. (Tr. 4,728–4,729)

### III.

When the Court was compelled to call a recess during the afternoon session on October 29, the defendant Rubin once more refused to rise in the traditional manner. (Tr. 4,763)

### IV.

On October 30 at the beginning of the morning session the defendant Rubin once more refused to rise in the traditional manner. (Tr. 4,801)

### V.

On October 30, when the Court was required to employ the marshals to physically restrain the defendant Seale, the following colloquy took place:

"Mr. Kunstler: Your Honor, are we going to stop this medieval torture that is going on in this courtroom? I think this is a disgrace.

Mr. Rubin: This guy is putting his elbow in Bobby's mouth and it wasn't necessary at all.

Mr. Kunstler: This is no longer a court of order, your Honor; this is a medieval torture chamber. It is a disgrace. They are assaulting the other defendants also.

Mr. Rubin: Don't hit me in the balls, m . . . . . f . . . . . .

Mr. Seale: This m . . . . . f . . . . . is tight and it is stopping my blood.

Mr. Kunstler: Your Honor, this is an unholy disgrace to the law that is going on in this courtroom and I as an American lawyer feel a disgrace.

Mr. Foran: Created by Mr. Kunstler.

Mr. Kunstler: Created by nothing other than what you have done to this man.

Mr. Hoffman: You come down here and watch this, Judge.

Mr. Foran: May the record show that the outbursts are the defendant Rubin.

Mr. Seale: You fascist dogs, you rotten low life son of a bitch. I am glad that I said it about Washington used to have slaves, the first President—

Mr. Dellinger: Somebody go to protect him.

Mr. Foran: Your Honor, may the record show that that is Mr. Dellinger saying, 'Someone go to protect· him,' and the other comment is by Mr. Rubin.

Mr. Rubin: And my statement, too.

The Court: Everything you say will be taken down." (Tr. 4,815–4,816)

### VI.

On October 30, when the Court recessed for the lunch hour, the defendant Rubin once more refused to rise in the traditional manner. (Tr. 4,849–4,850)

### VII.

At the beginning of the afternoon session on October 30, the defendant Rubin once more refused to rise in the customary manner. (Tr. 4,853)

### VIII.

On January 15, during the testimony of the witness Weiss, the defendant Rubin inserted several comments into the proceedings after the Court sustained ob-

jection to several defense exhibits. They follow:

"The Court: They laugh at that.

Mr. Rubin: We are standing.

The Court: They laugh at that. And talk about racism. I see no proof of racism in the many months we have been here.

Bring in the jury.

Mr. Rubin: Bobby Seale gagged and chained—" (Tr. 15,928)

## IX.

On January 23, the marshals determined that several spectators had been rowdy and had to be removed from the courtroom. One of those spectators was Jerry Rubin's wife. As she was being removed, Mr. Rubin protested loudly and violently. The incident is reported as follows:

"The Court: Since you refer to Bobby Seale, your client, I recall—

Mr. Kunstler: Not my client, your Honor.

The Court: —I recall being called various kinds of pigs by that man.

Mr. Rubin: Bill, they are taking out my wife.

Mr. Kunstler: Well, your Honor would not let him defend himself. Everyone knows that now.

(Cries of 'Hey, stop it.')

Mr. Kunstler: Your Honor, must we always have this, the force and power of the Government?

Mr. Foran: Your Honor—

Mr. Rubin: They are dragging out my wife—will you please—

The Court: We must have order in the courtroom." (Tr. 17,374)

Shortly thereafter, he raised another protest on the same issue:

"The Court: I will ask you to sit down, and I ask you again, sir—I order you to sit down.

Mr. Rubin: Am I entitled to a public trial?

The Court: No—you have a public trial.

Mr. Rubin: Does the public trial include my wife being in the courtroom? Am I entitled to a public trial?

The Court: I don't talk to defendants who have a lawyer.

Mr. Rubin: You didn't listen to my lawyer, so I have to speak. Am I entitled to a public trial?

The Court: Mr. Marshal, will you ask that man to sit down.

Marshal Johnson: Will you sit down, Mr. Rubin." (Tr. 17,385–17,386)

## X.

On February 3rd, the Government called as a rebuttal witness, James Murray. When that witness was excused, as he was walking out of the courtroom, the defendants at their table mocked him by saying, "Thanks a lot. Thanks a lot." And Mr. Rubin got up and mockingly offered to shake the man's hand. The incident is reported as follows:

"The Court: Call your next witness.

The Defense Table: Thanks a lot. Thanks a lot.

Mr. Schultz: Your Honor—

Mr. Foran: Look at that—

Mr. Schultz: These men who say they have such compassion and love for human beings are trying to humiliate a man, a poor man, a man who is frightened enough to be in this courtroom, who has—

The Court: I have personally noted that the defendant stood up as the witness was walking out with dignity and tendered his hand.

Mr. Rubin: I wanted to shake his hand.

Mr. Kunstler: Your Honor, we wanted to thank him. We thought that his testimony was helpful." (Tr. 19,443–19,444)

## XI.

On February 4, after the Court had determined that it must terminate the

bail of the defendant Dellinger, Mr. Rubin made the following comments:

"Mr. Rubin: Everything in this court is—bull shit."

\* \* \* \* \* \*

"You are not going to separate us. Take us all. Show us what a big man you are. Take us all."

\* \* \* \* \* \*

"Keep your hands off her. You see them taking away my wife?" (Tr. 19,778–19,779)

'After the Court had recessed that case and ordered the courtroom cleared, Mr. Rubin approached the lectern, pointed this finger directly at the Court and said, "You are a fascist, Hoffman—" (Tr. 19,781)

### XII.

On February 5, after the Court refused to vacate its order revoking defendant Dellinger's bail, Mr. Rubin engaged in several loud outbursts in the courtroom:

"Mr. Rubin: You haven't been patient at all. You interrupted my attorney right in the middle of his argument. He was right in the middle of his argument and you interrupted him. You are not being very patient at all. That is not patience.

The Court: Ask that man to sit down. Note who he is. That is Mr. Rubin.

Mr. Rubin: Jerry Rubin. Can he finish his argument? Can he finish his argument?

The Court: I will ask you to remain quiet, sir.

Mr. Rubin: I will ask you to remain quiet when our attorney represents us is making his arguments." (Tr. 19,-795–19,796)

\* \* \* \* \* \*

"Mr. Rubin: Gestapo.

Mr. Hoffman: Show him your .45. Show him a .45. He ain't never seen a gun.

Mr. Rubin: This is justice? Huh? Lawyers can't even make an argument? You're a disgrace.

The Clerk: That is all.

The Court: Bring in the jury, Mr. Marshal.

Mr. Rubin: You are the laughing stock of the world, Julius Hoffman; the laughing stock of the world.

Mr. Hoffman: Mies vander Rohe was a Kraut too.

Mr. Rubin: Every kid in the world hates you, knows you what you represent.

Marshal Dobowski: Be quiet, Mr. Rubin.

Mr. Rubin: You are synonymous with the name Adolf Hitler. Julius Hoffman equals Adolf Hitler today." (Tr. 19,802–19,803)

A few minutes later, after the witness Lawyer had taken the stand and the jury had re-entered the room, Mr. Rubin again engaged in the following outburst:

"The Court: Mr. Marshal, will you tell the defendant Hoffman to remain quiet.

Mr. Hoffman: Schtunk.

Mr. Rubin: You are a tyrant; you know that.

The Court: Mr. Marshal, will you ask Mr. Rubin to remain quiet.

Mr. Rubin: Black robes of death.

Marshal Dobowski: Mr. Rubin, I am asking you to be quiet again.

Mr. Rubin: Why don't you ask him so the lawyer can argue.

Marshal Dobowski: Be quiet.

Mr. Rubin: You're in a very funny role, Ron (Marshal Dobowski). You're in a very funny role. If he ordered you to kill me, would you do it?

Marshal Dobowski: Be quiet.

Mr. Rubin: You tell him to keep quiet so my lawyers can speak." (Tr. 19,814–19,815)

\* \* \* \* \* \*

"Mr. Kunstler: May we have a time when your Honor would sign this order?

The Court: I will do it as soon as I can, sir.

Mr. Rubin: Tyrant.

The Court: Mr. Marshal, please have that man refrain from using those epithets.

Mr. Rubin: It is just descriptive. Just describing what I see." (Tr. 19,818–19,819)

At the close of that morning session on February 5, the defendant Rubin once more exclaimed in a loud voice:

"Mr. Rubin: Tryant." (Tr. 19,877)

### XIII.

On February 6, at 10:28 a. m., in presence of the jury, after the courtroom had been filled by the press and spectators and all participants, except the defendants Rubin and Hoffman, were prepared to begin the proceedings, the defendant Rubin entered the courtroom wearing judicial robes. This conduct was a deliberate and wilful attempt to ridicule the court. (Tr. 19,888)

### XIV.

On February 6th, as the witness Irv Bock was leaving the stand and passing the defense table, the defendant Rubin commented to him, in a voice loud enough to be heard by the jurors and the Court:

"Mr. Rubin: Tough luck, Irv." (Tr. 20,019)

### XV.

On February 7th, while the Court was hearing argument on a motion for a continuance at the close of the Government's rebuttal case, the defendant Rubin interjected the following comment:

"Mr. Rubin: Refuse to rest." (Tr. 20,270)

Accordingly, I hereby adjudge the defendant Jerry C. Rubin guilty of the several individual and separate direct criminal contempts cited above.

### LEE WEINER

### I.

On October 28th at the end of the session, the defendant Weiner refused to stand in the traditional manner when directed to do so by the marshal. (Tr. 4,618–4,619)

### II.

On October 29th, when Court called a recess, the defendant Weiner once more refused to rise in the traditional manner. (Tr. 4,728–4,729)

### III.

On October 29th, when the Court was compelled to call a recess because of the conduct of the defendant Seale, the defendant Weiner once more refused to rise in the customary manner when the Court left the bench. (Tr. 4,763)

### IV.

On October 30th, at the beginning of the court session, the defendant Weiner refused to rise in the customary manner when the Judge entered the courtroom. (Tr. 4,801)

### V.

On December 1st, while the witness Rochford was on the stand, the defendant Weiner made the following comment in a voice loud enough to be heard by the Court and others present, including the jurors:

"Defendant Weiner: Bill, the executioner is mumbling and I can't hear him.

Mr. Kunstler: Your Honor, is it possible to tell the witness to keep his voice up?

The Court: I think it is possible. I have demonstrated that because I have asked him two or three times already.

Mr. Foran: May the record show the comment? Did you get that comment?

Defendant Dellinger: He was speaking to his lawyer.

Mr. Foran: The comment was: 'The executioner is mumbling and I can't hear him.' I would like the record to show that.

Mr. Kunstler: Your Honor, it is just like a school marm that has to every time point out—

The Court: Yes, I heard it. I heard that. It is in the record." (Tr. 8,610)

## VI.

On January 14th, during the redirect examination of the witness Edmundson, the defendant Dellinger rose and made a speech. After that speech, the Defendant Weiner sat at the table and openly applauded him. (Tr. 15,591)

## VII.

On January 28th, in front of the jury, the defendant Weiner engaged in the following exchange:

"Mr. Schultz: I wish Davis who was such a gentle boy on the stand the last couple of days, smiling at the jury and pretending he was just a little boy next door, would stop whispering and talking to me while I am talking.

Mr. Davis: You are a disgrace, sir. I say you are a disgrace. I really say you are a disgrace.

Voices: Yes. Yes.

Mr. Schultz: I think he has a split personality, like a schizophrenic.

Mr. Weiner: Now he is a psychological student.

Mr. Schultz: So, your Honor, I would ask that you do follow proper procedure considering the representation—

The Court: Will you excuse me, please.

Mr. Marshal, if you can't do it alone, have another marshal assist you, and stand at that table there so that I can listen to the United States Attorney make his presentation as I expect to try to listen to counsel for the defense when I call on them to reply. This thing has been going on all through this trial, but very little can be done about it at the moment." (Tr. 18,397–18,398)

Accordingly, I hereby adjudge the defendant Lee Weiner guilty of the several individual and separate direct criminal contempts of this court.

## JOHN R. FROINES

### I.

The record reveals that on October 28 the defendant *Froines* laughed openly and subsequently commented on his laughter by making the following remark:

"We laughed—we laughed because it was a stupid answer." (Tr. 4,544)

### II.

At the close of the session on October 28th, the defendant *Froines* refused to rise in the traditional manner, despite being instructed to do so by the United States Marshal. (Tr. 4,618–4,619)

### III.

When the Court was required to call a recess on October 29th because of the conduct of Mr. Seale, the defendant *Froines* refused to rise in the traditional manner when the Court left the bench. (Tr. 4,763)

### IV.

At the beginning of the session on October 30th when the Court entered the room, the defendant *Froines* once more refused to rise in the traditional manner. (Tr. 4,801)

### V.

On December 17th while the lawyers were engaged in an argument, *Mr. Froines* made the following comment, in a voice loud enough to be heard by all in the courtroom:

"Mr. Froines: That is a lie. That was not the testimony." (Tr. 11,549)

### VI.

On December 30th Mr. Dellinger was engaged in a colloquy with the Court. In the course of that discussion *Mr. Froines* interjected a comment. That is recorded as follows:

"Mr. Dellinger: Decorum is more important than justice, I suppose.

The Court: I have never sat in a trial, over the many years, where a defendant has spoken upon his own when—

Mr. Froines: Perhaps you can give him four years like you gave Bobby Seale.

Mr. Dellinger: We just walk politely into jail." (Tr. 12,915)

## VII.

On February 2nd, the Court ruled that the defendants had rested their case-in-chief in that they were not prepared to put another witness on the stand, and they made representations concerning their intentions to rest. The Court further ordered the defendants to make no reference before the jury of the fact that they had wanted Dr. Ralph Abernathy to testify. (Tr. 19,140)

Subsequently that morning before the jury, during the direct examination of the witness Lynskey, *Mr. Froines* made the following comment from the defense table:

"Mr. Foran: Your Honor, the interruption in the midst of the questioning of a witness in the presence of the jury is unheard of, Your Honor. I wish he would—

Mr. Froines: So is not putting on a witness." (Tr. 19,156)

## VIII.

On February 2nd, the Court objected to Mr. Kunstler's demonstration of affection for Dr. Abernathy in front of the jury. The following colloquy took place between the Court and Mr. Kunstler in which *Mr. Froines* interjected a comment:

"The Court: I have never seen that in a courtroom.

Mr. Kunstler: But you have never seen us before, your Honor, and the movement—

The Court: That's right.

Mr. Kunstler: —and the movement has a physically touching quality to it which is sort of irrepressible sometimes.

The Court: There are certain kinds of conduct one engages in in a courtroom and in other places.

Mr. Kunstler: Well, there is, because there are different life styles in this courtroom.

Mr. Froines: We will change that." (Tr. 19,194)

## IX.

On February 2, when the witness Murray left the stand, the defendants mockingly said, "Thanks a lot. Thanks a lot", and the defendant Rubin stood and mockingly offered to shake hands with the witness. *Mr. Froines* interjected the following remark, along with others:

"Mr. Kunstler: Your Honor, we wanted to thank him. We thought that testimony was helpful.

Mr. Froines: I beg your pardon. That man wants to put us away for ten years by lying and we think this proves it and we have a right—

The Court: Make a note that that man is *Mr. Froines.*

A Voice: Froines.

Mr. Froines: Disgusting." (Tr. 19,444)

## X.

On February 5, a loud conference was taking place at the defense table. The Court instructed the marshal to quiet the conference down and *Mr. Froines* interjected a comment:

"Mr. Foran: Your Honor, it is very difficult to present a witness who has got a soft voice when there is agitation at the defense table, whispering and motion over there. It is extremely difficult for the jury to hear what is going in. I wish we could have the defense table sit quiet.

The Court: The marshal will try to maintain quiet at the table while examination of the witness is going on.

Mr. Froines: I am sorry, there was no agitation. They were simply discussing the revocation of David Dellinger's bond." (Tr. 19,847)

Accordingly, I hereby adjudge the defendant John Froines guilty of the several individual and separate direct criminal contempts of this court.

## WILLIAM M. KUNSTLER

### I.

On October 9, the Court made an evidentiary ruling and ordered, with reference to Defendants' Exhibit D–23, that Mr. Kunstler on cross-examination of the witness Pierson could only have the document identified but could not go into the substance of the document, if and until the document had been admitted into evidence. After this order was entered, Mr. Kunstler repeatedly, before the jury, asked questions designed to delve into the substance of the document. He ignored the Court's continued admonitions and proceeded as follows:

"Question: I show you D–23 for identification and ask you whether this is not the story which Mr. Judge wrote.

Mr. Schultz: Well, I object to the question, your Honor. If the witness knows what Mr. Judge wrote, that is one thing, but if he can—

The Court: All you may do at this time, Mr. Kunstler, under the law, is to have this document identified by the witness. You may not go into its substance.

By Mr. Kunstler:

Q. All right. I will ask you, is that the story which you say appeared in the Chicago Tribune on August 31, 1968?

A. Yes, sir, I believe it is.

Q. Now, in the interview did you tell Mr. Judge that the diary of Jerry Rubin had been given to you on Monday, August 25, instead of August 27?

A. No, sir, I did not.

Q. Would you look on Page 2 of that story? Does that story indicate that the diary was given on August 25?

The Court: I don't think you understand me.

Mr. Schultz: Objection.

The Court: I had always thought I talked so clearly. I said you may not question the witness about the substance or contents of the document until it is in evidence. This exhibit is not in evidence. It has been, in a way, identified as Defendants' Exhibit 23 for identification. I sustain the objection to the question.

By Mr. Kunstler:

Q. I will ask you just to look, then, at the portion which refers to the incident which you have described in the book being given to you by Mr. Rubin. Do you see that in there? I have marked it, it should be easy to find.

A. I see a marking here and reference made to a diary.

Q. Is that statement there correct or incorrect?

Mr. Schultz: Objection.

The Court: I sustain the objection and I must admonish you, Mr. Kunstler, you are disregarding the Court's direction.

Mr. Kunstler: Your Honor, I would like the jury excused so we may discuss and argue this question.

The Court: I shall not discuss—dismiss the jury at this time, sir.

Mr. Kunstler: Well, then, I would like to argue it, your Honor.

The Court: I don't want to argue that one. I won't permit you to argue it.

Mr. Schultz: Your Honor, if I may explain, the proper way is to ask the witness a question, a question which is in substance what Mr. Kunstler thinks he told somebody else, and if the witness denies the truth of that question, then he can impeach him by saying, 'Didn't you say, the following to such and such a person?' and then if he denies it, that person will testify.

The Court: Oh, I have been trying to point out what the proper procedure is, but that is not the way that counsel has been doing it. All I can do is

rule on objections if they are made and I shall continue to do so.

By Mr. Kunstler:

Q. Did you tell Mr. Judge in your interview that a diary had been taken from Jerry Rubin or given by Jerry Rubin to you on Augsut 25, a Monday evening, 1968? Did you tell him that?

A. No, sir, I did not.

Q. I will ask you whether this statement which appears in the article was what you told Mr. Judge or not—

Mr. Schultz: Objection.

The Court: I sustain the objection and now I will excuse the jury.

Ladies and gentlemen of the jury, you are excused. Before you return to the jury room, I must, of course, order you not to talk with anybody about this case, not to let anybody speak with you about it, and do not discuss the case among yourselves.

I order you not to read the newspapers or any other journals, not to look at radio or television, or listen to television. I direct you that if anybody attempts to communicate with you in any manner about this case, you notify the United States Marshal who will, in turn, lay the matter before me. You are excused for a few minutes.

I excused the jury, Mr. Kunstler, to say on the record that your persistent disregard of the Court's directions in asking questions, objections to which have been repeatedly sustained, I regard as unprofessional conduct, and I want that statement on the record.

Mr. Kunstler: Your Honor, may we argue this point now? I brought the law in, I think I have a right—you called me unprofessional and I have a right to say what I think my authority is.

The Court: When I tell you that you may not inquire about a document that is not in evidence, which is elementary, I don't want you to persist in asking about it.

Mr. Kunstler: Your Honor, I want to do what is right and I have brought in Judge Holtzoff—

The Court: You are not doing what is right. I don't want to argue it. It is elementary. I have taken the trouble to give you the citations early in this trial and I will give them to you again. I have them right here.

Mr. Kunstler: I have got McCormick on evidence, I have got Judge Holtzoff, Learned Hand—

The Court: We have the United States Supreme Court up here.

Mr. Kunstler: I have the Supreme Court as well, your Honor.

The Court: I don't want you to do it and that is the reason why I excused the jury. Mr. Marshal, you may now bring in the jury." (Tr. 1,644–50)

II.

On October 15, following the incident of the Vietnam Moratorium demonstration alluded to in the citations of contempt by the defendant Dellinger, the following colloquy took place with Mr. Kunstler:

"Mr. Kunstler: Are you turning down my request after this disgraceful episode. You are not going to say anything?

The Court: I not only turn it down, I ignore it.

Mr. Kunstler: That speaks louder than words, too, your Honor.

The Court: And let that appear of record, the last words of Mr. Kunstler, and, Miss Reporter, be very careful to have them on the record." (Tr. p. 2,-435)

III.

On October 30th, as the Court was attempting to maintain order by restraining the defendant Bobby Seale, Mr. Kunstler not only made no attempt to aid the Court in maintaining order, but engaged in the following colloquy as well:

"Mr. Kunstler: Your Honor, are we going to stop this medieval torture that

is going on in this courtroom? I think this is a disgrace.

Mr. Rubin: This guy is putting his elbow in Bobby's mouth and it wasn't necessary at all.

Mr. Kunstler: This is no longer a court of order, your Honor; this is a medieval torture chamber. It is a disgrace. They are assaulting the other defendants also.

Mr. Rubin: Don't hit me in the balls, m..... f......

Mr. Seale: This m..... f..... is tight and it is stopping my blood.

Mr. Kunstler: Your Honor, this is an unholy disgrace to the law that is going on in this courtroom and I as an American lawyer feel a disgrace.

Mr. Foran: Created by Mr. Kunstler.

Mr. Kunstler: Created by nothing other than what you have done to this man.

Mr. Hoffman: —being a defendant —You come down here and watch it, Judge.

Mr. Foran: May the record show that the outbursts are the defendant Rubin.

Mr. Seale: You fascist dogs, you rotten, low-life son of a bitch. I am glad I said it about Washington used to have slaves, the first President.

Mr. Dellinger: Somebody protect him.

Mr. Foran: Your Honor, may the record show that it is Mr. Dellinger saying 'Someone go to protect him' and the other comment is by Mr. Rubin.

Mr. Rubin: And my statement, too.

The Court: Everything you say will be taken down.

Mr. Kunstler: Your Honor, we would like the names of the marshals. We are going to ask for a judicial investigation of the entire condition and the entire treatment of Bobby Seale.

The Court: You ask for anything that you want. When you begin to keep your word around here that you gave the Court, perhaps things can be done.

Mr. Kunstler: If we are going to talk about words, I am prepared to give you back your word about Mr. Ball yesterday and what he said you said to him. We have the transcript now.

The Court: Don't point at me, sir, in that manner.

Mr. Kunstler: If we are going to talk about words, I'd like to exchange some.

The Court: Don't point at me in that manner.

Mr. Kunstler: I just feel utterly ashamed to be an American lawyer at this time.

The Court: You should be ashamed of your conduct in this case, sir.

Mr. Kunstler: What conduct, when a client is treated in this manner.

The Court: We will take a brief recess.

Mr. Kunstler: Can we have somebody with Mr. Seale? We don't trust—" (Tr. pp. 4,815–17)

IV.

Mr. Kunstler continually defied the Court's orders to sit down when the Court had determined that the argument was completed. One such occasion occurred on October 30 and is set forth in the following colloquy:

"Mr. Weinglass: Mr. Kunstler is his attorney.

Mr. Schultz: Mr. Kunstler is his attorney and Mr. Weinglass who just spoke have both encouraged Mr. Seale to proceed in violation of the Court's order when he has an appellate process of review.

Mr. Kunstler: Your Honor, just to compare hearsay with the right of a black man to defend himself—

The Court: I will not hear you any longer.

Mr. Kunstler: —after three hundred years of slavery—

The Court: I will hear you no longer.

Mr. Kunstler: But, your Honor, he said—he is comparing it to hearsay. This is a sovereign right which is a right black men fought and died for.

The Court: Will you ask that man to sit down, Mr. Marshal.

Mr. Kunstler: I may no longer continue in answer to Mr. Schultz?

The Court: No, no. We will go on forever.

Mr. Kunstler: Not forever, your Honor, just long enough to make a point." (Tr. pp. 4,842–43)

V.

On December 9th the Court refused to permit Mr. Kunstler to leave the room during the proceedings. His absence would have three of the remaining seven defendants unrepresented. The following remarks and insults were then made.

"The Court: You will remain.

Mr. Kunstler: We don't have—

The Court: You will remain here at this trial, sir.

Mr. Kunstler: All right. Then, your Honor is interfering with the defense of this case.

The Court: All right. Your motion is denied.

Mr. Kunstler: All right.

Then, your Honor, I am going to have the witness come to the counsel table and sit with the attorneys.

The Court: You are not going to have witnesses at the counsel table.

Mr. Kunstler: Your Honor, how can you be so inhumane as to not permit the lawyers to sit with the witnesses? I just don't understand it. It is with the consent of the defendants." (Tr. p. 9,887)

VI.

On December 12, during the direct examination of the witness Ginsberg, the Court determined that a recess was appropriate. Mr. Kunstler opposed that recess in a shouting and disrespectful manner.

"Mr. Foran: I think at least several minutes, your Honor, ten, fifteen minutes.

The Court: Are you suggesting we recess?

Mr. Foran: I would think possibly yes, your Honor, because I would just get back up here and get started.

The Court: You mean recess until the afternoon?

Mr. Foran: After lunch.

The Court: All right. We will go until 2:00 o'clock.

Mr. Weinglass: Your Honor—

Mr. Kunstler: Your Honor, we have witnesses who are leaving the country this afternoon who are presently here. I don't think there should be any delay in the cross examination.

Mr. Foran: Your Honor, after each—

Mr. Weinglass: Wait—

Mr. Kunstler: Mr. Foran, may I finish my statement?

Mr. Foran: Excuse me, Mr. Kunstler.

Mr. Kunstler: We have two witnesses in the witness room now waiting around here for two days. One is leaving the country tomorrow morning and must testify or we lose him forever, and the other has to return to the West Coast.

The Court: I have granted the request of the defendant—

Mr. Kunstler: We asked for five minutes two days ago in front of this jury and you refused to give it to us.

Mr. Foran: Your Honor, on every—

The Court: You will have to cease that disrespectful tone.

Mr. Kunstler: That is not disrespectful; that is an angry tone, your Honor.

The Court: Yes, it is. Yes, it is. I will grant the motion of the Government.

Mr. Kunstler: You refused us five minutes the other day.

**440**

Mr. Foran: Your Honor, on every—

The Court: You are going to have to learn—

Mr. Kunstler: I am trying to learn.

The Court: I have given up trying to point it out to you.

Mr. Kunstler: Why the different treatment?

The Court: I will not sit here and have you assume a disrespectful tone to the Court.

Mr. Kunstler: This is not disrespect.

The Court: Yes, it is.

Mr. Kunstler: I am asking you to explain to the defense which claims it is getting different treatment, why a simple request of five minutes was not granted.

Mr. Foran: Your Honor, may I comment that after the direct examination of every single Government witness in this case, the defense had a recess to prepare their cross-examination. That was after 54 witnesses. Every one had a recess.

Mr. Kunstler: Your Honor, this is the grossest statement I have ever heard in a courtroom. This jury doesn't know that after every Government witness—we might as well tell them—there is a series of documents that are given to the defense and the defense must read, and that is the only reason the request was granted. They have no documents—

Mr. Foran: That is right, your Honor. That is—

Mr. Kunstler: They must go on.

Mr. Foran: We don't—it is a two-way street—it is a one-way street.

Mr. Kunstler: They have no documents to read.

Mr. Foran: Your Honor—

Mr. Kunstler: It is a one-way street, your Honor. That is what we are on.

Mr. Foran: From the Government to the defense, your Honor.

The Court: Now, sir—

Mr. Kunstler: We are on a one-way street, your Honor. Five minutes we requested from you.

The Court: Mr. Kunstler—

Mr. Kunstler: Your Honor, what else can I think?

The Court: I have admonished you time and again to be respectful to the Court. I have been respectful to you.

Mr. Kunstler: Your Honor, this is not disrespect for anybody but—

The Court: You are shouting at the Court.

Mr. Kunstler: Oh, your Honor—

The Court: Shouting at the Court, the way you do—

Mr. Kunstler: Everyone has shouted from time to time, including your Honor. This is not a situation—

The Court: Make a note of that, please. I have never—

Mr. Kunstler: Voices have been raised—

The Court: I never shouted at you during this trial.

Mr. Kunstler: Your Honor, your voice has been raised.

The Court: You have been disrespectful.

Mr. Kunstler: It is not disrespectful, your Honor.

The Court: And sometimes worse than that.

The Witness: o-o-m-m-m-m-.

The Court: Will you step off the witness stand, please, and I direct you not to talk with anybody about this case or let anybody speak with you about it until you resume the stand at 2:00 o'clock, at which time you are directed to return for further examination.

Mr. Kunstler: He was trying to calm us both down, your Honor.

The Court: Oh, no. I needed no calming down.

Mr. Kunstler: Your Honor has—

The Court: I am pointing out to a lawyer that we will not tolerate disrespect in this court.

Mr. Kunstler: Your Honor, how—

The Court: That will be all.

Mr. Kunstler: What about our witnesses who have to leave the country? Are you depriving us of these witnesses.

The Court: We will recess, Mr. Marshal, until 2:00 o'clock.

Mr. Kunstler: Oh, that is unfair." (Tr. pp. 10,783–788)

### VII.

On December 23, Mr. Kunstler indicated that he had some information concerning a possible challenge by the Government to one of the jurors. Mr. Schultz raised an objection indicating that this matter should be discussed outside the presence of the jury. The Court then excused the jury. As the jury was walking out Mr. Kunstler repeated those charges in a loud voice so that the jury could hear him as they were exiting. This incident is set out in the record as appearing in the following summary:

"Mr. Weinglass: Your Honor, the defendants and Mr. Kunstler will be in the courtroom momentarily.

The Court: Will you please call your next witness.

Mr. Kunstler: Your Honor, before calling next witness the defense has an inquiry to make.

Your Honor will recall that I asked certain questions about the half-hour delay—

Mr. Schultz: If the Court please, I think that the matter that Mr. Kunstler made inquiry about out of the presence of the jury, if he wants to make inquiry now, we should have it with the Court solely.

Mr. Kunstler: Your Honor, I am not going into that but I want to indicate this, that we are prepared to call another witness but since this witness is a defendant, we have an inquiry to

make. We have heard from people outside the courtroom here, reporters and others—

Mr. Schultz: Your Honor—

Mr. Kunstler: —that the Government is planning to launch an attack on the jury.

Mr. Schultz: I don't know what it is Mr. Kunstler is going into, but I know that it is improper for him to say what it is in the presence of the jury.

The Court: I will excuse you.

Mr. Kunstler: Your Honor, it is an attack on the jury, and that is why I am mentioning it with the jury here.

Mr. Schultz: Mr. Kunstler has just heard the Court's ruling and he knows that the Court has ordered the jury excused for the purpose of this argument, but that doesn't stop him. He wants to continue. We are bound by Court—

The Court: Now I will hear you." (Tr. pp. 12,391–12,392)

### VIII.

On January 6 the defendants called Mayor Richard J. Daley of Chicago to the stand as their witness. In a colloquy prior to the witness' taking the stand Mr. Kunstler clearly indicated his understanding of the limitations on interrogating one's own witness. Furthermore, the Court ordered that any motions to declare the witness Daley a "hostile witness" be made outside the presence of the jury. In the course of the direct examination of this witness which runs from page 13,900 to 14,024 of the official transcript, Mr. Kunstler asked no less than 83 questions which were objectionable, mostly leading and suggestive. Furthermore, he directly violated the Court's order by moving to have the witness Daley declared a "hostile witness" in the presence of the jury (Tr. p. 13,944).

After this motion was denied, Mr. Kunstler continued asking leading and suggestive questions which he knew to be improper. His conduct was repeated so

many times that it must be considered contemptuous.

## IX.

On January 12 Mr. Kunstler refused to be seated and discontinue his argument despite admonitions and directions to do so by the Court. This incident occurred when the Court was interrupted by the loud laughter of the defendant Dellinger.

"The Court: —I wonder if you, Mr. Marshal, can keep that man quiet while I am speaking. I am trying to decide his lawyer's motion. Please go to him and tell him to keep quiet.

The Marshal: Mr. Dellinger—

The Court: Let the record show that after I requested the marshal to keep Mr. Dellinger quiet he laughed right out again, out loud. The record may so indicate.

Mr. Dellinger: And he is laughing now, too.

The Marshal: And the defendant Hayden, your Honor.

The Court: Mr. Hayden also.

Mr. Kunstler: Oh, your Honor, there is a certain amount of humor when talking about a bathroom—

The Court: Oh, I know that is your favorite reply.

Mr. Hoffman: I laughed, too.

Mr. Kunstler: But people can't help it sometimes, your Honor. You have laughed yourself.

The Court: I really have come to believe you can't help yourself. I have come to believe it.

Mr. Kunstler: But that is true. A whole courtrom full of people laugh when I say something and when you say something.

The Court: What I am saying is not very funny.

Mr. Kunstler: I know, but you are so ultrasensitive to laughter.

The Court: Will you sit down and not interrupt the Court when a decision is being made?

All I ask from you, sir, is simple manners. I don't reach the question of law.

Mr. Kunstler: A laugh is not bad manners. Really.

The Court: I have never been in a case where I have seen such bad manners.

Mr. Kunstler: I know, but your Honor, when you make a joke and the courtroom laughs, nobody is thrown out.

The Court: Just sit down. I have not made any jokes.

Mr. Kunstler: I know, but you do from time to time.

The Court: I ask you to sit down during the rendering of this decision, sir.

Let the record show that the defendants—rather the defendants' counsel, Mr. Kunstler, on two occasions here refused to sit down when the Court directed him to sit down.

Mr. Kunstler: Oh, that's not fair, your Honor.

Mr. Weinglass: He sat down on both occasions, your Honor. I must object to that.

Mr. Kunstler: I sat down on both occasions.

The Court: I mean right now, in this decision.

Mr. Kunstler: I sat down.

The Court: You did finally after I urged you.

Mr. Weinglass: Your Honor, that is not a fair characterization.

The Court: Will you sit down.

Mr. Weinglass: Mr. Kunstler did sit down both times.

The Court: I didn't ask you to stand. I am giving a decision, sir.

Mr. Weinglass: I think it should be on the record—

The Court: I am giving a decision, and if you don't sit down—he has sat down now.

Mr. Marshal see that Mr. Weinglass remains in his chair while the Court is rendering a decision on this motion made by Mr. Weinglass." (Tr. pp. 14,824–27)

### X.

On January 13 Mr. Kunstler again argued and refused to desist when the Court ordered him to do so:

"Mr. Kunstler: Your Honor, I move to strike your Honor's last remarks from the record.

The Court: I deny your motion.

Mr. Kunstler: I think they are derogatory.

The Court: I deny the motion.

Mr. Kunstler: And prejudice these defendants in front of the jury.

The Court: Did you hear me, sir.

Mr. Kunstler: I am ready to argue it.

The Court: I am not ready to hear you. It is so clearly ill founded.

Mr. Kunstler: It is not. I read to your Honor yesterday a decision of another court, a Federal Court.

The Court: I denied your motion.

Mr. Kunstler: The derogatory comments to counsel—

The Court: Mr. Marshal, will you have that man sit down.

Mr. Weinglass: Mr. Kunstler.

Mr. Kunstler: I just want the record to show I am sitting down because I don't want to have a marshal come and throw me into my seat, but I am sitting down under protest." (Tr. pp. 15,309–310)

### XI.

On January 4, Mr. Kunstler engaged in the following colloquy, twice more refusing to sit down when the Court ordered him to do so, and continuing his argument until the marshal approached him. The incident is set forth in the following excerpt from the record:

"The Marshal: Mr. Dellinger, also, will you refrain from laughing.

Mr. Dellinger: That is a lie. And it wasn't Mr. Rubin. We laugh enough and you can catch us when we do but you just happened to get that one wrong.

Mr. Kunstler: Your Honor, I don't think the record should constantly have these references to chuckles—

The Court: I think the record should show that and I see that the record does. I don't share your view.

Mr. Kunstler: The Court has made a sally before and the room laughed and you didn't say put that on the record.

The Court: I will not sit here—and you must know it by now, certainly—and have defendants laugh at my rulings, sir. And I will not hear you on that.

Mr. Kunstler: You don't mind if they laugh at me or if they laugh at someone else.

The Court: I will ask you to sit down.

Mr. Kunstler: I don't think your Honor's ultrasensitivity should make a difference in rulings in this court.

The Court: It isn't ultrasensitivity. It is a proper understanding of the conduct of a trial in the Federal District Court.

Mr. Kunstler: When you interpret it as a laugh as you—

The Court: Some people here don't seem to know about it.

Mr. Kunstler: No, but, your Honor, when you try to interpret a laugh as meaning you are the butt of a joke, then you react—

The Court: I will ask you to sit down. Did you hear me?

Mr. Kunstler: I just don't want to get thrown in my chair by the marshal, so I will have to sit down, but I just don't think it is fair to do that.

Mr. Hoffman: I laughed anyway.

The Court: Will you be quiet, Mr.—

Mr. Hoffman: I laughed. It wasn't Jerry. It was me.

The Court: Did you get that, Miss Reporter?

Mr. Hoffman: —at that ruling. I laughed. He didn't.

The Court: That was Mr. Dellinger.

Mr. Kunstler: That was not Mr. Dellinger." (Tr. pp. 15,585–87)

XII.

On January 16, in his direct examination of the witness Goodwin, Mr. Kunstler blatantly ignored the directions of the Court on evidentiary rulings. After a question was held to be objectionable, rather than move to the next question, he deliberately asked it again. This conduct continued with Mr. Kunstler making highly improper statements in front of the jury. The incident is reflected in the following excerpt from the transcript:

"By Mr. Kunstler:

Q. Mr. Goodwin, I call your attention to approximately three weeks before the opening of the Democratic National Convention. At that time you were campaign director, were you not, for Eugene McCarthy?

A. That is correct.

Q. At that time did you make any recommendations to Senator McCarthy?

Mr. Foran: Objection.

The Court: I sustain the objection.

By Mr. Kunstler:

Q. Did you have a conversation at that time with Senator McCarthy about whether he should or should not urge his supporters to come to Chicago?

A. Yes.

Mr. Foran: Objection, your Honor, as immaterial and irrelevant. Neither Senator McCarthy nor Mr. Goodwin are in this charge.

Mr. Kunstler: No, your Honor, but what is at issue is the atmosphere in the city of Chicago created by Mayor Daley.

The Court: I have ruled—

Mr. Foran: I object to Mr. Kunstler constantly attempting to testify.

The Court: I have ruled. Ask another question.

Mr. Kunstler: If Mayor Daley was preventing anybody from—

Mr. Foran: I object to that.

The Court: Will you ask another question, please? Mayor Daley is not in this one. He has come and gone.

Mr. Kunstler: Yes, your Honor, but he is in this case. He is the chief and only defendant here.

Mr. Foran: I object to that comment and ask that it be stricken and that the jury be directed—I ask that it be stricken from the jury's hearing and also that your Honor admonish counsel.

The Court: I do so and I direct the jury to disregard it and anything like that, Mr. Kunstler.

Mr. Kunstler: But that is part of our defense, your Honor. We are trying to show who—if you had a simple robbery case, you could show who the true robber was.

The Court: Don't make another statement like that.

By Mr. Kunstler:

Q. Did there come a time when Senator McCarthy did tell his supporters not to come to Chicago?

A. Yes.

Mr. Foran: I object to that form of the question and ask that the jury be directed to disregard the statement of counsel.

The Court: Yes. I sustain the objection. I do strike it and direct the jury to disregard it." (Tr. pp. 16,-129–31)

XIII.

On January 20, after a colloquy between the Court and Mr. Weinglass, Mr. Kunstler rose to join the argument. He again resisted the admonitions of the

Court to desist. The event is set forth in the transcript as follows:

"Mr. Schultz: Your Honor, I ask that that statement be stricken from this record and Mr. Weinglass admonished to conduct himself in a professional manner in this courtroom.

Mr. Kunstler: Your Honor, that was highly professional. Mr. Schultz opened the door—

Mr. Schultz: And the same goes for Mr. Kunstler.

Mr. Kunstler: —for that document to be offered.

The Court: Mr. Weinglass is taking care of this witness.

Mr. Kunstler: I am not going to stand by and have him—a colleague of mine—called anything like that.

The Court: Sit down.

Mr. Kunstler: I am not going to sit down unless I am directed—

The Court: I direct you to sit down.

Mr. Kunstler: Am I to be thrown in the chair by the marshal if I don't sit down?

The Court: I haven't asked the marshal to throw anybody in the chair. I have asked the marshal on occasion, sir, to direct you to sit down, and you have always followed his word.

Mr. Kunstler: I have followed. I am just indicating, your Honor, I don't think that kind of conduct should be permitted.

The Court: I will permit only one defense counsel to participate in the examination of this witness.

Mr. Kunstler: I am not participating in the examination. I am only defending Mr. Weinglass." (Tr. pp. 16,-663–64)

### XIV.

On January 22 the Court was again engaged in a colloquy with Mr. Weinglass when Mr. Kunstler rose to interject himself into the argument. Again Mr. Kunstler refused to desist when the Court told him to sit down. The incident is reflected in the record thusly:

"The Court: I direct the jury to disregard the last statement.

Mr. Foran: That is the law.

Mr. Kunstler: Your Honor—

The Court: I will not hear from you.

Mr. Kunstler: —he said that I said something that is improper. It is not improper, I have heard this in court after court.

The Court: I will not hear from you while your associate is examining this witness.

Mr. Kunstler: It has nothing to do with this witness.

Mr. Foran: The reference was to Mr. Weinglass.

Mr. Kunstler: He said I said someing that was improper. It was not improper.

The Court: I ask you to sit down. Sir, you may continue your examination.

Mr. Marshal, have that man sit down." (Tr. pp. 17,088–89)

### XV.

On January 22, after a ruling by the Court, there were loud groans from the defense table. Instead of attempting to aid the Court in keeping order, Mr. Kunstler indicated that he encouraged and approved of such behavior by the defendants. The incident is reported in the record as follows:

"(Groans)

The Court: Mr. Marshal, I wish you'd take care of that.

Mr. Kunstler: Your Honor, those groans are highly appropriate. I get no help from you, so a groan of a client once in a while at least keeps my spirit up.

The Court: I note that you approve of the groans of the client in open court.

Mr. Kunstler: I approve of those groans, your Honor, when your Honor does not admonish Mr. Schultz.

The Court: I note them. I note them, sir.

Mr. Kunstler: What can I do.

The Court: You may continue with your argument." (Tr. p. 17,195)

### XVI.

On January 22, the Court was again engaged in a colloquy with Mr. Weinglass. After making a ruling and after indicating directly that the Court did not wish to hear any more argument on that point, Mr. Kunstler then rose and engaged the Court in the following colloquy:

"The Court: I don't want to hear *anything further.* I have overruled the objection.

Mr. Kunstler: He makes it appear like some startling singular fact, which isn't true.

The Court: Did you hear me, sir? Did you hear me or must I again have the marshal order you to sit down?

Mr. Kunstler: The marshal has never ordered me to sit down. I have sat down when you said so.

The Court: The other marshal. We have a new marshal sitting right here.

Mr. Kunstler: There was no marshal when I sat down.

The Court: Oh, yes.

The Kunstler: He only approached me and I have sat down.

The Court: That is an order.

Mr. Schultz: May I restate—

Mr. Kunstler: I'm down.

The Court: Yes. Please remain there." (Tr. pp. 17,307–08)

### XVII.

On January 23 the Court denied the motion for a mistrial. After the denial Mr. Kunstler continued to attempt to argue the motion. The record appears as follows:

"Mr. Kunstler: You haven't even heard the motion.

Mr. Rubin: You haven't heard it yet.

The Court: For a mistrial.

Mr. Kunstler: Yes, but I would like to argue it.

The Court: Oh, there is no grounds for a mistrial.

Mr. Kunstler: Your Honor knows you have referred to the question of the defendants taking the stand. You have committed the cardinal error of a court with reference—

The Court: I ask you to sit down, sir.

Mr. Kunstler: But your Honor—

The Court: I direct the marshal to have this man sit down.

Mr. Kunstler: Every time I make a motion am I going to be thrown in my seat when I argue it?

The Court: You may sit down.

Mr. Dellinger: Force and violence.

Mr. Kunstler: If that is the ruling of the Court that we cannot argue without being thrown in our seats.

Mr. Dellinger: The Judge is inciting a riot by asking the marshal to have him sit down." (Tr. p. 17,371)

After this incident there was a loud burst of applause from the spectators' galleries and the marshal determined that several spectators would have to be removed. During the removal and disorder, instead of helping the Court to maintain order in the courtroom, Mr. Kunstler issued the following running commentary from the lectern, which had the effect of encouraging disorder among the spectators.

"Marshal Johnson: Will you sit down.

(Applause)

The Court: Will you continue, please, with the direct examination of this witness.

Mr. Dellinger: There goes the violence right there.

Mr. Kunstler: That's the Government in operation, your Honor, as it has been throughout this trial.

The Witness: Your Honor, that's my sister they're taking out of the courtroom.

The Court: Even your sister—

Mr. Kunstler: Nobody but the Government has employed violence in this courtroom—with Bobby Seale, with spectators.

The Court: Since you refer to Bobby Seale, your client, I recall—

Mr. Kunstler: Not my client, your Honor.

The Court: —I recall being called various kinds of pigs by that man.

Mr. Rubin: Bill, they are taking out my wife.

Mr. Kunstler: Well, your Honor would not let him defend himself, everybody knows that now.

(Cries of 'Hey, stop it.')

Mr. Kunstler: Your Honor, must we always have this, the force and power of the Government?

Mr. Foran: Your Honor—

Mr. Rubin: They are dragging out my wife—will you please—

The Court: We must have order in the courtroom.

Mr. Kunstler: They like to strike women, your Honor, we've seen that constantly here." (Tr. pp. 17.373–74)

## XVIII.

On January 23 when the Court determined that it was time to recess the afternoon session, Mr. Kunstler made the following argument and insulting remarks to the Court:

"Mr. Kunstler: I realize that, but as long as we are going on six days a week now—

The Court: 9:30 tomorrow.

Mr. Kunstler: —I just don't understand the half hour difference.

The Court: I am not obligated to explain to you, sir, the time for the arrival of the jurors and the parties—

Mr. Kunstler: No, but since we are going to work the extra day—

The Court: —and the parties to a lawsuit.

Mr. Kunstler: Why, shouldn't that be at 10:00 o'clock like any other day?

The Court: Because it is at 9:30.

Mr. Kunstler: That is like a child saying, 'Because, because.' I don't think that when we are going an extra day—

The Court: Let the record show that, in the presence of the jury, Mr. Kunstler compared me to a child.

Mr. Kunstler: Oh, your Honor—

The Court: Now, we will have no more of that, sir.

Mr. Kunstler: Your Honor, I don't think we can come down to the absurd.

The Court: We have had enough of your remarks in this trial.

Mr. Kunstler: That is—

The Court: 9:30 tomorrow morning, ladies and gentlemen.

Mr. Kunstler: —absurd.

The Marshal: Mr. Hoffman, will you keep quiet, please.

Defendant Hoffman: It is funny.

The Court: If the marshals can keep those defendants quiet, I will direct the jury when to return." (Tr. pp. 17,597–98)

## XIX.

On January 28, when Mr. Schultz was making his argument concerning the exclusion of Ramsey Clark from the witness stand, Mr. Kunstler engaged in the following disrespectful colloquy:

"Mr. Schultz: Mr. Murrill, will you tell the Court, please, what the Attorney General said about the admissibility?

Mr. Murrill: May I?

Mr. Kunstler: May Mr. Murrill be sworn as a witness and take the witness stand, because I was there, and I heard it.

Mr. Schultz: But Mr. Kunstler can't represent anything in its proper perspective.

Mr. Kunstler: Have him sworn, your Honor, and then I will question him.

The Court: Oh, don't assume that attitude here, Mr. Kunstler.

Mr. Kunstler: I am going to assume it.

The Court: You ought to know that that makes no impression.

Mr. Kunstler: Your Honor, that you could sit there and hear a lawyer say—

The Court: 'I'll examine him,' I don't like that.

Mr. Kunstler: Your Honor, he has made a representation.

The Court: I don't like that attitude. I never saw that man in my life before.

Mr. Kunstler: I ask you to put him on the stand.

The Court: Right now I will do as I think should be done. Please don't order me around, Mr. Kunstler.

Mr. Kunstler: Your Honor, a representation has been made. Mr. Murrill is in the courtroom. Let him take the stand and say under oath—

The Court: You assume a respectful attitude toward the Court. I have been respectful to you. I have tried awfully hard throughout this trial.

Mr. Kunstler: I won't even go into that, your Honor.

The Court: Even though when I say a thing like that, I get the guffaws out there." (Tr. 18,439–41)

### XX.

On February 2, after the Court ruled that Mr. Kunstler would have to abide by his representation the previous Friday, and therefore would not be able to call the Reverend Ralph Abernathy to the stand, Mr. Kunstler made the following speech at the conclusion of his argument:

"The Court: . . . There have been several witnesses called here during this trial—I need not mention their names—whose testimony the Court ruled could not even be presented to the jury: singers, performers, and former office holders. I think in the light of the representations made by you unequivocally, sir, with no reference to Dr. Abernathy, I will deny your motion that we hold—

Mr. Kunstler: I want to comment on this, your Honor, because I think what you have just said is about the most outrageous statement I have ever heard from a bench, and I am going to say my piece right now, and you can hold me in contempt right now if you wish to.

You have violated every principle of fair play when you excluded Ramsey Clark from the witness stand. The New York Times, among others, has called it the ultimate outrage in American justice.

Voices: Right on.

Mr. Kunstler: I am outraged to be in this court before you. Now because I made a statement on Friday that I had only a cameraman, and I discovered on Saturday that Ralph Abernathy, who is the chairman of the Mobilization, is in town, and can be here, and because you took a whole day from us on Thursday by listening to this ridiculous argument about whether Ramsey Clark could take that stand in front of the jury, I am trembling because I am so outraged. I haven't been able to get this out before, and I am saying it now, and then I want you to put me in jail if you want to. You can do anything you want with me, if you want to; because I feel disgraced to be here, to say to us on the technicality of my representation that we can't put Ralph Abernathy on the stand. He is the co-chairman of the MOBE. He has relevant testimony. I know that doesn't mean much in this Court when the Attorney General of the United States walked out of here with his lips so tight he could hardly breathe, and if you could see the expression on his face, you would know,

and his wife informed me he never felt such anger at the United States Government as at not being able to testify on that stand.

Voices: Right on.

Mr. Kunstler: You can't tell me that Ralph Abernathy cannot take the stand today because of the technicality of whether I made a representation. That representation was made in perfect good faith with your Honor. I did not know that Reverend Abernathy was back in the country. We have been trying to get him for a week and a half to be the last witness for the defense in this case. And now to tell me that we are going ahead, the Government is ready, after you took Thursday from us to have this argument over whether a man could be presented to a jury, I told your Honor then, and I am telling you now, no American court has ever done what your Honor did—

Voices: Right on.

Mr. Kunstler: —basing it on a case which was inapplicable to the situation. That was done for one purpose only, and the New York Times said it more beautifully than I could say it, and they said, 'It was done to make inadmissible anything that would "interfere" with the Justice Department's intent to prove a conspiracy to incite a riot during the Democratic National Convention.'

Voices: Right on.

Mr. Kunstler: That was the reason behind your Honor's ruling, nothing short of that.

I have sat here for four and a half months and watched the objections denied and sustained by your Honor, and I know that that is not a fair trial.

I know it in my heart. If I have to lose my license to practice law and if I have to go to jail, I can't think of a better cause to go to jail for and to lose my license for—

A Voice: Right on.

Mr. Kunstler: —than to tell your Honor that you are doing a disservice to the law in saying that we can't have Ralph Abernathy on the stand. You are saying truth will not out because of the technicality of a lawyer's representation. If that is what their liberty depends upon, your Honor saying I represented to you that I had a cameraman, and that was our only witness, a cameraman, whom we can't get, incidentally, then I think there is nothing really more for me to say.

The Court: There is not much more you could say, Mr. Kunstler.

Mr. Kunstler: I am going to turn back to my seat with the realization that everything I have learned throughout my life has come to naught, that there is no meaning in this court, and there is no law in this court—

Voices: Right on.

Mr. Kunstler: —and these men are going to jail by virtue of a legal lynching—

Voices: Right on.

Mr. Kunstler: —and that your Honor is wholly responsible for that, and if this is what your career is going to end on, if this is what your pride is going to be built on, I can only say to your Honor, 'Good luck to you.'

(There were shouts of 'Right On,' and there was applause in the courtroom.)" Official Transcript, Pages 19,108–112.

### XXI.

After the Court ruled, on February 2, that the Reverend Abernathy would not be permitted to take the stand, the Court ordered that Mr. Kunstler and the other attorneys and defendants not mention the name of the Reverend Abernathy in front of the jury. Mr. Kunstler not only defiantly indicated that he fully intended to violate that order, but in the middle of the direct testimony of the witness Lynskey, Mr. Kunstler actually brought the Reverend Abernathy into

the courtroom and made a statement to the jury and physically embraced the Reverend Abernathy in front of the jury. This flagrant violation of the Court's order is reported as follows:

"Mr. Schultz: Your Honor, may the defendants and their counsel then not make any reference in front of the jury that they wanted Doctor Abernathy to testify?

Mr. Kunstler: No, no.

The Court: I order you not to make such a statement.

Mr. Kunstler: We are not going to abide by any such comment as that.

Doctor Ralph Abernathy is going to come into this courtroom, and I am going to repeat my motion before that. jury.

The Court: I order you not to.

Mr. Kunstler: Then you will have to send me to jail, I am sorry.

Mr. Schultz: Your Honor, it is our position we are ready to go ahead now. If Doctor Abernathy were here, if he were here, it would be our position that they could put him on, but he is not here. We are ready to go ahead. We would like to proceed with the case.

The Court: Bring in the jury, Mr. Marshal.

Mr. Kunstler: We have a right to state our objection to resting before the jury.

The Court: Don't do it.

Mr. Kunstler: I am going to have to put my liberty in your hands on that score.

Mr. Schultz: Mr. Kunstler is simply inviting it.

Mr. Kunstler: Oh, of course, I am inviting it because what your Honor is doing is a disgrace in this court.

The Court: He did more than invite.

Mr. Kunstler: He will be here in five minutes. Your Honor, what is an honest man to do when your Honor has done what he has done? What am I to do? Am I to stand here and say, 'Yes, yes, yes'?

The Court: I will ask you to sit down. I have heard enough from you along this line this morning, sir. I have never as a lawyer or a judge heard such remarks in a courtroom made by a lawyer.

Mr. Kunstler: Your Honor, no one has heard of such conduct as is going on in this courtroom from the bench. The New York Times is not alone in that respect, and this is the ultimate outrage—and I didn't say—the editorial writers of the New York Times said that.

Mr. Schultz: May we proceed, your Honor?

The Court: Yes. I have ordered the jury brought in." Official Transcript, Pages 19,140–42.

"Mr. Kunstler: Your Honor, if I can interrupt, Doctor Ralph Abernathy has just arrived.

The Court: Let him sit down.

Mr. Kunstler: I would like to put him on the stand for the defense.

The Court: Let him sit down.

Mr. Kunstler: I would like to move to reconsider to put him on the stand as a witness for the defense. It is now just 11:37.

The Court: Let him sit down, please. You may continue with your examination, Mr. Foran.

Mr. Kunstler: Does your Honor deny my motion?

The Court: I do, sir.

You may continue with your examination.

Mr. Kunstler: Your Honor, it is only 16 minutes after the Government said they would have no objection to having Doctor Abernathy testify. He was flown here from Atlanta to be a witness for the defense.

The Court: I do not interpret what the Government says to mean that, and the Government is not running this courtroom.

Mr. Kunstler: Your Honor—

The Court: Will you continue?

Mr. Kunstler: Is the truth to be deprived from this jury because of 16 minutes?

Mr. Foran: Your Honor, the Government is in the middle of the examination of a witness.

Mr. Kunstler: We have tried to get the few minutes delay so we could bring Doctor Abernathy here.

The Court: I ask you to sit down, sir.

By Mr. Foran:

Q. What was the noise level at that time?

Mr. Kunstler: Your Honor, before this goes on, would your Honor permit an application for Doctor Abernathy to testify after this witness has testified?

The Court: I ask you to sit down.

Mr. Kunstler: Otherwise we are going to excuse him.

The Court: Mr. Marshal, have that lawyer sit down.

Mr. Kunstler: Can you give me an answer to my question? We want to excuse Doctor Abernathy.

The Court: If you will please sit down—

Mr. Kunstler: I am going to be forced in a minute so I have no alternative.

The Court: Yes.

Mr. Kunstler: Can I get an answer sitting down to my question?

Mr. Foran: Your Honor, the interruption in the midst of the questioning of a witness in the presence of the jury is unheard of, your Honor. I wish he would—

Mr. Froines: So is not putting on a witness.

A Voice: —going to walk out of the courtroom because we can't put a man on the stand—

A Voice: Can't put on our witness—

The Court: Did you hear what I asked you to do, sir?

Mr. Kunstler: I am down.

The Court: Please continue with your examination.

Mr. Kunstler: I am going to ask Doctor Abernathy to leave, your Honor. It is obvious he is not going to testify.

Mr. Foran: Your Honor, the proper procedure is to discuss such matters outside the presence of the jury, not in midst of the questioning of the witness.

The Court: I ordered him not to discuss that witness in the presence of the jury before the jury came in. He violated my order.

Mr. Foran: Your Honor, may I wait? May I await Mr. Kunstler returning to counsel table?

Mr. Kunstler: I will be back, your Honor.

The Court: Yes. You may wait.

Let the record show the hug of counsel for the witness.

Mr. Foran: Your Honor, the discussion of whether or not the witness should be called as a witness would properly await the finishing of the examination of this witness and the demonstration—

The Court: Go ahead.

Mr. Kunstler: Then I told him to leave, your Honor. He—

The Court: All right. You have told him to leave.

Mr. Kunstler: I can hold him if there is nothing—we want him to testify.

The Court: You told him to leave and I again direct you to sit down. We have had enough this morning.

Mr. Kunstler: May I send one of the defendants out just to ask him to say, so perhaps—

The Court: No, you may not send one of the defendants out. You may not send—

Mr. Kunstler: May I go and tell him?

The Court: I ask you to sit down.

Mr. Kunstler: Your Honor, just to tell him so that, if the Government is going to permit him to testify—

The Court: I have had enough of your insults this morning.

Mr. Kunstler: Your Honor, this— I am not being insulting.

The Court: You were this morning.

Mr. Kunstler: I was not insulting. I told you the truth this morning. I told you what the New York Times said—

The Court: All right.

Mr. Kunstler: —about the refusal to put a witness on the stand.

The Court: Sit down, sir, or we will arrange to have you put down." Official Transcript, Pages 19,154–159.

## XXII.

On February 4, when the Court determined that the time had come to revoke the bail of the defendant Dellinger, there was a loud outburst in the courtroom. It was essential that marshals forcibly clear people from the courtroom in order a maintain order. When disorder broke out in the spectator benches, Mr. Kunstler blamed the disorder on the Court, fanning the flames of the disorder with these inciting comments:

"Mr. Kunstler: You brought this on, your Honor. This is your fault. This is what happened in Chicago. You made the power move. You exerted the power, and I would like to argue the point.

The Court: You won't argue the point.

Mr. Kunstler: I will argue, your Honor, that your Honor's action is completely and utterly vindictive, and there is no authority that says because a defendant blurts out a word in court—

The Court: This isn't the first word, and I won't argue this." Official Transcript, Pages 19,777–78.

"Mr. Kunstler: No, you know that if you did that, you would add to reversible error in this case. Why not take them all?

Mr. Kunstler: Your Honor, there is no need for your action." Official Transcript, Page 19,779.

"Mr. Kunstler: Your Honor, is there no decency left here? Can't we just argue the point?" Official Transcript, Page 19,780.

## XXIII.

On February 5, after the Court had denied the defendants' motion to reinstate the defendant Dellinger's bond, the Court determined that argument was complete. Once more Mr. Kunstler defied the Court's order to desist arguing and sit down. The incident is reported as follows:

"Mr. Kunstler: The United States Attorney is trying to get the stenographer to add words to the record.

The Court: And that order to sit down—

Mr. Weinglass: Your Honor, I ask the Court—

The Court: Mr. Marshal, please have that lawyer sit down—both of them.

Mr. Weinglass: Your Honor will not permit me to continue legal argument?

The Court: You heard what I said. I deny the motion.

Mr. Davis: May we defend ourselves if our lawyers can't?

Mr. Kunstler: I think the marshal is going to have this time to put me in my seat. I am not going to sit down unless I am forced to sit down.

The Court: I direct you to.

Mr. Weinglass: Your Honor cited the Fernandez case—

The Court: I asked you to sit down.

Mr. Kunstler: I think we ought to argue the motion.

The Court: I ask you to sit down and there will be no further argument." Official Transcript, Pages 19,800–01.

### XXIV.

On February 9th, Kunstler engaged the Court in a colloquy concerning certain representations he had made to the Court concerning defendants' surrebuttal case. The Court had occasion to take him to task, and he insulted the Court in the following manner:

"The Court: I want to read what you said.

Mr. Kunstler: All right.

The Court: I will wait.

'But do you'—and I am addressing you—'do you give me your assurance, sir—' —I am reading from the transcript of evidence, Page 20278, 'in the presence of this jury and all those assembled here, the lawyers, the parties, that you will not attempt or offer any additional—or offer any additional witnesses on Monday? We are conditioning this continuance or I propose to condition it on your representation that will not be the case.

May I have just a moment to consult?'

Now it takes a witness to identify a document, sir.

Mr. Kunstler: No, no. The witness has testified already, your Honor. Your Honor is now proved wrong. I said 'witnesses,' and I stand by that. There are no additional witnesses. I did—I think your Honor has read the transcript to show that I was right in this instance. Now, your Honor, you are not going to find it, I don't think.

Your Honor, why don't you just agree for once that perhaps I am right, and I am.

The Court: I will strike the remark of Mr. Kunstler, insulting as it is.

Mr. Kunstler: It is not insulting.

The Court: And I direct the jury to disregard it.

Mr. Kunstler: Your Honor—

The Court: I sat here patiently for five months, sir, pretty nearly.

Mr. Kunstler: I have been here patiently for five months.

The Court: I want to tell you that for you to say 'Why don't you agree for once' is about as rotten a thing as I have ever had said to me.

Mr. Kunstler: With rare exceptions you have not agreed with me on anything throughout this trial. It is not meant to be insulting, your Honor. You are poring through the transcript—

The Court: I take it as an insult.

Mr. Kunstler: Because you want to find that I am wrong.

The Court: I have given all my judicial time to this case.

Mr. Kunstler: I have devoted all my legal time. We have all devoted our time. The jury devotes its time and you do.

The Court: I will not hear you further in connection with that exhibit.

Mr. Kunstler: Will you then just for the record admit that you were wrong, that I did not say documents?

The Court: No, I will not admit that I was wrong because I am not wrong. If you will read the transcript —and I don't propose to take the time—

Mr. Kunstler: You have read it to us, your Honor.

The Court: Not all of it.

Mr. Kunstler: It is quite clear." Official Transcript, Pages 20,324–26.

Mr. Schultz then spoke. He cited explicit sections of the transcript which conclusively demonstrated that the Court had been correct in its understanding of Mr. Kunstler's representations. Mr. Kunstler's accusations were demonstrated to be erroneous. Even Mr. Kunstler recognized that he had erred, and he apologized.

"Mr. Kunstler: In the light of that, your Honor, I will make the admission and be quite candid and frank that then I was wrong and I will not offer 109 although I think it ought to go in. When I am wrong, I think it is proper to admit it.

The Court: You were pretty sure, though, when you said that I was mistaken. You didn't use the charitable word that you just used.

Mr. Kunstler: Your Honor, I admit when a man is wrong, I think he has an obligation to say it and I am saying it." Official Transcript, Page 20,327.

One minute later Mr. Kunstler directly violated an explicit order of the Court by mentioning once more the name of the Reverend Abernathy before the jury. When the Court challenged him to justify his conduct, he attempted to do so by citing previous violations of that order, as if past misconduct by defendants and their attorneys could some way justify this violation.

"Mr. Kunstler: I only do it, your Honor, because it has been discussed ten times in front of them (the jurors)." Official Transcript, Page 20,-329.

Accordingly, I hereby adjudge William M. Kunstler guilty of the several individual and separate specifications of direct criminal contempt of the Court.

## LEONARD I. WEINGLASS

### I.

Mr. Weinglass has consistently ignored the orders of the court to discontinue argument or to sit down. The first occasion upon which this occurred was on September 24, during motions made prior to the voir dire of the jury panel. The incident is thus reported:

"Mr. Weinglass: Mr. Birnbaum and Mr. Bass have withdrawn from the case as trial counsel. Mr. Seale is not represented here in court.

The Court: Mr. Weinglass, I direct you to sit down.

Mr. Weinglass: If the Court please, I would like to know—

The Court: I would like you to sit down, or I will ask the marshal to escort you to your chair.

Mr. Weinglass: I will sit down, but I do so under protest.

The Court: Then do so." Voir Dire Transcript, Page 24.

### II.

On October 1, during the cross examination of the witness Stahl, Mr. Weinglass continually asked questions that were beyond the scope of the direct examination. The court sustained the objections but he persisted in asking the questions, over objection, again and again. In an effort to enlighten him, the court sent out the jury and directed some remarks concerning the cases on contempt to Mr. Weinglass who virtually ignored the court while the court was addressing him. The incident is reported in Pages 555 through 565 of the official transcript as follows:

"Mr. Weinglass: The last document should be marked identification No. 7, Defendants' Exhibit, and we can mark this Defendants' Exhibit 8.

(Said documents were thereupon marked Defendants' Exhibits 7 and 8 for identification.)

By Mr. Weinglass:

Q. I show you your handwritten notes of the August 12 meeting marked Defendants' No. 8.

Is that your handwritten note, a copy of it?

A. Yes, these are a copy of my notes of the meeting August 12.

Q. August 12. Directing your attention to the first page, did you state right at the beginning that the National Mobilization Committee made it clear to you at the outset that they wanted to avoid unnecessary tensions, is that correct?

A. Mr. Dellinger made that statement and immediately followed with a

statement that he believed in civil disobedience, that he just returned from Paris where he studied street riots. I think that he would say violence and then say non-violence and then say—

Q. Is that correct? Well, does that statement appear in your notes?

A. Yes, the statement about civil disobedience does.

Q. Yes. Would you read to the jury, after having said that, what your notes reflect Mr. Dellinger said about civil disobedience?

Mr. Foran: Object to that.

The Court: I sustain the objection.

By Mr. Weinglass:

Q. Is it not a fact that Mr. Dellinger said, according to your notes, that he believes in civil disobedience, but that he does not intend to disrupt delegates at the convention? Isn't that what he said, Mr. Stahl? Isn't that what your notes reflect him saying?

Mr. Foran: Your Honor, I object to that.

The Court: I sustain the objection.
By Mr. Weinglass:

Q. I ask you to look over that entire first page, and I ask you whether or not there are any notations indicating that Mr. Dellinger had been to Paris or that he had studied riot techniques on that first page?

Mr. Foran: Your Honor, I object to this. There is a clearly proper way to establish that if it is true.

The Court: Of course. I sustain your objection.

Mr. Foran: The same type of objection, your Honor, has been sustained a number of times, and I wish counsel would be directed that there is a proper way to go into those matters if he would use it, and it is not this way.
By Mr. Weinglass:

Q. Do you further recall Mr. Dellinger saying to you in the course of that meeting that he didn't want to interfere with the police, business, or traffic? I am referring to page 2 of your notes.

A. Yes, he made that statement.

Q. He made that statement. Did he also make the statement to you that he wanted to meet with the police?

A. He said he may want to meet with the police.

Q. I refer you to the middle of the page. That was the second recquest to meet with the police. His first request appears in the middle of the page. Does it qualify—does he say he wants to meet with the police?

A. My notes say, 'Want to meet with police.'

Q. Yes. Did Mr. Dellinger also make known to you, as reflected in your notes, that denying of the permits is a denial of the rights?

A. Yes.

Q. At the August 12 meeting who appeared there on behalf of the City besides yourself?

A. Assistant Corporation Counsel, Richard Elrod, was there. I believe that's all. There may have been others.

Q. Was there any understanding between you and Mr. Simon or someone else on behalf of National Mobilization that you were to have other department heads there so that this matter could be resolved in one meeting?

A. No, there was no such understanding.

Mr. Foran: I object.

By Mr. Weinglass:

Q. There was no such under—

The Court: Do you persist in your objection, or do you let the answer—

Mr. Foran: I will withdraw.

The Court: Let the answer stand.
By Mr. Weinglass:

Q. Did you ever have an understanding with Mr. Dellinger or Mr. Davis that you would bring before them at one meeting heads of the Park District and the Department of Sanitation and Streets for resolution of the problem?

Mr. Foran: I object to that now.

The Court: I sustain it.

By Mr. Weinglass:

Q. Was it your understanding, Mr. Stahl, at that August 12 meeting that you were to have other people there from the City who did not appear?

Mr. Foran: Object, Your Honor.

The Court: I sustain the objection.

By Mr. Weinglass:

Q. Were you ever able to bring together in a single meeting Rennie Davis and Mr. Dellinger and the head of the Park District or the head of the Department of Streets and Sanitation?

Mr. Foran: Your Honor, I object.

The Court: I sustain the objection.

By Mr. Weinglass:

Q. Were you ever requested to bring together—were you ever requested by Mr. Davis and Mr. Dellinger to bring together in a meeting himself and other persons from City Government?

Mr. Foran: Your Honor, I object.

The Court: I sustain the objection.

Mr. Foran: May I ask that the jury be excused for a moment?

The Court: On request of the United States Attorney, ladies and gentlemen of the jury, I will excuse you.

Before you go into the jury room, my usual orders that you are not to read the newspapers, not to listen to television or radio, not to talk about this case with anyone or let anybody speak with you about it. Do not discuss the case among yourselves. I think I omitted to say, don't look at television, although I don't think our great Government has provided a television in the jury room in any event. But I am obligated to make that order.

You are excused for a few moments.

(The following proceedings were had in open court, out of the presence and hearing of the jury:)

Mr. Foran: Your Honor, I find it a little unusual to conduct or attempt to conduct a class in basic legal procedure, but where counsel constantly asks questions that are outside the scope of the direct examination, I cannot expect that it is for any reason except to generate some erroneous impression in the jury because it generates objections from counsel. There is a perfectly proper way to put in matters other than those covered on direct examination. It is not by trying to put facts into questions that if they are denied sound as if they are in the record. That is the reason that Wigmore, that common law since the beginning of time designated a trial technique, and I ask your Honor to direct counsel to comply with what is the proper conduct of examination of a witness.

The Court: Since the jury is out, I do direct counsel to confine his cross examination to matters brought out on direct.

The objections of the government are valid, and they have all been sustained.

And by the way, Mr. Weinglass, this morning I referred Mr. Kunstler to two cases—

Mr. Weinglass: Am I being addressed on this?

The Court: What did you say?

Mr. Weinglass: Am I being addressed or Mr. Kunstler?

The Court: No, I said, 'By the way.' I am addressing you. I do mention his name because I referred to two cases this morning, the Sacher case in the 343 Supreme, Sacher and Others against the United States, and 343, page 1, and the case of United States of America v. Schiffer, reported in 351 F.2d 91 (1965).

Mr. Kunstler said he was familiar with those cases, but I fear that he misunderstood the names because when he said he understood them, he didn't.

I do want to call your attention to those cases.

I will wait until you get through reading your papers. Have you finished?

Mr. Weinglass: Am I being questioned on what my co-counsel—

The Court: I am telling you something. I am trying to enlighten you. I am trying to do something for you. Haven't you been listening to me?

Mr. Weinglass: I frankly thought these remarks were addressed to counsel who cited the cases, not to myself. I had no part of this dialogue.

The Court: Well, then I tell you sir, and I am addressing you now—

Mr. Weinglass: Yes.

The Court: I am not accustomed to having lawyers turn pages while I address them. I don't turn pages up here when you address me, sir.

I commend to you for your examination the case of Sacher and Others against the United States, 343 U.S., page 1 [72 S.Ct. 451, 96 L.Ed. 717], and United States of America v. Schiffer, 351 F.2d page 91.

I shall not take the time to read those cases to you, but they are quite apposite, I think, when a lawyer persists in asking questions that are beyond the scope of the direct examination after repeated objections have been sustained.

Mr. Marshall, will you please bring in the jury." Tr. 555–65.

### III.

On October 30 when the court was making an evidentiary ruling, Mr. Weinglass engaged in the following colloquy with the court indicating his belief that the court had been prejudicial in its rulings on evidence:

"The Court: What do the lawyers say about that, they open the door? Is that what you lawyers all say?

Mr. Weinglass: We do not open the door to a prejudicial question. I very carefully avoided any mention of any section of a code.

The Court: That is the reason for the open-the-door rule.

Mr. Weinglass: Well, the door has been—

The Court: Very often it kicks back in your face.

Mr. Weinglass: The door in this courtroom seems to swing in one direction. Many times I have attempted to—

The Court: Miss Reporter, please make note of that. The court admonishes counsel to be cautious in his observations, in the observations he makes such as he just completed." Tr. 4925.

### IV.

On November 26, during the cross examination of the witness Schaller, Mr. Weinglass engaged the court in the following colloquy:

"The Court: In justice to my own position here, I must reveal, sir, that prior to the jury coming in, you said you would need the tape recorders—

Mr. Weinglass: Because the—

The Court: —on your motion, and I made it of record—I gave leave to the gentlemen of the government who had those devices in charge to take them out.

Now, isn't that true?

Mr. Weinglass: That is correct, because your Honor—your Honor must give me a chance to answer that. That's most unfair. That is most unfair, and I object to that.

The Court: That is not unfair, sir, and please be careful about your language.

Mr. Weinglass: Your Honor—

Mr. Kunstler: We couldn't play those—

Mr. Weinglass: I couldn't play 40 because it was not in evidence.

The Court: I can't listen to two shouting lawyers at the same time.

Mr. Weinglass: Because it's the only way we can be heard at times. Those documents were not in evidence. The government excluded—

The Court: Please read that last statement of Mr. Weinglass.

Mr. Weinglass: It was, because there are times we can't be heard unless we shout.

The Court: All right.

Mr. Weinglass: And that is what I said. I will stand by that.

The Court: I just wanted to be sure I heard that statement." Tr. 8,286–87.

### V.

On January 13 Mr. Weinglass engaged the court in the following colloquy, when the court made the reasonable request that Mr. Weinglass stop repeating his argument after an extensive statement.

"Mr. Weinglass: Your Honor, Wigmore, the Seventh Circuit Court of Appeals, McCormick on Evidence—

The Court: Don't repeat.

Mr. Weinglass: —Judge Learned Hand—

The Court: Don't repeat. I have listened very carefully to you. You are repeating the judges and the authors and—

Mr. Weinglass: I am summarizing.

The Court: If you have anything additional to say, I will hear you.

Mr. Weinglass: I am exercising an attorney's right to summarize in argument.

The Court: Not in the middle of a trial. I don't think you have that right where the court has already made a ruling and I have listened to you most attentively.

If you have anything additional, I will be glad to let you put it into the record.

Mr. Weinglass: Well, all of the authorities I have cited, all of the legal writers who have written on the subject, Judge Learned Hand and the Seventh Circuit Court of Appeals, all agree—

The Court: You are doing precisely what I asked you not to do.

Mr. Weinglass: I am doing what I feel I am permitted to do.

The Court: I forbid your repeating right in the middle of a trial here. And you haven't even stated your motion. You haven't even stated your motion. That is how carefully I have been listening to you, sir.

Mr. Weinglass: I will state my motion after my summary conclusion.

The Court: Most lawyers when they address the court announce what their motion is. You haven't told me what your motion is yet.

Mr. Weinglass: Your Honor, I don't think it is very much in doubt that I am moving to put these documents in evidence.

The Court: It should not be in doubt at all. A lawyer standing at the lectern to make a motion should state his motion.

Mr. Weinglass: Well, your Honor, this has happened time and again in the course of the case, the substance of a legal argument has been compromised by your Honor's insistence of pure form." Tr. 15,233 to 15,234.

### VI.

On January 13 during the redirect examination of the witness Simon Mr. Weinglass again in front of the jury attempted to make an invidious comparison between the treatment the court afforded the witnesses called by the defendant as opposed to the treatment afforded witnesses called by the government. This event is recorded at Pages 15,308 and 15,309 of the transcript as follows:

"The Court: Oh, wait at least until he gets through law school.

Mr. Weinglass: But Mr. Foran—

The Court: Mr. Weinglass—

Mr. Weinglass: I didn't go into it. Mr. Foran asked that. I did not go into this on direct examination.

The Court: Did I hear an objection to the question?

Mr. Foran: Yes, your Honor.

The Court: I think you stood.

I sustain the objection.

Mr. Weinglass: Your Honor, he was asked his opinion about ordinances, laws, what is a responsible act of a public official on cross examination, so it was opened by the government.

The Court: Continue with your re-direct examination.

Mr. Weinglass: Is only one side able to use this witness' expertise and not the other? The Government has asked—

The Court: There will be no more of that type of observation. I have tried to make that clear to you all through this trial, Mr. Weinglass.

Mr. Weinglass: Well, I make that observation reluctantly but I make it only when I think it is based in fact.

The Court: You should not succumb to your desire to make that kind of observation, sir, and I can understand why you make it reluctantly.

Mr. Kunstler: I didn't hear the last remark, your Honor.

Mr. Weinglass: If your Honor means something derogatory in that reference, I make that observation because I think it is based in fact and I think as a matter of fact it is incorrect. I say that respectfully to the court. And I don't understand your Honor's observation.

The Court: Continue with the re-direct examination of this witness, please."

## VII.

On January 13 during the direct examination of the witness Misner, the attorney Weinglass made the following sarcastic comments about the court's rule on an evidentiary matter:

"Mr. Weinglass: Oh, if your Honor please, an expert is called to court by a party to assist the jury in interpreting evidence that has been put before the jury. An expert is needed to assist the jury in that role in order to help the jury draw conclusions, and

you can only do that with an expert from testimony or facts already related.

Now your Honor knows that doctors are regularly called as expert witnesses. A jury cannot from hearing a temperature chart or the symptoms of illness draw conclusions as to what is wrong with the patient; that is why you call a doctor.

The Court: Oh, this is an eye witness. He has testified that he got hit on the back and even he disagreed with the diagnosis of the doctor. His diagnosis as a criminologist differed from that of the medical man.

So I will sustain the objection.

Mr. Weinglass: No, your Honor. That is evading the issue.

Mr. Schultz: Your Honor—

The Court: Oh, please, sir. I am not evading the issue.

Mr. Weinglass: It is just evading it. It is getting us off into a little diversion about medical testimony.

The Court: Don't say so a third time.

Mr. Weinglass: I say it most respectfully. This man came here as an expert criminologist. He talked to Chief Nolan—

The Court: Ask another question. I sustain the objection." Tr. 15,441–42.

## VIII.

On January 16 Mr. Weinglass once more continued an argument after the court had ruled and after the court had directed him to desist in his argument. The incident is reported as follows:

"By Mr. Weinglass:

Q. Who did you speak with?

A. I called the office to talk to both Tom Hayden and Rennie Davis.

Q. Did you speak to either or both?

A. I talked to Tom.

Q. Do you recall that conversation at that time?

A. Yes. I told Tom that I had just been in a meeting called the Coalition for an Open Convention at which a number of people who were supporters of Bobby Kennedy, which was what I was, were supporters of Gene McCarthy, who were—

Mr. Schultz: Your Honor, I object. This conversation is wholly irrelevant, and simply because it's a conversation with the defendant does not make it admissible, and I object.

The Court: I sustain the objection.

Mr. Weinglass: Your Honor, it is another telephone conversation with Mr. Schultz apparently has some information on, and I would like again—

The Court: Which candidate this witness was supporting whether it was the late Senator Kennedy or anybody else, is immaterial and irrelevant here.

Mr. Weinglass: No, your Honor will recall—

The Court: I direct that jury to disregard the last statement.

Mr. Weinglass: Your Honor will recall during the cross-examination—

The Court: Ask another question, sir, or if the witness will answer the question without referring to these irrelevant matters—perhaps he can—I will let him answer, but there will be none of this stuff about whom he campaigned for, who his candidate was—

Mr. Weinglass: Your Honor will recall that during the cross examination of the witness Mark Simons by Mr. Foran, Mr. Foran on cross examination indicated in his questions that perhaps the people who were coming here were irresponsible people who should not be given permits. The fact of the matter is that a sizable number of McCarthy delegates and Kennedy delegates who were elected and certified representatives to the convention had joined with the National Mobilization in an effort to seek permits in the city.

The Court: I will hear no further argument.

Mr. Weinglass: And that is—

The Court: I will let my ruling stand, sir.

Mr. Weinglass: That is why it is relevant, your Honor, and that is why I am trying to get into it.

The Court: No, it is not.

Mr. Weinglass: These persons are cast as being persons who wanted to create an irresponsible situation.

The Court: Will you discontinue your argument, because I have ruled, sir." Tr. 16,063–64.

### IX.

On January 17 Mr. Weinglass once more continued an argument after the court had ruled.

"The Court: It is not relevant or material, and there is so much in that that has nothing to do with this case that I just couldn't take it in.

Mr. Weinglass: Well, the document encompasses Miami and Chicago.

The Court: I have heard the argument. I have looked at the document, read it carefully, and that is my ruling, sir.

Mr. Weinglass: Well, then, I re-offer as Defendants' Exhibit 310 Page 7 of that document.

The Court: I remember Page 7. I don't—

Mr. Weinglass: Page 7 deals exclusively with Chicago and the status of negotiation.

The Court: Do you want to look at Page 7?

Mr. Schultz: No, I have read Page 7. I prefer, your Honor, the witness testifies to what occurs rather than introduce a document. Objection.

The Court: It is not proper to take that page in, any more than it is to talk about other things to which I shall not here refer.

In order that the record is complete, I sustain the objection of the government to defendants' Exhibit 310 for identification.

Mr. Weinglass: Well, your Honor, this document contains an assessment—

The Court: I have ruled, sir. You must learn—you mustn't keep on arguing after I rule. I have tried to make you understand that, that I have never had so much difficulty. That is good trial practice, and I have tried to make you understand it, but I haven't been able to.

By Mr. Weinglass:

Q. Mr. Pomeroy, in preparing this document, whose assistance did you have, if anyone's?

Mr. Schultz: Objection. This document has been ruled inadmissible.

The Court: I sustain the objection." Tr. 16,298–99.

Shortly later on January 17, also during the testimony of the witness Pomeroy, Mr. Weinglass repeated his conduct. He once more argued after the court had made a ruling. This came within minutes of the court's admonition just quoted, not to argue after rulings.

"The Court: I sustain the objection.

Mr. Kunstler: Your Honor, he just said to ask Mr. Weinglass to say what he saw. Why are they trying to keep hidden what happened here?

Mr. Schultz: If they want to bring in the plans of the Chicago Police Department, whatever the witness saw, let them bring in the person who says, 'These are the plans that we enforced. Here's what we did.'

The Court: I have ruled. There will be no further argument.

Mr. Weinglass: He knows—

The Court: I sustained the objection. No further argument.

Mr. Weinglass: He was liaison officer for the Attorney General of the United States.

The Court: Did you hear me, sir? You continue day after day to persist in arguing after ruling has been made." Tr. 16,332.

X.

On January 20 the court specifically directed Mr. Weinglass not to refer to a document, objection to which had been sustained. Mr. Weinglass continued to argue after this relatively simple ruling had been made. He continued to argue after told to desist. He was insulting to the court and indicated that the court had acted dishonestly. The incident is set forth in the record as follows:

"Mr. Weinglass: After Mr. Schultz says that, Mr. Wilkins went back to Washington and told the Attorney General—

Mr. Schultz: Now, Mr. Weinglass—

The Court: Just a minute, Mr. Schultz. I direct you, sir, not to refer to a document objection to which has been sustained.

Mr. Weinglass: He wouldn't have if Mr. Schultz didn't object—

The Court: I order you not to refer to that document.

Mr. Weinglass: But he replied that this witness—

The Court: There will be no 'but' about it. You will not refer to that document.

Mr. Weinglass: But it contains the evaluation to rebut just what Mr. Schultz said.

The Court: Mr. Weinglass—

Mr. Weinglass: It's most unfair, your Honor. You must see that. You have read the document yourself.

The Court: I order you to refrain from further discussion of a document where objection has been sustained out of the presence of the jury.

Mr. Weinglass: But how can you permit this dishonesty? He's read the document—

Mr. Schultz: Dishonesty?

Mr. Weinglass: It is dishonest, absolutely dishonest.

Mr. Schultz: Your Honor, I ask that that statement be stricken from this record and Mr. Weinglass admonished

to conduct himself in a professional way in this courtroom."

\* \* \* \* \* \*

"The Court: I direct the jury to disregard the remarks of Mr. Weinglass, and I strike them from the record, those referring to dishonesty.

Mr. Schultz: May I proceed, your Honor?

The Court: You may proceed, sir.

Mr. Weinglass: Will your Honor also direct the jury to disregard the remarks of the court that I need a defense? And I would like to get an explanation from the court as to what the court means by it.

The Court: No, I will not—

Mr. Weinglass: I would like to know why I need a defense in this particular case.

The Court: If you don't understand them, I am sorry, sir. Your lawyer there—

Mr. Weinglass: I am afraid I do understand them. I think they are improper." Tr. 16,662–666.

## XI.

On January 22, during the direct examination of the witness Buff, Mr. Weinglass continued to make statements from the lectern rather than question the witness. He was directly ordered to continue the examination and was forbidden to make such statements. He defied that order, and the incident is set forth in the record as follows:

"The Court: I direct you, sir—

Mr. Foran: You are supposed to ask a question.

The Court: I direct you, sir, to proceed with the direct examination of this witness, and forbid the making of a statement.

Mr. Weinglass: In order to protect Mr. Rubin's rights in the state court prosecution—

Mr. Foran: There is no necessity of arguing legal questions that are not the obligation of a jury to decide. That is what he is attempting to do,

to try to get the jury to violate its obligation.

The Court: I forbid you to make any statement during this direct examination other than to ask questions. You may ask any questions you like.

Mr. Weinglass: These questions are being asked, your Honor, under protest in light of Mr. Rubin's state court prosecution.

The Court: I strike that statement because you did it, you made the statement after I gave you my direction not to.

Mr. Weinglass: I can't compromise the man's rights in this courtroom.

Mr. Foran: There is no compromise of rights. The jury is a factual finding body. It has nothing to do with the legal questions.

The Court: I direct the jury to disregard the last statement.

Mr. Foran: That is the law.

Mr. Kunstler: Your Honor—

The Court: I will not hear from you.

Mr. Kunstler: —he said I said something that is improper. It is not improper. I have heard this in court after court.

The Court: I will not hear from you while your associate is examining this witness.

Mr. Kunstler: It has nothing to do with this witness.

Mr. Foran: The reference was to Mr. Weinglass.

Mr. Kunstler: He said I said something that was improper. It was not improper.

The Court: I ask you to sit down, sir. And you may continue.

Mr. Marshal, have that man sit down.

You may ask a question. You may ask any question of this witness you like. Defiantly, you made a statement after three times I directed you not to.

Please don't do it again.

Mr. Weinglass: I did not make that statement defiantly. I have an obligation.

The Court: You made it in derogation of the court's order.

Mr. Weinglass: There was nothing improper about the statement.

The Court: It is improper if the court ordered you not to make it. I wish you could continue with the examination now.

Mr. Weinglass: The effect of the order is to compromise the rights of Mr. Rubin.

The Court: Will you continue with the direct examination of the witness. Otherwise, I will ask the witness to leave the stand." Tr. 17,087–89.

## XII.

On January 24, during the direct examination of the witness Davis, Mr. Weinglass continued to argue after a ruling had been made and he had been directed to complete his argument. He openly defied the order of the court and refused to continue with the examination when told to do so. The incident is set forth in the transcript as follows:

"The Court: I will let my ruling stand.

Mr. Weinglass: Your Honor—

The Court: I said I'd let my ruling stand, sir.

Mr. Weinglass: Your Honor must permit us the opportunity of responding to that.

The Court: I have permitted you. I have permitted Mr. Kunstler to speak, and now you may ask another question of this witness.

Mr. Weinglass: Reverend Abernathy was mentioned as an officer of the National Mobilization.

The Court: Mr. Weinglass—

Mr. Dellinger: He was co-chairman.

The Court: I direct you not to—

Mr. Weinglass: He was national co-chairman.

Mr. Foran: Your Honor, there were seven individuals who are still in this case as part of this indictment. There is no national—

The Court: Will you continue with the examination.

Mr. Weinglass: Your Honor, I would like to ask Mr. Foran what relationship the unidentified speaker had with the National Mobilization. His speech was—

The Court: I order you to continue with his examination, sir.

Mr. Weinglass: I understand your Honor's sensitivity to what Reverend Abernathy said at that particular time.

The Court: And I direct that that remark go out.

Mr. Weinglass: And Senator McCarthy also spoke.

The Court: And I direct the jury to disregard it.

Mr. Weinglass: Two witnesses referred to what Senator McCarthy had to say, and he is not a defendant here.

Mr. Foran: On cross examination, your Honor. On cross examination by these men, not on direct examination by the government.

Mr. Weinglass: On direct examination—

The Court: Will you comply with my order?

Mr. Kunstler: Your Honor, I am going to answer the second part of the argument.

Mr. Weinglass: Richard Goodwin, when he was called as a witness by us, referred to the exact words by Senator McCarthy.

The Court: Will you comply with my order?

Mr. Kunstler: What about the second part of the argument that the mule train was mentioned on direct?

The Court: I will ask you to sit down.

Mr. Kunstler: Your Honor, but that is not—your Honor ruled that was irrelevant.

The Court: I cannot let two lawyers conduct an examination and handle the objections.

Mr. Kunstler: I am not conducting the examination. I raised the second argument and that was not answered, that the SCLC Mule Train, if the mule train was afraid of the demonstrators, why did Ralph Abernathy speak to them the next day?

The Court: Will you comply with my order?

Mr. Weinglass: If your Honor will not permit the jury to hear what Reverend Abernathy said—

Mr. Foran: Listen to that, Your Honor. Just listen to that. Isn't that classical?

The Court: I will strike that last remark, and don't make it again. I direct the jury to disregard it.

Mr. Marshal, anyone who laughs aloud at the rulings of the court will please—other than the defendants—be asked to leave the courtroom.

Mr. Kunstler: Your Honor, am I entitled to an answer to my objection?

The Court: I have heard you.

Mr. Kunstler: Well, the prosecutor has not responded. He has ignored it.

The Court: I have heard you.

Mr. Weinglass: I just want the record to show that Reverend Abernathy was an officer of the National Mobilization.

The Court: Oh, Mr. Weinglass. Mr. Weinglass. I am sorry—" Tr. 17,-805–806.

### XIII.

On January 26, during the cross examination of the witness Davis, Mr. Weinglass made an objection. When his objection was overruled he again argued the question, and made a citation to the Canon of Judicial Ethics. He was instructed not to make such a statement again during the trial, and he defiantly immediately thereafter made the statement again. The incident is reported as follows:

"Mr. Weinglass: Your Honor, I object to that because they are two different conversations. Mr. Froines made a presentation at which the defendant Davis indicated he said that. Mr. Bock was referring to a later time, he said. We are talking, again, about confusion in Mr. Foran's question.

Mr. Foran: When did you structure that, Mr. Weinglass? It wasn't testified to.

The Court: I will overrule the objection and let the witness answer if he can.

Mr. Weinglass: If the court please, will the court indicate some admonition to Mr. Foran to my objection?

The Court: If it has offended you, I strike it, I direct the jury to disregard it.

Mr. Weinglass: It didn't offend me. It violated the rules of evidence and Canon of Ethics 47 which prohibits such conduct which they have been engaging in all through this trial and which the court has countenanced. That is why I object.

Mr. Foran: Your Honor, the hyprocrisy of Mr. Weinglass' statement—

The Court: I do strike the last statement or comment of Mr. Weinglass, and I direct the jury to disregard it, and direct you not to make such a statement again.

Mr. Weinglass: I have read that Canon of Ethics, your Honor.

Mr. Foran: —is monumental.

Mr. Weinglass: I refer to the Canon of Ethics.

The Court: Don't make that statement during this trial again.

Mr. Weinglass: Well, it is true, and I stand by it.

The Court: You did it again.

Mr. Weinglass: It involves the Canon of Judicial Ethics which indicates the court must admonish counsel

when he refers personally to his adversary, and that hasn't been done on the Government's side." (Tr. 18,-056–18,057).

### XIV.

On February 5, Mr. Weinglass once more defied openly the court's order to discontinue argument and be seated. The incident is reported as follows:

"Mr. Weinglass: Your Honor, while Mr. Kunstler is examining the 3500 material, I would want at this time because I sincerely and honestly feel that the court realizes that its position with respect to the jailing of Dave Dellinger is indefensible in law—

The Court: Don't speak for me.

Mr. Weinglass: That is why I was cut off.

The Court: I will not hear you further on that motion.

Mr. Weinglass: Well, your Honor, you are keeping a man in custody, and you are not permitting a lawyer to make an argument for his freedom. That is unheard of. That is unprecedented in law.

The Court: I have considered the matter carefully.

Mr. Weinglass: You have not considered it because you did not hear the argument.

The Court: I ask you to sit down, sir.

Mr. Weinglass: Your Honor knows —you cited cases—

The Court: I ask you to sit down.

Mr. Weinglass: —that you—

The Court: Mr. Marshal, will you ask that man to sit down.

Mr. Weinglass: You have no authority for taking that man's freedom away, and you will not let me make a legal argument in his behalf.

Mr. Schultz: That is disgraceful.

Mr. Weinglass: That is disgraceful.

Mr. Schultz: Because Mr. Weinglass—

Mr. Weinglass: Because I was cut off in the middle of a legal argument.

Mr. Schultz: Because Mr. Weinglass would not order his client to be quiet during the argument.

Mr. Weinglass: Because I wouldn't order Jerry Rubin to be quiet. If Dave Dellinger remains in jail, that is Mr. Schultz' concept of justice.

The Court: Will you sit down, sir. Will you have him sit down.

Mr. Weinglass: If that is the way it is going to apply in this courtroom.

The Court: Mr. Marshal, will you have him sit down." Tr. 19,811–13.

Accordingly, I hereby adjudge Leonard I. Weinglass guilty of the several individual and separate specifications of direct criminal contempts of this Court.